## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHRISTINE CLAYTON,

       Plaintiff,

vs.                                          No. CIV 09-0188 JB/ACT

VANGUARD CAR RENTAL U.S.A., INC.,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Vanguard's Motion for Summary Judgment, filed October 8, 2010 (Doc. 134)("Motion"). The Court held a hearing on November 8, 2010. The primary issues are: (i) whether Plaintiff Christine Clayton has established a genuine question of material fact whether she was discriminated against on the basis of her gender in violation of Title VII, 42 U.S.C. § 2000e-2 and the New Mexico Human Rights Act, NMSA 1978, § 28-1-7 ("NMHRA"); (ii) whether Clayton has established a genuine question of material fact whether she was discriminated against on the basis of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 to 634 ("ADEA") and the NMHRA; (iii) whether Clayton can establish a prima-facie case under the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), and, if Clayton can establish a prima-facie case, whether Defendant Vanguard Car Rental U.S.A., Inc. has sufficiently established that the wage disparity was justified such that no rational jury could find to the contrary; (iv) whether there is an issue of fact whether Vanguard's Associate Handbook or practices created an objectively reasonable expectation that employees would be terminated only after progressive discipline or whether Vanguard's anti-discrimination policy created an implied contract; and (v) whether there is an issue of fact whether Vanguard failed to follow any agreement

regarding progressive discipline, and whether there is an issue of fact whether Clayton has a claim under the implied-covenant-of-good-faith-and-fair-dealing for Vanguard's failure to follow its anti-discrimination policy.  The Court finds that Clayton has established the elements of a prima-facie case of age discrimination under the ADEA and of gender discrimination under Title VII.  Vanguard has offered a legitimate nondiscriminatory reason for Clayton's termination, but there is a genuine issue of material fact whether Vanguard's proffered reason for Clayton's termination is pretextual.  There is also evidence that Vanguard's legitimate nondiscriminatory reason for Clayton's termination is pretext for gender discrimination, because there are genuine issues of material fact whether Jeremy Ham was biased on account of Clayton's gender and whether Ham's actions caused, in part, Clayton's termination.  The Court will therefore deny Vanguard's request that it grant summary judgment on Clayton's federal discrimination claims.  Because the Supreme Court of New Mexico has stated that it looks to federal civil rights adjudication for guidance in interpreting the NMHRA, and because the parties incorporate their arguments and analysis regarding Clayton's federal discrimination claims into their arguments regarding Clayton's NMHRA claims, the Court will deny Vanguard's request that it grant summary judgment on Clayton's claims under the NMHRA.  The Court finds that Clayton has established a prima-facie case that the male who replaced her was paid more for substantially equal work, but it also finds that Vanguard has proved that he was paid more for factors other than sex.  The Court finds that Clayton has not established a prima-facie case that she was paid less than male general mangers in other markets for substantially equal work, because she has not demonstrated that the other general managers performed substantially equal work.  The Court will therefore grant summary judgment on Clayton's EPA claim.  The Court will not grant summary judgment on Clayton's breach-of-implied-contract claim regarding progressive discipline, because there is a genuine issue of material fact whether the

Associate Handbook and Vanguard's employment practices created an objectively reasonable expectation that Vanguard would use progressive discipline, except in cases of serious offenses such as theft, and there is a genuine issue of material fact whether Clayton's offense was a serious offense. Although it may be that the Court need not decide Clayton's breach-of-implied-contract claim regarding Vanguard's anti-discrimination and investigation policy, the Court finds that there is no genuine issue of fact whether Vanguard's policies created an implied contract. The Court will not grant summary judgment on Clayton's implied-covenant-of-good-faith-and-fair-dealing claim, because there is a genuine issue of material fact whether Vanguard deprived Clayton of the benefits of its agreement regarding progressive discipline. Although it may be that the Court need not decide whether it should grant summary judgment on Clayton's implied-covenant-of-good-faith-and-fair-dealing claim related to Vanguard's anti-discrimination and investigation policies, it finds that there is not a genuine issue of material fact regarding this claim. The implied covenant of good faith and fair dealing that arises out of the implied contract of employment regarding Vanguard's discipline policies would not cover Clayton's claim that Vanguard did not follow its anti-discrimination or investigation policies. Under New Mexico law, an implied contract of employment covers only those matters on which there were representations sufficiently specific for a reasonable employee to rely. Any implied contract of employment that Vanguard would follow progressive discipline covers only matters regarding progressive discipline and not discrimination or investigation of discrimination. Although the Court may not need to decide the issues, the Court finds that Vanguard's anti-discrimination and investigation policies would not create an implied contract, because they are not sufficiently specific; therefore, there is no contract with which to impose on Vanguard a duty to act in good faith.

## FACTUAL BACKGROUND

The Court begins by noting that the parties did not properly present the evidentiary record to the Court.  D.N.M.LR-Civ.56.1(b) states:

> The memorandum in support of the motion must initially set out a concise statement of all material facts as to which movant contends no genuine issue exists.  The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies.

> A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

D.N.M. LR-Civ. 56.1(b).[1]  Vanguard set forth twenty pages of allegedly undisputed material facts.

---

[1] The Court has recently proposed amendments to D.N.M. LR-Civ 56.1(b) that will require the party responding to the motion for summary judgment to number any additional facts and the party moving for summary judgment to specify whether the additional facts are disputed or not in its reply.  A "redline" version of the proposed revisions to the Local Rules of Civil Procedure of the United States District Court for the District of New Mexico is currently available on the Court's website at www.nmcourt.fed.us.  The proposed revisions were posted for public comment.  The period for public comment closed November 24, 2010.  The Court will now consider the comments and further revisions, as necessary.  The proposed version of D.N.M. LR-Civ 56.1(b) states:

> The Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.  The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

In responding to Vanguard's asserted undisputed material facts, Clayton often disputed a fact by citing to a range of pages in her Response, which contained citations to the record interspersed with legal argument and case law, as evidence that the fact was disputed. Clayton asserted additional facts in her Response, but did not set them forth as additional undisputed material facts. Vanguard did not address any of these additional facts as undisputed material facts; therefore, it was not clear to the Court whether these additional facts were disputed. The Court has done the best it can on the record before it. "It is not the job of this court to search the record . . . for evidence . . . ." Adams v. Dyer, 223 F. App'x 757, 762 (10th Cir. 2007).

      1.     **Individuals Involved.**

Clayton was born in 1958. See, e.g., Motion ¶ 1, at 5 (setting forth this fact); Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 35, filed October 25, 2010 (Doc. 142)("Response")(admitting this fact). Vanguard's predecessor, National Car Rental, hired Clayton in 1978 as a counter representative at the Albuquerque, New Mexico airport. See, e.g., Deposition of Christine Clayton at 6:9-14, 7:4-18 (taken August 25, 2009), filed October 8, 2010 (Doc. 135-1); Motion ¶ 1, at 5 (setting forth this fact); Response at 35 (admitting this fact). Clayton lists no college on her resume. See, e.g., Resume of Christine Clayton at 1, filed October 27, 2010 (Doc. 143-1); Motion ¶ 1, at 5 (setting forth this fact); Response at 35 (admitting this fact). National Car Rental promoted Clayton to lead counter agent and later airport manager. See, e.g., Clayton

---

The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

Proposed revisions to D.N.M. LR-Civ. 56.1(b)(emphasis added).

Depo. at 8:2-9:19; Motion ¶ 1, at 5 (setting forth this fact); Response at 35 (admitting this fact). National Car Rental then promoted Clayton to city manager in Brownsville, Texas in 1989.  See, e.g., Clayton Depo. at 10:3-12, 12:2-22; Motion ¶ 1, at 5 (setting forth this fact); Response at 35 (admitting this fact).

Clayton returned to Albuquerque in 1993 as a station manager.  See, e.g., Clayton Depo. at 15:2-16:1; Motion ¶ 2, at 5 (setting forth this fact); Response at 35 (admitting this fact).  Clayton maintained her rate of pay despite the demotion to station manager; soon afterward National Car Rental promoted her to city manager in Albuquerque.  See, e.g., Clayton Depo. at 19:1-21; Motion ¶ 2, at 5 (setting forth this fact); Response at 35 (admitting this fact).  In either 2001 or 2002, National Car Rental promoted Clayton to general manager of all New Mexico operations; she remained general manager until her termination in February, 2008.  See, e.g., Clayton Depo. at 22:10-14; Motion ¶ 2, at 5-6 (setting forth this fact); Response at 35 (admitting this fact).  In 2003, Vanguard became Clayton's employer.  See, e.g., Clayton Depo. at 23:24-24:4; Motion ¶ 2, at 6 (setting forth this fact); Response at 35 (admitting this fact).

Regional Vice President David Davenport promoted Clayton to her position in Brownsville. See, e.g., Clayton Depo. at 12:2-22; Motion ¶ 3, at 6 (setting forth this fact); Response at 35 (admitting this fact).  Davenport was later Clayton's boss in Albuquerque; overall, Clayton worked under him for over fifteen years.  See, e.g., Motion ¶ 3, at 6 (setting forth this fact); Response at 35 (admitting this fact).  Davenport supported Clayton throughout her career and promoted her several times.  See, e.g., Deposition of David Davenport at 252:2-20 (taken February 9, 2010), filed October 8, 2010 (Doc. 135-2); Motion ¶ 3, at 6 (setting forth this fact); Response at 35 (admitting this fact). Clayton "highly regarded" Davenport.  Clayton Depo. at 123:25.  See Motion ¶ 3, at 6 (setting forth this fact); Response at 35 (admitting this fact).  Clayton testified she did not believe Davenport made

decisions on the basis of gender, but that his decisions to terminate Stacy Jered, Rebecca Rivers, and Linda Black were "in part because of their gender."  Clayton Depo. at 183:1-8.[2]  When Davenport left Vanguard in December, 2007, Clayton congratulated him.  See, e.g., Clayton Depo. at 165:24-166:4; Motion ¶ 3, at 6 (setting forth this fact); Response at 35 (admitting this fact).

Mike Filomena replaced Davenport as Clayton's Regional Vice President in late December 2007.  See, e.g., Clayton Depo. at 124:17-24, 167:12-17; Motion ¶ 4, at 6 (setting forth this fact); Response at 36 (admitting this fact).  Clayton did not know Filomena before that change.  See, e.g., Clayton Depo. at 167:12-163:12; Motion ¶ 4, at 6 (setting forth this fact); Response at 36 (admitting this fact).  Filomena reported to John Murphy, Vice President of Operations.  See,

---

[2] In its Motion, Vanguard asserted that Clayton "admits Davenport did not make 'sexist' decisions based on gender."  Motion ¶ 3, at 6 (citing Clayton Depo. at 182:23-183:3).  Clayton responds, arguing that she testified that "Davenport's decisions regarding other female employees was based in part on gender."  Response at 35 (citing Clayton Depo. at 183:4-7).  In her deposition, Clayton testified:

> Q.     Do you believe that Mr. Davenport was a sexist?
>
> A.     Would you define what you mean by a sexist?
>
> Q.     Do you believe he made decisions against individuals on the basis of their gender?
>
> A.     No.
>
> Q.     Do you believe that his decision to terminate any of those three -- Stacy Jered, Rebecca Rivers or Linda Black -- was because of their gender?
>
> A.     I believe it was in part because of their gender, yes.

Clayton Depo. at 182:23-183:8.  Clayton's testimony apparently attempts to distinguish decisions based solely on gender and decisions based in part on gender.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept Clayton's version of the asserted fact as true.  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).

e.g., Deposition of Mike Filomena at 83:10-23 (taken February 10, 2010), filed October 8, 2010 (Doc. 135-3); Motion ¶ 4, at 6 (setting forth this fact); Response at 36 (admitting this fact).  Bill Baker was Manager of Human Resources ("HR") in Clayton's region.  See, e.g., Deposition of Bill Baker at 6:15-18 (taken February 10, 2010), filed October 8, 2010 (Doc. 135-4); Motion ¶ 4, at 6 (setting forth this fact); Response at 36 (admitting this fact).  Michelle Choquette was Vice President of HR for all of Vanguard.  See, e.g., Baker Depo. at 86:10-14; Motion ¶ 4, at 6 (setting forth this fact); Response at 36 (admitting this fact).  Filomena, Murphy, Baker, and Choquette participated in site visits, conference calls, and meetings regarding Clayton in late 2007 and early 2008, which led to the decision to terminate Clayton's employment.  See, e.g., Baker Depo. at 87:7-24, 142:24-144:5; Filomena Depo. at 24:24-26:11, 41:20-42:19; Deposition of John Murphy at 14:11-15:1 (taken August 12, 2010), filed October 8, 2010 (Doc. 135-5).[3]

---

[3] Vanguard's asserted fact states "these individuals participated in either site visits, conference calls or meetings regarding Plaintiff in late 2007 through early 2008 which led to the decision to terminate her employment." Motion ¶ 4, at 6 (citing Baker Depo. at 87:7-24, 142:24-144:5; Filomena Depo. at 24:24-26:11, 41:20-42:19; Murphy Depo. at 14:11-15:1).  In his deposition, Filomena testified that he visited Albuquerque, and his impression was that the market was underperforming.  See Filomena Depo. at 24:25-26:11.  Filomena also stated that he participated in a conference call regarding Clayton along with Murphy, Baker, and Choquette, in which they discussed Clayton.  See Filomena Depo. at 41:20-42:19.  In his deposition, Baker stated that he participated in a conference call with Filomena, Murphy, and Choquette, in which they discussed Clayton's signature on a letter that they believed violated Vanguard's anti-union policy.  See Baker Depo. at 86:19-88:1.  Murphy testified that he participated in a conference call with Baker and Filomena in which they discussed Clayton's signature on the letter.  See Murphy Depo. at 14:11-17:16.  Murphy also testified, that during the conference call, he recommended Clayton's termination to Filomena.  See Murphy Depo. at 32:9-18.  Clayton disputes this asserted fact, on the grounds that these individual's participation in the site visits, conference calls or meetings did not lead to the decision to terminate her.  See Response at 36 (citing Filomena Depo. at 70:20-25).  In Filomena's deposition, he states that Murphy never told him the specifics of why Clayton was being fired.  See Filomena Depo. at 70:20-25.  The evidence to which Clayton directs the Court's attention does not controvert Vanguard's assertion that these events led to Clayton's termination.  The Court will therefore deem Vanguard's asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

2.     **Clayton's Performance as General Manager.**

Clayton's 2006 Performance Evaluation states that her "relationship with [Revenue Management System ("RMS")] must improve."  2006 Performance Evaluation/Development Plan at 3, filed October 27, 2010 (Doc. 143-2).[4]  It also states that Clayton needed to "improve . . . her teamwork outside of the Albuquerque market," "not alienate people," and that she was sometimes "perceived as abrasive or short with people."  2006 Performance Evaluation at 3.  See Motion ¶ 7, at 7 (setting forth this fact); Response at 36 (not controverting this fact).  The 2007 Performance Evaluation states that Clayton "still needs to work on her relationship with RMS[;] [t]he relation did not improve in 2007."  2007 Performance Evaluation/Development Plan at 4, filed October 7, 2010 (Doc. 143-3).[5]

---

[4] Vanguard asserts that the 2006 Performance Evaluation of Clayton "repeatedly referenced her communication problems with RMS."  Motion ¶ 7, at 7 (citing 2006 Performance Evaluation/Development Plan).  Clayton responds that the 2006 Performance Evaluation made one reference to RMS and did not reference it as a communication problem.  See Response at 36.  The 2006 Performance Evaluation references RMS only once, stating "[Clayton's] relationship with RMS must improve."  2006 Performance Evaluation at 3.  Because Clayton has directed the Court's attention to evidence that controverts Vanguard's asserted fact, and because the evidence supports Clayton's asserted fact, the Court will accept Clayton's asserted fact as true.  See D.N.M. LR-Civ. 56.1(b).

[5] Vanguard asserts that, "[b]y 2007, [Clayton's communication problems with RMS] had not improved despite the previous counseling."  Motion ¶ 7, at 7 (citing 2007 Performance Evaluation; Davenport Depo. at 29:13-30:18, 46:20-47:7, 48:17-22).  Clayton responds by asserting that the "2007 evaluation refers only to relationships with RMS and makes no reference to any communication problems with Regional/HQ[,] [and that] [t]he 2006/2007 evaluation rates Ms. Clayton as 'meets requirements' for communications."  Response at 36 (citing 2006 Performance Evaluation; 2007 Performance Evaluation).  The 2006 Performance Evaluation states that Clayton's relationship with RMS must improve.  See 2006 Performance Evaluation at 3.  The 2007 Performance Evaluation states that "[Clayton] still needs to work on her relationship with RMS[;] [t]he relation did not improve in 2007."  2007 Performance Evaluation at 4.  Because Clayton appears to attack Vanguard's semantics -- specifically their use of the word communication -- rather than the substance of Vanguard's asserted fact, the Court will deem the asserted fact in the text admitted.  See D.N.M. LR-Civ. 56.1(b).

After Filomena became Clayton's new Vice President, he visited Albuquerque in January

2008.  See, e.g., Filomena Depo. at 16:12-14, 17:2-9; Motion ¶ 5, at 7 (setting forth this fact);

Response at 36 (not controverting this fact).  Filomena's impression was that Clayton's market was

underperforming, and that there were problems in employee retention and counter sales, but in

January 2008 the Albuquerque market was ranked eighth out of sixty markets.  See Albuquerque

Performance Ranking at 1, 2008 Fiscal Year, filed October 25, 2010 (Doc. 142-6); Filomena Depo.

at 25:1-19.[6]  Filomena's impression was that Clayton seemed to take little responsibility for the

_____

[6] Vanguard asserts that Filomena's "impression was that [Clayton's] market was underperforming, ranking in the 40's out of 62, and that there were problems in employee retention and counter sales."  Motion ¶ 5, at 7 (citing Filomena Depo. at 25:1-19).  Clayton disputes this assertion, contending that a chart, which she prepared, showing Albuquerque's performance ranking that year shows that Albuquerque was ranked eighth out of sixty markets, and objecting to the foundation of Filomena's testimony as his conclusions were feelings and senses.  See Response at 36 (citing Albuquerque Performance Ranking; Filomena Depo. at 26:16-27).

In Vanguard's Reply, it contests Clayton's chart, because the chart "fails to put the underlying data before the Court."  Vanguard's Reply in Support of its Motion for Summary Judgment at 9, filed November 1, 2010 (Doc. 145)("Reply").  Vanguard asserts that, "in truth, the data show her market ranked 38th, 13th, 61st, 56th, 41st, and 25th for the last six months of 2007."  Reply at 9 (citing Reply Affidavit of Bill Baker ¶ 9, at 4 (dated October 29, 2010), filed November 1, 2010 (Doc. 146-1).  Vanguard also attached the monthly rankings for each market throughout Vanguard's operation in late 2007.  The attached rankings support Vanguard's assertion that Clayton's market was ranked 38th, 13th, 61st, 56th, 41st, and 25th for the last six months of 2007.  See Operations Scorecards at 6-11, filed November 1, 2010 (Doc. 146-1).  Clayton's chart is of the Albuquerque market's ranking in January, 2008.  See Albuquerque Performance Ranking at 1.  Because the information that Vanguard has provided the Court is from 2007, it does not controvert Clayton's assertion that, in January 2008, the month of Filomena's visit, her market ranked eighth out of sixty markets.  The Court must construe the evidence in the light most favorable to the non-moving party; the Court will therefore accept as true Clayton's version of this portion of the asserted fact.  See Hunt v. Cromartie, 526 U.S. at 551.

Clayton also objected to Vanguard's asserted fact on the grounds that Filomena's testimony was about his feelings.  Rule 701 of the Federal Rules of Evidence limits a fact or lay witness's testimony in the form of opinions or inferences, if the witness is not testifying as an expert, to those based on the witness' rational perception, and that are helpful to understanding the witness' testimony or a fact in issue, and are not based on scientific, technical or other specialized knowledge.  See Fed. R. Evid. 701.  Filomena's impression is based on his personal knowledge of working at Vanguard and visiting the Albuquerque market.  His opinion, based on the information available to him, is thus admissible, and the Court will admit Vanguard's asserted fact regarding

problems, finger-pointing and blaming others, and that there seemed to be a lack of teamwork and leadership from Clayton.  See Filomena Depo. at 26:12-30:20.[7]  Filomena had conversations with other managers at the regional level about Clayton.  See, e.g., Filomena Depo. at 33:3-13; Motion ¶ 6, at 7 (setting forth this fact); Response at 36 (not controverting this fact).  Filomena spoke with Davenport during his transition into the Regional Vice President position about Clayton's strengths, and about her challenges communicating with the HR department and cooperating with Revenue Management System ("RMS") personnel, particularly Ham, who supervised that group.  See Filomena Depo. at 18:1-19:18.[8]

---

Filomena's impression of the performance of the Albuquerque market.  See Thomas v. International Business Machines, 48 F.3d 478, 485 (10th Cir. 1995)("To be sure, the nonmoving party need not produce evidence 'in a *form* that would be admissible at trial,' but the content or substance of the evidence must be admissible." (internal citation omitted)).

   [7] Clayton objects to this asserted fact, because Filomena qualified his conclusions as feelings and senses.  See Response at 36 (citing Filomena Depo. at 26:16-27:11, 30:6-11).  In his deposition, Filomena stated: "I got the sense after the visit that Chris was blaming everyone else for all of the issues" and "I could sense a lack of teamwork."  Filomena Depo. at 26:16-27:12.  Filomena testified that

> [Clayton] wasn't happy with Colby, her service agents weren't washing enough cars, thus they weren't making their incentives.  Her rental agents couldn't make incentive -- enough incentive money in their mind -- in her mind, and that was a lot of the reasons why there was performance issues was her pointing fingers at her team.

Filomena Depo. at 26:19-25.  He testified that he had a discussion with Clayton, "which was kind of a summary after we had walked around the facility and we were in her office.  [T]here was a lot of what I would define as finger pointing at Colby and he wasn't doing enough.  And just in general, I could sense a lack of teamwork."  Id. at 27:4-12.  Although courts will not consider "generalized, unsupported opinions" in a motion for summary judgment, see Lundien v. United Airlines, 242 F.2d 389, at *4 n.1 (10th Cir. 2000), the Court does not believe that Filomena's opinion regarding Clayton's job performance is a generalized, unsupported opinion.  His opinion was based on his personal knowledge, which resulted from his experiences in the Albuquerque market.  See Fed. R. Evid. 701.  The Court will therefore deem Vanguard's asserted fact admitted.

   [8] Clayton disputes this fact, arguing that "Davenport has no recollection of any discussions with Filomena about Ms. Clayton as a GM in the Albuquerque market."  Response at 36 (citing Deposition of David Davenport at 20:13-16 (taken February 9, 2010), filed October 25, 2010 (Doc.

Filomena also spoke to Baker about the internal perception that Clayton had challenges working with RMS and HR, and had trouble working in a team environment.  See, e.g., Filomena Depo. at 34:5-13; Motion ¶ 8, at 8 (setting forth this fact); Response at 36 (not controverting this fact).[9]  Filomena spoke with regional controller Jim Ducker and fleet manager Shane Habib, both

_____

142-5).  In his deposition, Davenport testified about his discussions with Filomena.

> Q.    Do you recall recognizing -- you said you did not make the trip with Mr. Filomena to -- to Albuquerque.  Do you recall any discussions with Mr. -- excuse me -- Filomena about the Albuquerque market?
>
> A.    I don't remember any specifics of the conversation with regarding to any of the locations.
>
> Q.    Okay.  Do you remember any specific discussion you had with Mr. Filomena about Ms. Clayton as a general manager in the Albuquerque market?
>
> A.    I do not remember anything specific, no, sir.
>
> Q.    Do you remember if Mr. Filomena asked you any questions about Ms. Clayton during the -- we'll call it the transition period, where you're meeting with him and traveling around to some of the locations?  Do you recall him asking you any questions about Ms. Clayton?
>
> A.    No, sir. I don't remember any specifics.

Id. at 20:6-23.  Davenport did not testify that he did not remember any discussion with Filomena; he testified he did not remember any specifics of the conversation.  This evidence does not controvert Vanguard's assertion, and the Court will thus deem the asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

[9] Vanguard also asserts that Filomena spoke with regional controller Jim Ducker, who stated that Clayton was difficult to work with, and fleet manager Shane Habib, who stated he was aware that Clayton had difficulty working with RMS.  See Motion ¶ 8, at 47 (citing Filomena Depo. at 35:8-13, 37:2-7).  Clayton objects to the "hearsay statements of Jim Ducker."  Response at 36.  To the extent they are offered for the truth of the matters asserted, both Ducker's and Habib's statements are hearsay, as they are "statement[s], other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  The Court will therefore consider that Filomena spoke to Ducker and Habib, and that they gave him unfavorable comments about Clayton, but will not consider Ducker's and Habib's statements in its Memorandum Opinion and Order for the truth of the matter they asserted.

-12-

of whom gave him unfavorable comments about Clayton.  See Filomena Depo. at 35:8-13, 37:2-7.

At one point, Choquette heatedly complained to Davenport about Clayton's lack of cooperation and

support.  See, e.g., Davenport Depo. at 176:25-177:16, 183:8-18.[10]  Filomena also heard from

---

See Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this
circuit that we can consider only admissible evidence in reviewing an order granting summary
judgment.  Hearsay testimony cannot be considered because [a] third party's description of [a
witness'] supposed testimony is not suitable grist for the summary judgment mill."  (internal
quotations and citations omitted)).

[10] Clayton objects to this asserted fact on the grounds that Clayton only had one conversation
with Choquette in which Choquette apologized to Clayton.  See Response at 36 (citing Clayton Aff.
¶ 11, at 5).  Clayton's affidavit states:

> I had one telephone conversation with Michelle Choquette who was the Vice-
> President of Human Resources.  Ms. Choquette called me to apologize for the
> confusion in recruitment ads I was trying to run in the Albuquerque Journal.
> Classified ads are required to be submitted to the Albuquerque Journal by Thursday
> at noon and we met that deadline, however, the ad did not appear in the Sunday
> paper.  When I called the Albuquerque Journal, I was informed that Michelle
> Choquette or someone from the corporate HR Department had called to cancel the
> ad.  Corporate had recently implemented a new centralized recruiting plan.  Until
> then, each market handled its own advertising and recruiting.  There was much
> confusion and misunderstanding regarding the new procedure and Mr. Davenport,
> my Regional Vice-President, advised that we should just continue to do as we had
> done in the past until Corporate got the "kinks" worked out.  The only conversation
> I had with Ms. Choquette was cordial and she was apologizing for the confusion and
> disruption in getting our recruiting ad in the local newspaper.  I did not raise my
> voice, become angry, nor make any demands on Ms. Choquette or the Corporate HR
> Department.

Clayton Aff. ¶ 11, at 5 (emphasis added).  Clayton's assertion that her only conversation with
Choquette was cordial does not controvert Vanguard's assertion that Choquette complained about
Clayton to Davenport.  Because Clayton has not controverted Vanguard's asserted fact, the Court
will deem the fact admitted.  See D.N.M. LR-Civ. 56.1(b).
    Vanguard further asserts that "Filomena also heard from [Vice President] of HR Michelle
Choquette that Clayton had been 'very difficult to work with' on some recruiting strategies, and had
become 'competitive' with employees in HR."  Motion ¶ 9, at 8 (citing Filomena Depo. at 38:1-14;
Affidavit of Michelle Choquette (dated October 22, 2010), filed October 8, 2010 (Doc. 135-7)).
Clayton objects to this asserted fact on the grounds that Filomena's assertion of Choquette's
statements is hearsay and that Clayton only had one conversation with Choquette in which
Choquette apologized to Clayton.  See Response at 36 (citing Affidavit of Christine Clayton ¶ 11,

Choquette that Clayton had been very difficult to work with on some recruiting strategies, and had become competitive with employees in HR.  See Filomena Depo. at 38:1-14.

      **3.**      **Clayton's Relationship with RMS.**

RMS had the responsibility to maximize revenue according to corporate directives by using the fleet and setting car rental rates in reference to competitors.  See Clayton Depo. at 130:1-131:22.[11]  RMS had computer tools and information for setting rates that managers in the field did

at 5, filed October 25, 2010 (Doc. 142-7)).  Vanguard's asserted fact may contain hearsay depending for what Choquette's statements are being offered.  See Fed. R. Evid. 801(c)("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").  The Court will not consider in its Memorandum Opinion and Order Choquette's statements for the truth of the matter asserted, but will consider them for the fact that they were said to Filomena and for any impact they may have had on Filomena.  See Gross v. Burggraf Const. Co., 53 F.3d at 1541.

      [11] Clayton objects to this asserted fact, stating that her deposition testimony does not support it.  See Response at 36.  In her deposition, Clayton testified about RMS's role.

Q.      What do you understand the role of RMS to be?

A.      To maximize revenue by utilization of the fleet and the appropriate rates and positioning within the market.

. . . .

Q.      What do you mean by "positioning within the market"?

A.      Well, different markets have different competitors that are owned either corporately or by franchises.  And meeting our company goals through revenue achievement would be one of the criteria that a revenue management person would look at in positioning to the overall market.

Q.      But, again, what do you mean by "positioning within the market"?

A.      Placement within the other competitors.

Q.      Are you talking about on a given day, the rates of National Car Rental's rentals versus Hertz?

not have.  <u>See</u>, <u>e.g.</u>, Clayton Depo. at 133:5-13; Motion ¶ 10, at 8 (setting forth this fact); Response at 36 (not controverting this fact).  RMS had the "final say" on rates for the individual locations. Davenport Depo. at 62:23-25.  <u>See</u> Motion ¶ 10, at 8 (setting forth this fact); Response at 36 (not controverting this fact).

Clayton challenged RMS on rental rates more than all the other eleven markets in the region combined.  <u>See</u>, <u>e.g.</u>, Davenport Depo. at 69:24-70:4; Motion ¶ 11, at 8 (setting forth this fact);

---

. . . .

A.     Day, week, month, overall goal strategy, where our brand is seen from a corporate standpoint, yes.

Q.     But when you say "positioning," you're primarily talking about where the company's rates are versus other companies' rates over different periods of time?

A.     Yes.

Q.     How do you understand that RMS serves that function?

A.     I don't understand the question.

Q.     Well, you said that you understood the function of RMS to be maximizing the revenue by utilization of the fleet and the appropriate rates and positioning within the market.  I'm asking how you understand they actually performed that function.

A.     They perform that function via directives from -- from a corporate standpoint.  Case in point, or for example, there were points in time where due to fleet costs and incentives and whatnot, the directive of the company or the strategy of the company was to maximize capacity, which would mean that our positioning in various markets would be on a lower scale as opposed to holding out for a higher rate, as we were in latter years, because of fleet pricing.  So it was an overall company strategy.

Clayton Depo. at 130:1-131:22.  Upon a careful review of Clayton's testimony, the Court concludes that her testimony does not controvert Vanguard's asserted fact and, rather, supports the statement. The Court will therefore deem the fact admitted.  <u>See</u> D.N.M. LR-Civ. 56.1(b).

Response at 36 (admitting this fact).  Such arguments from other markets were "seldom," while

Clayton's were "numerous."  Davenport Depo. at 65:2-10.  See Motion ¶ 11, at 8 (setting forth this

fact); Response at 36 (admitting this fact).  The other markets had a "great relationship" with RMS,

but Clayton's was "horrible," "disjointed," and "harmful to the region."  Davenport Depo. at 75:19-

76:1; Motion ¶ 11, at 8-9 (setting forth this fact); Response at 36 (admitting this fact).  Davenport

testified that Clayton's electronic mail transmissions to RMS could be "demanding and close-

minded."  Davenport Depo. at 73:14-74:21.[12]  Clayton told Davenport in an electronic mail

transmission that she was concerned about RMS trying to manage her operation from its base in

Tulsa, Oklahoma, to which Davenport replied that she was overreacting.  See, e.g., Electronic Mail

Transmission Between David Davenport and Chris Clayton at 1 (dated February 21, 2007), filed

October 27, 2010 (Doc. 143-4); Motion ¶ 11, at 9 (setting forth this fact); Response at 36 (not

controverting this fact).

        Clayton's conduct frustrated and irritated RMS personnel, including RMS manager, Jeremy

Ham.  See, e.g., Deposition of Jeremy Ham at 11:23-12:5 (taken February 26, 2010), filed October

8, 2010 (Doc. 135-8).[13]  Ham sent an electronic-mail transmission to Clayton on September 12,

---

        [12] Clayton denies that "she sent [electronic mail transmissions] to RMS that were demanding and close-minded."  Response at 36 (citing Response at 11-12, 17-22).  The Court has read the portion of Clayton's Response to which she directs the Court.  In one portion of her Response, Clayton asserts that Davenport testified that there was nothing inappropriate, aggressive, hostile or accusatory in Clayton's electronic mail transmission of September 12, 2006.  See Response at 19 (citing Davenport Depo. at 111:13-116:5).  Davenport's statement that Clayton's electronic mail transmissions on September 12, 2006 were not inappropriate does not controvert his statement that Clayton's electronic mail transmissions to RMS could be demanding and close minded.  The Court will therefore deem Vanguard's assertion admitted.  See D.N.M. LR-Civ. 56.1(b).

        [13] Clayton disputes this asserted fact.  See Response at 36 (citing Response at 11-12, 17-22).  After a careful consideration of these pages in Clayton's Response, the Court found an assertion that Ham instructed controllers in the division to give only brief and vague responses to Clayton's inquiries.  See Response at 18 (citing Ham Depo. at 64:16-66:15).  Ham did not state in his

2006, detailing Clayton's allegedly severe problems communicating.   See Electronic-Mail Transmission from Jeremy Ham to Chris Clayton at 1 (dated September 12, 2006), filed October 27, 2010 (Doc. 143-5).[14]

Clayton had previously worked well with Ham.   See, e.g., Clayton Depo. at 265:3-15; Motion ¶ 13, at 9 (setting forth this fact); Response at 36 (not controverting this fact).   Clayton thought that Ham was a good employee and respected him.   See, e.g., Clayton Depo. at 265:10-15; Motion ¶ 13, at 9 (setting forth this fact); Response at 36 (not controverting this fact).   Clayton has no reason to doubt either Ham's or Davenport's credibility.   See, e.g., Clayton Depo. at 125:11-19; Motion ¶ 13, at 9 (setting forth this fact); Response at 36 (not controverting this fact).   As RMS Manager, Ham was never Clayton's supervisor and was outside her chain of command.   See, e.g., Affidavit of Bill Baker ¶ 4, at 2, filed October 8, 2010 (Doc. 135-9); Motion ¶ 13, at 9 (setting forth this fact); Response at 36 (not controverting this fact).

---

deposition, however, that he instructed controllers to give brief and vague responses to Clayton's inquiries.   See Ham Depo. at 66:11-15 (Q. "Can you identify by name any general manager that you instructed Noah Millsap to be vague in his responses or communications?   A.   I -- I don't recall using that term.").   In her Response, Clayton also asserts that Noah Millsap sometimes ignored Clayton's electronic-mail-transmission requests.   See Response at 18 (citing Ham Depo. at 68:22-70:19; Davenport Depo. at 108:5-109:4). In Davenport's deposition, counsel showed him a copy of an electronic-mail transmission in which Millsap stated he was going to ignore Clayton, and Davenport verified that he saw that statement. See Davenport Depo. at 108:5-25. The evidence that Millsap sometimes ignored Clayton's electronic-mail-transmission requests does not controvert Vanguard's assertion that Clayton's conduct frustrated and irritated RMS personnel; instead, it tends to support Vanguard's assertion.   The Court will thus deem Vanguard's assertion admitted.   See D.N.M. LR-Civ. 56.1(b).

[14] Clayton objects to this asserted fact.   See Response at 36 (citing Response at 11-12, 17-22). In one portion of the pages of her Response to which she points, Clayton asserts that Ham sent her an electronic-mail transmission, personally attacking her with slanderous accusations and false statements.   See Response at 19 (citing September 12, 2006 Electronic-Mail Transmission). Because Clayton's disputes Vanguard's semantics, but does not controvert the substance of Vanguard's assertion, the Court will deem this assertion admitted.   See D.N.M. LR-Civ. 56.1(b).

Davenport mediated several conversations with Clayton and Ham, and told both to calm down and try to work out their differences. <u>See</u> Davenport Depo. at 38:25-39:17.[15] After these meditations, the communications between Ham and Clayton would improve for a short time, then revert back to continued argument. <u>See</u>, <u>e.g.</u>, Motion ¶ 14, at 10 (setting forth this fact); Response at 37 (not controverting this fact).[16] Clayton's problems with RMS and others pre-dated Ham's management of RMS; Ham's predecessor Gerard Nobrega observed a similar poor relationship between Clayton and RMS employees. <u>See</u> Affidavit of Gerard Nobrega ¶¶ 3-4, at 1-2 (dated October 8, 2010), filed October 8, 2010 (Doc. 135-10).[17] Clayton's prior RMS controller, Babyson Mathai, found Clayton "demanding, disrespectful, and unprofessional" to the point where he felt she

---

[15] Clayton asserts that Davenport's testimony does not support Vanguard's assertion that he mediated multiple conversations and that Davenport admits that he directed Ham to improve his relations. <u>See</u> Response at 37 (citing Davenport Depo. at 39:1-17). Davenport testified that he had several conversations with Clayton and Ham individually in an attempt to work out their problems, and that he told both people to calm down and work their differences out. <u>See</u> Davenport Depo. at 39:1-17. Davenport's testimony does not controvert Vanguard's asserted fact. Clayton also directs the Court's attention to another portion of Davenport's testimony. <u>See</u> Response at 37 (citing Davenport Depo. at 126:10-15, 127:1-4). In this portion of his deposition, Davenport did not recall Ham's request that he mediate a dispute with Clayton until his memory was refreshed with the relevant electronic-mail transmission. <u>See</u> Davenport Depo. at 127:1-4. Because the evidence to which Clayton has directed the Court's attention does not controvert Vanguard's asserted fact, the Court will deem the asserted fact admitted. <u>See</u> D.N.M. LR-Civ. 56.1(b).

[16] Vanguard cited to Ham's deposition in support of this asserted fact, but did not provide the Court with this portion of Ham's deposition. The Court did not find anything in Ham's deposition to support this asserted fact. Because Clayton does not dispute this asserted fact other than her dispute regarding Davenport's alleged mediation, which the Court previously addressed, the Court will deem this fact admitted. <u>See</u> D.N.M. LR-Civ. 56.1(b).

[17] Clayton disputes this asserted fact, arguing that Nobrega never indicated to Davenport that he had any problems with Clayton. <u>See</u> Response at 37 (citing Davenport Depo. at 255:2-9). Davenport testified that he was aware of a little friction between the two, but nothing abnormal. <u>See</u> Davenport Depo. at 255:2-9. Clayton has not directed the Court's attention to evidence that controverts Vanguard's assertion. The Court will therefore deem Vanguard's asserted fact admitted. <u>See</u> D.N.M. LR-Civ. 56.1(b).

created an "uncomfortable work environment" and asked for a transfer.  Affidavit of Babyson

Mathai ¶¶ 5-7, at 2 (dated October 8, 2010), filed October 8, 2010 (Doc. 135-11).[18]  Clayton's

assistant manager, Colby Phillips, found her "argumentative, critical, and demeaning."  Affidavit

of Colby Phillips ¶¶ 2-4, at 1-2 (dated October 7, 2010), filed October 8, 2010 (Doc. 135-12).  See

Motion ¶ 15, at 10 (setting forth this fact); Response at 37 (not controverting this fact).  On the other

hand, Clayton did not knowingly disregard the HR group's policies and she did not make demands

on the HR group.  See Clayton Aff. ¶ 11, at 5.[19]

--------

[18] Clayton disputes this fact, arguing that "Babyson Mathai, in an [electronic-mail transmission] to Jeremy Ham on May 29, 2007, he [sic] never described Ms. Clayton as disrespectful and unprofessional."  Response at 37 (citing Electronic-Mail Transmission from Babyson Mathai to Jeremy ham (dated May 29, 2007), filed October 25, 2010 (Doc. 142-22)).  This electronic-mail transmission states that Clayton was demanding and condescending, and Clayton's conduct bothered Mathai so much that he asked to be relieved of his responsibilities in Albuquerque.  See May 29, 2007 Electronic-Mail Transmission at 2.  Because this evidence does not controvert Vanguard's asserted fact, the Court will deem Vanguard's asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

[19] Vanguard asserts that Clayton had disputes with the regional HR group, insisting on doing things her own way and knowingly disregarding Vanguard's policies.  See Motion ¶ 15, at 10 (citing Choquette's Aff. ¶¶ 3-5, at 1-2).  Clayton disputes this fact.  See Response at 37 (citing Clayton Aff. ¶ 11, at 5).  Choquette's affidavit states that Clayton was "very difficult to work with," and that "on several occasions Ms. Clayton completely disregarded HR procedures and directive [sic]."  Choquette Aff. ¶¶ 3-4, at 1.  Choquette alleges:

> HR recruiters would coordinate ad placements with our location management and an advertising agency.  Ms. Clayton insisted on running her own employment ads and on several occasions went directly to the newspaper in Albuquerque to place ads.  Ms. Clayton did this in spite of being well-aware of this practice based on her prior history of working with HR, as well as her complaining directly to me about this process and me providing detailed explanations of the reasons why this practice was important to follow.

Choquette Aff. ¶ 4, at 1-2 (emphasis added).  Clayton's affidavit states:

> I had one telephone conversation with Michelle Choquette who was the Vice-President of Human Resources.  Ms. Choquette called me to apologize for the confusion in recruitment ads I was trying to run in the Albuquerque Journal.

Davenport counseled Clayton numerous times over the years about the need to remedy her communication deficiencies, and the need to fix her dysfunctional relationships with RMS, HR, and other employees.  See Affidavit of David Davenport ¶ 4, at 2 (dated October 7, 2010), filed October 8, 2010 (Doc. 135-6).[20]  Davenport sent several electronic-mail transmissions to Clayton, one of which was disciplinary, telling her that she needed to change her relationship with RMS; he also had several phone calls with her and Ham.  See Davenport Depo. at 36:6-25, 141:5-9, 181:15-24; Electronic-Mail Transmission from David Davenport to Chris Clayton at 2 (dated July 12, 2006),

---

Classified ads are required to be submitted to the Albuquerque Journal by Thursday at noon and we met that deadline, however, the ad did not appear in the Sunday paper. When I called the Albuquerque Journal, I was informed that Michelle Choquette or someone from the corporate HR Department had called to cancel the ad.  Corporate had recently implemented a new centralized recruiting plan.  Until then, each market handled its own advertising and recruiting.  There was much confusion and misunderstanding regarding the new procedure and Mr. Davenport, my Regional Vice-President, advised that we should just continue to do as we had done in the past until Corporate got the "kinks" worked out.  The only conversation I had with Ms. Choquette was cordial and she was apologizing for the confusion and disruption in getting our recruiting ad in the local newspaper.  I did not raise my voice, become angry, nor make any demands on Ms. Choquette or the Corporate HR Department.

Clayton Aff. ¶ 11, at 5 (emphasis added).  Because Clayton's affidavit creates a issue of fact whether she knowingly disregarded HR policies, and because the Court must resolve all reasonable inferences in Clayton's favor, the Court will accept as true Clayton's version of the fact.  See Hunt v. Cromartie, 526 U.S. at 551.

[20] Clayton disputes this asserted fact.  See Response at 37 (citing 2007 Performance Evaluation; Davenport Depo. at 36:6-12).  The 2007 Performance Evaluation states "[Clayton] still needs to work on her relationship with RMS[;] [t]he relation did not improve in 2007."  2007 Performance Evaluation at 4.  Davenport testified that he did not take formal corrective action against Clayton, but sent her electronic-mail transmissions telling her that she needed to change with regards to her relationship with RMS.  See Davenport Depo. at 36:6-20.  The evidence to which Clayton has directed the Court's attention does not controvert Vanguards asserted fact.  The Court will therefore deem the asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

filed October 27, 2010 (Doc. 143-6).[21]

In October 2006, Davenport informed Clayton that, if she could not repair her disjointed relationship with RMS, her job would be in jeopardy.  See Clayton Depo. at 153:17-154:10.[22]  Baker also counseled Clayton on her performance and behavior during a telephone call that Clayton initiated.  See Baker Depo. at 158:2-12.[23]

Vanguard's employee handbook states under the bold heading "Pro-People Philosophy" that it has "chosen to be union-free."  Associate Handbook at 14, filed October 8, 2010 (Doc. 135-13).  See Motion ¶ 21, at 11 (setting forth this fact); Response at 37 (admitting this fact).  Vanguard took this issue seriously, and as general manager, Clayton was responsible for enforcing the anti-union policy.  See, e.g., Clayton Depo. at 275:20-276:7, 278:18-20; Motion ¶ 21, at 11 (setting forth this

---

[21] Clayton disputes this asserted fact.  See Response at 37 (citing 2007 Performance Evaluation; Davenport Depo. at 36:6-12).  The 2007 Performance Evaluation states: "[Clayton] still needs to work on her relationship with RMS[;] [t]he relation did not improve in 2007."  2007 Performance Evaluation at 4.  Davenport testified that he did not take formal corrective action against Clayton, but sent her electronic-mail transmissions telling her that she needed to change her relationship with RMS.  See Davenport Depo. at 36:6-20.  He stated that he viewed at least one of the electronic-mail transmissions as disciplinary.  See Davenport Depo. at 181:15-24.  Because the evidence to which Clayton directs the Court's attention does not controvert Vanguard's assertion, the Court will deem the assertion admitted.  See D.N.M. LR-Civ. 56.1(b).

[22] In her Response, Clayton admits "only that immediately following [her] report of a hostile work environment and slanderous communications with Ham, Davenport threatened her job."  Response at 37 (citing Clayton Depo. at 151:1-54:10).  The Court will deem Vanguard's assertion admitted, because Clayton's objection sets forth legal argument, which is not proper in asserted undisputed facts, see Ruiz v. City of Brush, 2006 WL 1816454, at *4 (D. Colo. 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;] [l]egal argument should be reserved for separate portions of the brief.")(citation omitted), and disputes Vanguard's semantics, but not the substance of Vanguard's asserted fact.

[23] Clayton admits that she "called to talk to Baker about statements made to her by Davenport on July 11, 20036."  Response at 37.  The Court will deem Vanguard's assertion admitted, because Clayton's objection goes to the semantics of Vanguard's asserted fact, but does not controvert Vanguard' asserted fact.  See D.N.M. LR-Civ. 56.1(b).

fact); Response at 37 (admitting this fact).  As general manager, Clayton attended anti-union training.  See, e.g., Clayton Depo. at 276:8-15; Motion ¶ 21, at 11 (setting forth this fact); Response at 37 (admitting this fact).

After Filomena became her supervisor, Clayton received a letter addressed to him from four hourly employees, asking for a salary increase.  See Salary Increase Justification Letter at 1 (dated February 6, 2008), filed October 27, 2010 (Doc. 143-8).[24]  During Filomena's site visit, Clayton complained that her employees' pay was too low.  See, e.g., Filomena Depo. at 22:2-17; Motion ¶ 20, at 11 (setting forth this fact); Response at 37 (admitting this fact).

Clayton signed her name to the letter alongside that of the employees and sent it by facsimile transmission to Baker without explanation or a cover sheet.  See Clayton Depo. at 283:11-284:6.[25] Clayton testified that Baker and Filomena "told her they were unhappy that [she] signed [the letter]." Clayton Depo. at 294:19-21.  See Motion ¶ 22, at 12 (setting forth this fact); Response at 37 (admitting this fact).  Baker and Filomena never told Clayton that they believed that the letter

---

[24]Clayton disputes this fact.  See Response at 37 (citing Response at 12-16).  The Court cannot find any evidence, however, in Clayton's Response that properly disputes Vanguard's assertion that Clayton received a letter addressed to Filomena from four employees, which asked for a salary increase.  The Court will therefore deem this fact admitted.  See D.N.M. LR-Civ. 56.1(b).

[25] Clayton disputes this fact.  See Response at 37 (citing Response at 12-16).  In her Response, Clayton asserts that she called and sent an electronic transmission to Baker regarding the facsimile transmission after she sent it.  See Response at 13 (citing Plaintiff's Answers to Defendant's Second Set of Interrogatories, Responses to Second Requests for Production and Responses to First Requests for Admission No. 13, at 3-7, filed October 25, 2010 (Doc. 142-3)). In her deposition, Clayton testified that she sent the letter without a facsimile transmission cover sheet, because she never used them.  See Clayton Depo. at 284:3-6.  The evidence to which Clayton has directed the Court's attention does not controvert Vanguard's asserted fact.  The Court will therefore deem Vanguard's asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

potentially compromised Vanguard's anti-union policy.  See Clayton Depo. at 294:19-25.[26]

Clayton states that she signed the letter merely to show receipt before sending it by facsimile transmission to the HR Department.  See, e.g., Clayton Depo. at 283:11-284:2, 293:13-24; Motion ¶ 23, at 12 (setting forth this fact); Response at 37 (admitting this fact).  Clayton did not write "received by Christine Clayton," or make any other distinction between her signature or the employees' signatures.  See, e.g., Clayton Depo at 283:11-284:2, 294:3-6; Motion ¶ 23, at 12 (setting forth this fact); Response at 37 (admitting this fact).  The union-activity implications of Clayton's signature on the letter disturbed Baker and Filomena; they believed it called for severe disciplinary action and escalated the letter to their boss, Murphy.  See, e.g., Filomena Depo. at 41:20-42:19, 54:22-55:12; Baker Depo. at 82:22-83:24; Motion ¶ 24, at 12 (setting forth this fact); Response at 38 (not controverting this fact).  Filomena was especially concerned, because his primary car-rental competitor, Hertz, had union employees in Albuquerque.  See Filomena Depo. at 55:15-56:1.[27]  Murphy was displeased after reading the letter, because of its apparent endorsement

---

[26] The Defendants assert that Clayton's testimony is contradictory, because, in her deposition, she testified that Baker and Filomena never told her that they believed the letter potentially compromised the company's anti-union policy, yet in her answers interrogatories, she states that Filomena asked her what she thought would happen if the employees took the letter to the union.  See Motion ¶ 22, at 12.  Clayton asserts that her answers were not contradictory, because they were in response to different questions.  See Response at 37.  Because the Court believes that the differences in Clayton's testimony can be explained by the fact that her statements were given in response to different questions, and because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true Clayton's version of the asserted fact.  See Hunt v. Cromartie, 526 U.S. at 551.

[27] Clayton objects to this asserted fact, stating that "Filomena testifies he thought it 'odd.'" Response at 38 (citing Response at 12-16).  In his deposition, Filomena testified  that he thought it was odd that a general manager would endorse the letter and that there was a potential theat to the company if there was union activity.  See Filomena Depo. at 41:12-19, 55:6-12.  The Court will deem the asserted fact admitted, because Clayton has not directed the Court's attention to evidence that contradicts Vanguard's assertion.  See  D.N.M. LR-Civ. 56.1(b).

of union-like organizing activity, which Vanguard actively opposed.  See, e.g., Murphy Depo. at

26:10-21; Filomena Depo. at 60:3-9.[28]

In a conference call, Baker, Filomena, Murphy, and Choquette discussed Clayton's signature

on the letter, Clayton's prior performance, and her communication problems with RMS and HR.

See Filomena Depo. at 59:17-61:21; Baker Depo. at 86:10-88:1.[29]  In his deposition, Filomena

testified that

> there had been a pattern from all the folks that I had talked to with Chris.  Her
> performance in -- in the station, especially in the last two years, had started to
> deteriorate in certain areas.  Some areas she was doing well in.  All the challenges
> that she had had with RMS and HR.  There was the visit that I had with Chris and her
> team in Albuquerque.  So all of those things I believe contributed to the -- the piece
> where we terminated her, but the final point was the letter itself.

---

[28] Clayton disputes this asserted fact.  See Response at 38 (citing Response at 12-16).
Because the Court did not find, after a careful review of the pages to which she cites, any evidence
in Clayton's Response that controverts Vanguard's asserted fact, the Court will deem Vanguard's
asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

[29] Clayton disputes this asserted fact, arguing that "Baker testifies the only discussion he
recalls was about the letter."  Response at 38 (citing Baker Depo. at 87:5-13).  Baker testified that
all he recalled about the conference call was the discussion about the letter.  See Baker Depo. at
87:7-12.  He did not deny other issues were discussed.  See Baker Depo. at 87:1-88:1.  The Court
will deem Vanguard's asserted fact admitted, because Clayton has not directed the Court's attention
to evidence that controverts Vanguard's assertion.  See D.N.M. LR-Civ. 56.1(b).

Vanguard asserts that Baker testified that the petition was perceived as the "last straw."
Motion ¶ 25, at 13 (citing Baker Depo. at 142:24-144:5).  Clayton disputes this fact, objecting to
Baker's perceptions, because he testified he did not recall what other people said during the
conference.  See Response at 38 (citing Baker Depo. at 89:6-18).  In his deposition, in response to
a question regarding why someone would use the phrase the last straw if the conference call only
discussed Clayton's signature on the letter, Baker testified that, in his opinion, the people on the call
might have had some knowledge of Clayton's history, and that they would be tying that history to
the letter.  See Baker Depo. at 143:23-144:5.  Baker knew the people who participated in the
conference call, and he knew they had knowledge of Clayton's history.  The Court will therefore
admit his opinion as supported by his personal knowledge.  See Fed. R. Evid. 701.

-24-

Filomena Depo. at 71:5-16.[30]  Baker also believed that the people who participated in the conference

call perceived Clayton's signature to be the last straw.  See Baker Depo. at 143:23-144:5.  Murphy

felt Clayton's signature on the letter was a terminable offense and recommended termination to

Filomena.   See Murphy Depo. at 18:1-6, 32:9-18.   Filomena understood this opinion and

recommendation to be a directive to terminate Clayton's employment.  See Filomena Depo. at 64:9-

15.  Filomena undertook to implement the termination along with Baker.  See Filomena Depo. at

65:12-16.[31]  Filomena testified that, following the conference call, Murphy called him and asked him

to terminate Clayton.  See Filomena Depo. at 64:9-15.  Murphy testified that, during the conference

call with Filomena and Baker, he suggested Baker and Filomena speak to the legal and HR team,

that Filomena and Baker made the decision to terminate Clayton's employment, and that he did not

---

[30] Clayton objects to this asserted fact on the grounds of "relevancy regarding Filomena's 'feelings.'" Response at 38.  The Court will deem this asserted fact admitted, because it is an opinion supported by personal knowledge, as Filomena participated in the conference call, was the person who fired Clayton, and supervised Clayton.

[31] Clayton objects to the asserted facts contained in paragraph 27 of Vanguard's Motion. See Response at 38 (citing Response at 12-16).  In Clayton's Response, she alleges that the testimony regarding who decided to terminate her is contradictory.  See Response at 10.  Clayton alleges that Filomena testified that Murphy made the decision to terminate Clayton.  See Response at 10 (citing Filomena Depo. at 64:9-65:15, 70:2-25).  Clayton alleges that Murphy contradicts Filomena, and states that Filomena and Baker made the decision to terminate Clayton. See Response at 10 (citing Murphy Depo. at 35:23-36:6).  In his deposition, Murphy testified that, during the conference call with Filomena and Baker, he suggested they speak to the legal and HR team, that he recommended termination, that Filomena and Baker made the decision to terminate Clayton's employment, and that he did not recall any other conversations with Filomena and Baker. See Murphy Depo. at 31:9-33:1, 36:3-6.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will use Murphy's testimony regarding his recollection of the events.  See Hunt v. Cromartie, 526 U.S. at 551. In his deposition, Filomena states that, following the conference call, Murphy called him and asked him to terminate Clayton. See Filomena Depo. at 64:9-15("Q.  Okay.  And what did Mr. Murphy say to you in this -- in this follow-up phone call?  A.  He said that -- he asked me to go out and terminate [Clayton]. ").  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will use this testimony regarding his recollection of the events.  See Hunt v. Cromartie, 526 U.S. at 551.

recall any other conversations with Filomena and Baker.  <u>See</u> Murphy Depo. at 31:9-33:1, 36:3-6.

Baker and Filomena went to Albuquerque on February 12, 2008 to inform Clayton of her termination.  <u>See</u> Filomena Depo. at 68:18-70:1.[32]  Filomena told Clayton that they were going to make a change in leadership and that she was not at the top of her game.  <u>See</u> Clayton Depo. at 171:9-22.[33]  Filomena told Clayton that the letter was the final point that contributed to her termination.  <u>See</u> Filomena Depo. at 72:6-16.[34]

### 4.  <u>Clayton's Complaints Regarding her Employment.</u>

While she was working with National Car Rental, Clayton was aware of its zero-tolerance discrimination policy and the procedures for making a complaint.  <u>See, e.g.,</u> Clayton Depo. at 10:21-

---

[32] Clayton objects to this asserted fact.  <u>See</u> Response at 38 (citing Response at 12-16).  After a careful review of the pages to which Clayton points, the Court could find no evidence in Clayton's Response that controverts this asserted fact.  The Court will therefore deem Vanguard's asserted fact admitted.  <u>See</u> D.N.M. LR-Civ. 56.1(b).

Vanguard also asserts that Baker recalls Filomena telling Clayton that, because of a culmination of things, he had lost confidence in her leadership and he wanted to make a change.  <u>See</u> Motion ¶ 28, at 13-14 (citing Baker Depo. at 100:15-20).  Clayton objects to this asserted fact.  <u>See</u> Response at 38 (citing Response 12-16).  The Court did not find any evidence that Clayton cited in this portion of the brief that controverted this assertion; however, this assertion appears to be based, at least in part, on hearsay.  The Court therefore will not deem what Filomena said admitted, but will consider that Filomena made the statement to Clayton.  <u>See</u> <u>Gross v. Burggraf Costr. Co.</u>, 53 F.3d at 1541.

[33] Clayton objects to this asserted fact.  <u>See</u> Response at 38 (citing Response at 12-16).  The Court could find no evidence in this portion of the brief that controverts this assertion.  Moreover, the statement is an admission by a party-opponent.  <u>See</u> Fed. R. Evid. 801(d)("A statement is not hearsay if . . .[t]he statement is offered against a party and is . . . the party's own statement, . . . or . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.").  The Court will therefore admit the asserted fact.

[34] Clayton objects to this asserted fact.  <u>See</u> Response at 38 (citing Response at 12-16).  After a careful review of the pages on which Clayton relies, the Court could find no evidence in Clayton's Response that controverts Vanguard's asserted fact.  The Court will therefore deem Vanguard's asserted fact admitted.  <u>See</u> D.N.M. LR-Civ. 56.1(b).

11:21; Motion ¶ 29, at 14 (setting forth this fact); Response at 38 (admitting this fact).  When her employer changed to Vanguard, Clayton had responsibility to implement the same policies, including a new "alert line" that employees could call with complaints.  Clayton Depo. at 26:14-28:6.  See Motion ¶ 29, at 14 (setting forth this fact); Response at 38 (admitting this fact).  Clayton conducted anti-discrimination training in Albuquerque for her employees, including distributing a new handbook for Vanguard when it took over in 2003.  See, e.g., Clayton Depo. at 28:24-29:23, 36:11-24; Motion ¶ 29, at 14 (setting forth this fact); Response at 38 (admitting this fact).  Clayton received training on diversity, inclusiveness, and sensitivity from Vanguard.  See, e.g., Clayton Depo. at 39:1-40:3; Motion ¶ 29, at 14 (setting forth this fact); Response at 38 (admitting this fact). Vanguard took these policies seriously.  See, e.g., Clayton Depo. at 40:24-41:8; Motion ¶ 29, at 14 (setting forth this fact); Response at 38 (admitting this fact).

Vanguard's written Equal Employment Opportunity ("EEO") Policy in its employee handbook states that complaints of discrimination should be brought to management or to an HR representative, after which an investigation and any necessary remedial action may occur.  See, e.g., Associate Handbook at 12-13; Motion ¶ 30, at 14 (setting forth this fact); Response at 38 (admitting this fact).  Clayton was aware of this protocol and saw it used successfully in the past.  See, e.g., Clayton Depo. at 43:20-47:25; Motion ¶ 30, at 14 (setting forth this fact); Response at 38 (admitting this fact).  Clayton did not know of any complaints of discrimination or harassment ever brought by a general manager against Vanguard or its predecessors.  See, e.g., Clayton Depo. at 49:11-50:9; Motion ¶ 31, at 15 (setting forth this fact); Response at 38 (admitting this fact).

Ham initiated the October 2006 conference call with Davenport and Baker following the September 12, 2006 electronic-mail transmission.  See, e.g., Clayton Depo. at 150:1-151:20; Motion ¶ 34, at 14 (setting forth this fact); Response at 38 (admitting this fact).  During that call, Clayton

complained that Ham was creating a "hostile work environment," and that  Ham had personally

attacked her and her work performance.  See, e.g., Clayton Depo. at 151:21-152:4; Motion ¶ 34, at

14 (setting forth this fact); Response at 38 (admitting this fact).  Clayton testified:

> A.    [Ham] had written me an e-mail based on some questions that I had asked of
>        Noah Millsap in early September -- so roughly a month prior to this phone
>        call -- that was unprofessional.
>
> . . . .
>
> Q.    Ms. Clayton . . . you said "Jeremy Ham had personally attacked me" and you
>        had begun to discuss an e-mail that was at issue, do you recall that?
>
> A.    Yes.
>
> Q.    Okay.  Are there any other e-mails when you would characterize Jeremy
>        Ham as having personally attacked you, your work performance, or your
>        experience?
>
> A.    Not to that degree, no.

Clayton Depo. at 152:21-153:14;  Motion ¶ 34, at 15-16 (setting forth this fact); Response at 38

(admitting this fact).

        During the call, Clayton informed Baker and Davenport that she perceived Ham's remarks

in his September 12, 2006 electronic mail transmission to be sexist, and that she believe Davenport

was using a double standard regarding Ham's versus her remarks.  See Clayton Depo. at 262:5-

263:17; Plaintiff's Answers to Defendant's Second Set of Interrogatories No. 13, at 3-7.[35]  On its

_____

        [35] Vanguard asserts that Clayton did not testify that the alleged hostile work environment had
been sexist, or that she felt discriminated against or harassed based on gender.  See Motion ¶ 35, at
16 (citing Clayton Depo. at 151:21-153:14).  Clayton disputes this fact, alleging that her "complaint
[during the conference call] . . . included concerns about Davenport's double standard."  Response
at 38.  In her answers to interrogatories, Clayton stated that she told Davenport that he continued to
act on a double standard in regards to how he would communicate with her and Ham.  See Plaintiff's
Answers to Defendant's Second Set of Interrogatories No. 13, at 3-7.  In her deposition, Clayton also
testified that, during the conference call, she told Baker and Davenport that she perceived Ham's
remarks in the September 12, 2006 electronic-mail transmission to be sexist.  See Clayton Depo. at

face, the electronic-mail transmission from Ham did not contain any sexist or gender references to Clayton.  See, e.g., Electronic-Mail Transmission from Jeremy Ham to Chris Clayton at 1 (dated September 12, 2006); Motion ¶ 35, at 16 (setting forth this fact); Response at 38 (not controverting this fact).  Baker testified that, in the conference call, neither Clayton nor anyone else suggested the hostile work environment to which Clayton referred was age related.  See, e.g., Baker Depo. at 181:3-21; Motion ¶ 36, at 16 (setting forth this fact); Response at 38 (not controverting this fact).

Clayton never complained of age discrimination to Davenport or Baker.  See Baker Depo. at 181:12-15; Davenport Depo. at 250:11-13.[36]  Clayton cannot recall making an age discrimination

---

262:5-263:17.  The Court will accept Clayton's version of the fact as true, because the Court must resolve all reasonable inferences and doubts in favor of the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 551.

Vanguard asserts that Clayton made no complaint of gender or age discrimination, pay discrimination based on gender, or sexual harassment to Baker or Davenport.  See Motion ¶ 32, at 15.  Clayton disputes this asserted fact.  See Response at 38 (citing Response at 18-22).  Clayton's Response states that she complained that Ham was creating a hostile work environment during a conference call with Baker, Ham, and Davenport, and that Davenport was applying a double standard.  See Response at 19 (citing Baker Depo. at 38:3-10; Plaintiff's Answers to Defendant's Second Set of Interrogatories No. 13, at 3-7).  In her deposition, Clayton testified that she told Baker and Davenport during the conference call that she perceived Ham's comments in the September 12, 2006 electronic-mail transmission to be gender based.  See Clayton Depo. at 262:8-263:17.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true Clayton's version of the asserted fact.  See Hunt v. Cromartie, 526 U.S. at 551.

Vanguard alleges that Clayton's deposition reconvened after a year and that, when it reconvened, Clayton changed her testimony about the September 12, 2006 electronic-mail transmission to state that it was sexist.  See Motion ¶ 37, at 16-17 (citing Clayton Depo. at 261:9-262:25).  Clayton responds that she did not change her testimony, because counsel did not ask her previously whether she considered the electronic-mail transmission sexist.  See Response at 38.  The Court has carefully considered Clayton's deposition testimony and has found that, in her first deposition, counsel did not ask her whether she considered the electronic mail transmission sexist.  The Court therefore finds that Clayton's testimony is not contradictory.

[36] Clayton objects to this asserted fact.  See Response at 38 (citing Response at 18-22).  After a thorough review of the pages to which Clayton cites, the Court could find no evidence in Clayton's Response that controverts this assertion.  The Court will therefore deem the asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

-29-

complaint at any time to anyone.  See, e.g., Clayton Depo. at 260:21-261:9;  Motion ¶ 33, at 14 (setting forth this fact); Response at 38 (admitting this fact).

Clayton knew all the relevant policies and complaint procedures, but never called the alert line to make any gender discrimination complaint.  See, e.g., Clayton Depo. at 258:1-261:9; Motion ¶ 33, at 14 (setting forth this fact); Response at 38 (admitting this fact).  While Clayton complained generally of pay issues to Davenport, she did not relate them to her gender.  See, e.g., Clayton Depo. at 260:7-20; Motion ¶ 33, at 14 (setting forth this fact); Response at 38 (admitting this fact).  Other than her alleged statements in the October 2006 conference call, Clayton never made any complaint to anyone at Vanguard about gender discrimination.  See, e.g., Clayton Depo. at 262:9-13; Motion ¶ 38, at 17 (setting forth this fact); Response at 38 (admitting this fact).  No person at Vanguard -- other than Ham -- ever made any statement to her that she considered discriminatory based on gender.  See, e.g., Clayton Depo. at 264:5-10; Motion ¶ 38, at 17 (setting forth this fact); Response at 38 (admitting this fact).  Neither Ham nor anyone else at Vanguard ever made a disparaging remark about her age.  See, e.g., Clayton Depo. at 115:8-12, 271:1-5; Motion ¶ 38, at 17 (setting forth this fact); Response at 38 (admitting this fact).

In discovery, three electronic-mail transmissions were produced in which Ham referred to Clayton as "insane Jane" and "crazy Betty."  Electronic-Mail Transmissions, filed October 27, 2010 (Doc. 143-4); Ham Depo. at 11:5-14, 37:8-12.  Ham admitted these electronic-mail transmissions were unprofessional and reflected his long-term frustration with Clayton's arguments with RMS. See Ham Depo. at 11:23-12:5, 37:10-23.   Clayton was unaware of these electronic-mail transmissions while she was employed, and Ham never made these remarks directly to her. See Clayton Depo. at 270:1-19. Clayton does not point to any other comments that Ham made about

-30-

her aside from these electronic-mail transmissions.  See Clayton Depo. at 271:25-273:3.[37]

No manager or decision maker in Clayton's chain of command was aware of the electronic-mail transmissions that Ham sent.  See, e.g., Davenport Depo. at 76:5-11; Baker Depo. at 163:4-21; Filomena Depo. at 96:22-97:12; Murphy Depo. at 60:21-61:11.[38]  In her Charge of Discrimination filed with the Equal Employment Opportunity Commission ("EEOC"), Clayton referred only to generic hostility from Ham, and did not allege age or gender based harassment; and in her affidavit supporting the Charge, Clayton did not reference hostility or Ham.[39]  The Intake Notes for the EEOC Charge state that Clayton called Ham "disagreeable and argumentative," that she complained to Davenport about Ham's hostility, but that she did not refer to age or gender when she complained to her employer.  Intake Notes, filed October 8, 2010 (Doc. 135-16).[40]

---

[37] Clayton objects to the facts asserted in paragraph 39 of Vanguard's Motion.  See Response at 38 (citing Response at 21-22).  After a careful review of the pages to which Clayton points, the Court could find no evidence in Clayton's Response that controverts these assertions.  The Court will thus deem these facts admitted.  See D.N.M. LR-Civ. 56.1(b).

[38] Clayton objects on the grounds that "Jeremy Ham sent the electronic mail transmissions to Jim Ducker, Regional Comptroller, and Randy Phillips, GM of Memphis, TN and each were required by VCR policies and procedures to report Ham's offensive, derogatory and sexist electronic mail transmissions, but none did."  Response at 39 (citing Response at 21-22).  Clayton has not, however, directed the Court's attention to evidence that controverts Vanguard's asserted fact.  The Court will therefore deem Vanguard's asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

[39] Clayton disputes this statement, stating "[s]ee testimony of Jeremy Ham cited in preceding section regarding RMS Director hostile work environment [electronic mail transmissions]."  Response at 39.  In Clayton's Response, she contends that Ham admits he did not refer to any male general managers using those similar terms, and that he admits his electronic-mail transmissions were inappropriate and unprofessional.  See Response at 21-22 (citing Ham Depo. at 12:2-5, 13:13-24, 25:2-5, 38:20-40:10, 44:1-47:4).  This evidence does not controvert Vanguard's asserted fact, and the Court could find no evidence that controverts Vanguard's asserted fact.  The Court will thus deem the asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

[40] Clayton objects to the Intake Notes on the grounds that they are hearsay.  See Response at 39.  Although the Intake Notes are hearsay, Clayton's statements are the statements of a party opponent, see Fed. R. Evid. 801(d)(not hearsay), and the Intake Notes are a public record, see Fed.

5.     __Vanguard's Associate Handbook and Progressive Discipline Policies__.

Vanguard became Clayton's employer in 2003; at that time, Clayton signed an agreement accepting and creating a new employment relationship with Vanguard.  See, e.g., Clayton Depo. at 23:24-24:10; Motion ¶ 42, at 18 (setting forth this fact); Response at 39 (admitting this fact). Clayton received an Associate Handbook from Vanguard and relies on it for her claims.  See, e.g., Clayton Depo. at 228:20-230:13; Motion ¶ 43, at 18 (setting forth this fact); Response at 39 (admitting this fact).  The Associate Handbook contains various at-will provisions, including the Preface, and a separate "Employment At-Will" heading, which states that "employment *may* be terminated with or without cause, as well as, with or without notice at any time at the option of either the associate or Vanguard."  Associate Handbook at 6, 12.  See Motion ¶ 43, at 18 (setting forth this fact); Response at 39 (admitting this fact).  Clayton signed an acknowledgment form upon receipt of the Associate Handbook.  See, e.g., Clayton Depo. at 230:1-13, 231:1-11; Motion ¶ 44, at 19 (setting forth this fact); Response at 39 (admitting this fact).  The Acknowledgment states: "I further acknowledge that this handbook or any other communication by management representatives is not intended to create, in any way, an expressed or implied contract and that my employment is at will unless [sic]."  Associate Handbook at 51.  See Motion ¶ 44, at 19 (setting forth this fact); Response at 39 (admitting this fact).   Clayton understood that the at-will language of the acknowledgment was the policy of Vanguard.  See Clayton Depo at 254:11-256:1; Motion ¶ 44, at 19 (setting forth this fact); Response at 39 (admitting this fact).

---

R. Evid. 803(8)("The following are not excluded by the hearsay rule . . . .  Records . . . of public offices or agencies, setting forth . . . matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . .").  The Intake Notes may, with the proper foundation, also be a business record of the EEOC.  These statements are therefore admissible, and the Court will therefore deem Vanguard's asserted fact admitted.

The provisions of the Associate Handbook referring to progressive discipline and termination state:

> The specific nature of the offense will ultimately guide the level and course of corrective action. Suspension or termination is sometimes appropriate for certain types of offenses. There may be situations where these steps may be bypassed due to the serious nature of the offense.
>
> Corrective Action may involve four sequential steps:
> - Step I      Coaching Discussion
> - Step II     Documented Discussion
> - Step III    Written Warning
> - Step IV     Final Disposition
>
> . . . .
>
> Involuntary Termination -- Depending upon the severity of a situation or policy violation, disciplinary action up to and including immediate termination may be taken at the Company's sole discretion. Involuntary terminations may occur as a result of reorganizations, job elimination, reduction of workforce, violation of Company policy or unsatisfactory work performance.

Associate Handbook at 18-19.[41]

The Associate Handbook states that Clayton was an at-will employee, that termination may occur without progressive discipline, and that termination may occur at the company's sole discretion. See Clayton Depo. at 233:3-236:23.[42] Murphy felt Clayton's signature on the letter was a severe and terminable offense for which progressive discipline would not apply, especially

---

[41] Clayton "[a]dmit[s] portions of progressive discipline policy recited." Response at 39. Because it is unclear the extent of Clayton's objections, and because Clayton has not directed the Court's attention to any evidence that controverts Vanguard's asserted fact, the Court will deem the asserted fact admitted. See D.N.M. LR-Civ. 56.1(b).

[42] Clayton disputes these asserted facts. See Response at 39 (citing Clayton Depo. at 234:5-16). Clayton testified in her deposition that, although there was no requirement in the policy requiring progressive discipline, it was the practice at Vanguard to progressively discipline employees. See Clayton Depo. at 234:1-16. Because Clayton has not directed the Court's attention to evidence that controverts Vanguard's asserted fact, the Court will deem this fact admitted. See D.N.M. LR-Civ. 56.1(b).

considering her training on union avoidance, and recommended termination to Filomena.  See Murphy Depo. at 18:1-6, 32:9-18, 48:20-49:20.[43]  Four termination notices for employees which Clayton signed do not reflect any progressive discipline in the areas on the form set aside for noting such discipline.  See Counseling Reviews, filed October 27, 2010 (Doc. 143-10).[44]  Clayton cannot recall whether any progressive discipline was provided to any of these employees before their termination.  See Clayton Depo. at 237:1-250:25.[45]  At her deposition, counsel asked Clayton whether she was "required under the policy to follow all four steps of the progressive discipline

---

[43] Clayton disputes Vanguard's asserted fact, stating: "Murphy's individual understanding is irrelevant to the issue of reasonableness of an employee's expectations created by a handbook." Response at 39.  The Court will deem Vanguard's assertion admitted, because Clayton's objection sets forth legal argument, which is not proper in asserted undisputed facts, and because she has not directed the Court to evidence that controverts the asserted fact.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4.

[44] Clayton objects to this asserted fact, arguing that the exhibits are hearsay.  See Response at 39.  The Court will admit the asserted fact, as the records regarding the individual's termination fall under the hearsay exception for business records.  Fed. R. Evid. 803(6) states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, . . . .

Fed. R. Evid. 803(6).  The Counseling Reviews are standard forms, filled out when an employee was terminated.  The Court therefore believes that they are business records and are admissible.

[45] Clayton disputes Vanguard's asserted fact.  See Response at 39 (citing Response at 29-33). After carefully reviewing the pages on which Clayton relies, the Court could find no evidence in Clayton's Response that controverts this assertion.  The Court will thus deem the asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

before you fired Ms. Schoder," to which Clayton answered "No."  Clayton Depo. at 249:7-10.[46]

Phillips, Clayton's Assistant Manager, confirms that Clayton was aware of and concurred in all these

terminations in her operation, and that these employees did not receive any particular progressive

discipline before being let go.  See Affidavit of Colby Phillips ¶¶ 5-7, at 2 (dated October 7, 2010),

filed October 8, 2010 (Doc. 135-12).[47]

    A former general manager, Villegas, would not use progressive discipline when the

individual was stealing or for insubordination, but other than those violations, he would "[p]retty

much" follow progressive discipline.  Villegas Depo. at 32:5-33:16.  Another former general

manager, Jared, understood that there were several instances where she could terminate someone

instantly -- such as theft, employee violence, or any violation of Vanguard's work rules.  See Jared

Depo. at 68:3-12.

---

[46] Clayton objects to Vanguard's asserted fact.  See Response at 39 (citing Response at 29-33).  In her Response, Clayton asserts that she and other general managers understood that they were required to follow progressive discipline.  See Response at 29 (citing Clayton Depo. at 231:19, 234:4-16, 235:14-22, 236:10-12); Deposition of Stacy Walker Jared at 67:16-69:5 (taken September 27, 2010), filed October 25, 2010 (Doc. 142-19); Deposition of Luis Villegas at 31:19-33:16 (taken August 12, 2010), filed October 25, 2010 (Doc. 142-17)).  In her deposition, Clayton stated that the practice at Vanguard was for progressive discipline to be followed for job performance issues.  See Clayton Depo. at 234:4-7.  Villegas testified that he would not use progressive discipline when the individual was stealing or for insubordination, but other than those violations he would "[p]retty much" follow progressive discipline.  Villegas Depo. at 32:5-33:16.  Jared testified that there were several instances that she understood she could terminate someone instantly -- such as theft, employee violence, or any violation of Vanguard's work rules.  See Jared Depo. at 68:3-12.  The Court believes that, in her Response, Clayton was asserting Villegas' and Jared's testimony as additional undisputed facts.  Vanguard did not dispute Clayton's references to Villegas' and Jared's testimony.  See Reply at 19.  The Court will therefore include Villegas' and Jared's testimony in the undisputed material facts.

[47] Clayton disputes Vanguard's asserted fact.  See Response at 39 (citing Response at 29-33).  After a careful review of the pages upon which Clayton relies, the Court could find no evidence in Clayton's Response that controverts this asserted fact.  The Court will thus deem the asserted fact admitted.  See D.N.M. LR-Civ. 56.1(b).

6.      **Facts Regarding Clayton's EPA Claim.**

Clayton, and all general managers, had the opportunity for merit bonuses based on profit. See Clayton Depo. at 58:3-61:5.[48] Clayton admits the bonus plan itself was not discriminatory. See Clayton Depo. at 69:7-16, 72:14-20. Clayton testified that the bonus plan was not applied fairly, but stated that she had no evidence that her complaints were unique to Albuquerque or to markets where females were general managers. See Clayton Depo. at 58:20-59:10, 62:8-16, 64:6-9, 69:7-16. On two occasions, Phillips was paid more bonus than what the bonus plan suggested. See Clayton Depo. at 78:10-79:10. Clayton does not believe that these bonus payouts occurred because of Phillips' gender. See Clayton Depo. at 81:1-83:7. This situation with Phillips did not affect her pay. See Clayton Depo. at 80:11-14. Clayton does not have the belief or any information that the calculation of the total amount of bonus pay or that the application of percentages was ever based on gender or age. See Clayton Depo. at 84:1-85:6. Clayton never complained that these various pay issues were because of her gender. See Clayton Depo. at 260:7-20.

Clayton's position as general manager was posted internally at Vanguard after her discharge. See Filomena Depo. at 78:15-79:3. Two applicants applied for the position -- Robert Kennedy and Phillips; Kennedy was selected. See Filomena Depo. at 79:6-8, 85:12-18. Kennedy was younger

─────────────────────────

[48] Clayton disputes Vanguard's asserted facts in paragraphs 50-61 of its Motion. See Response at 39. Clayton states:

> Plaintiff does not rely on bonus payments or bonus plans for her Equal Pay Act (EPA) claims. As detailed in the EPA section in this brief, Ms. Clayton bases her claim on base salary paid to male GMs compared to female GMs. The facts recited in paragraphs 50-61 are not material facts to her claims, nor are they material facts to support VCR's burden of persuasion that the wage disparity was justified by one of the four permissible reasons required by 29 U.S.C. § 206(d).

Response at 39. The Court will thus deem these facts admitted, because Clayton merely states they are not material; she does not controvert the asserted facts. See D.N.M. LR-Civ. 56.1(b).

than Clayton.  See Answer to First Amended Complaint for Civil Rights Violations, Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing ¶ 13, at 2, filed March 26, 2010 (Doc. 106).[49]  Kennedy was well-qualified for the position.  See Affidavit of Mike Filomena ¶ 4, at 2 (dated October 8, 2010), filed October 8, 2010 (Doc. 135-17).  Clayton's base salary was $66,000.00 at the time she was discharged.  See Clayton Depo. at 25:20-24.  Kennedy was offered less than $68,000 to replace Clayton, which he declined.  See Deposition of Robert Kennedy at 43:3-44:11 (taken August 14, 2009), filed October 8, 2010 (Doc. 135-15).  Baker then offered Kennedy $68,000, which he also declined.  See id. at 44:11-16.  Vanguard then offered Kennedy a base of $68,000 plus a cost of living adjustment of $1,000 per month, which he accepted.  See id. at 44:20-45:6.

Both Kennedy and Clayton were eligible for bonus compensation based on merit and profits on a yearly basis.  See Baker Aff. ¶ 6, at 2.  To the extent that their bonus compensation differed, it would have been a direct result of non-gender related criteria inherent in company wide merit bonus plans.  See Baker Aff. ¶¶ 6-9, at 2.  In addition, the bonus plan criteria effective in 2009, the first full year after Kennedy took over Albuquerque operations, was significantly different in design than the one in effect during Clayton's last years in the position.  See Baker Aff. ¶ 9, at 2.

In addition, the job that Clayton previously held was absorbed into a new position in November 2008 -- that of Airport Market Manager -- which Kennedy now holds.  See Kennedy Depo. at 71:16-73:22, Baker Aff. ¶ 8, at 2.  The job now includes new locations in Durango and El Paso, and includes responsibility for the Enterprise brand in addition to National and Alamo.  See

---

[49] Clayton sets forth this fact in her Response.  See Response at 1.  Vanguard does not dispute this assertion in its Reply, and the Court will deem this fact admitted.  See D.N.M. LR-Civ. 56.1(b).

Kennedy Depo. at 72:1-74:5.  Kennedy must visit these locations, work with a different fleet management group, and deal with franchisees in some of the new locations.  See id. at 72:12-15, 77:5-15.  Kennedy now has a different supervisor, Kevin Hill.  See id. at 85:6-10.  His bonus plan was impacted in that he can make more money as a result of the additional car rental activity which is now under his supervision.  See Kennedy Depo. at 83:18-84:16.

Significant differences exist between the job responsibilities of general manager now and at the time of Clayton's employment, and between the market at the Albuquerque location and other Vanguard markets.  See Baker Aff. ¶ 10, at 3.  For example, Albuquerque is a small to medium sized location and has only one airport.  See Baker Aff. ¶ 10, at 3.  General managers in larger locations with more airports, such as Houston, are paid more because their job responsibilities and demands are greater.  See Baker Aff. ¶ 10, at 3.  This fact is true today and was at the time Clayton was at Vanguard.  See id. ¶ 10, at 3.

Enterprise acquired Vanguard in August 2007.  See Filomena Depo. at 10:13-18.  Clayton, Davenport, Filomena, Baker, Murphy, and Choquette were all employees of Vanguard through the time of Clayton's termination in February 2008.  See Baker Aff. ¶ 3, at 1.

## PROCEDURAL BACKGROUND

On January 28, 2009 Clayton filed her Complaint in the Second Judicial District of New Mexico.  See Complaint for Civil Rights Violations, filed February 25, 2009 (Doc. 1-1).  Vanguard removed the matter on February 25, 2010.  See Notice of Removal, filed February 25, 2009 (Doc. 1).  The Notice of Removal asserted that the Court had jurisdiction over Clayton's federal law claims under 28 U.S.C. § 1331 and supplemental jurisdiction over Clayton's state law claims.  See Notice of Removal at 2.

On March 11, 2010, Clayton filed an Amended Complaint.  See First Amended Complaint

for Civil Rights Violations, Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing, filed March 11, 2010 (Doc. 105). The Amended Complaint contains nine counts. <u>See</u> Amended Complaint at 3-11. Count I is a claim for sex discrimination under Title VII. <u>See</u> Amended Complaint at 3. Count II alleges sex discrimination under the NMHRA. <u>See</u> Amended Complaint at 4. Count III is a claim for age discrimination under the ADEA. <u>See</u> Amended Complaint at 5. Count IV is a claim for age discrimination under the NMHRA. <u>See</u> Amended Complaint at 5. Count V is a claim under Title VII for retaliation. <u>See</u> Amended Complaint at 6. Count VI is a claim under the NMHRA for retaliation. <u>See</u> Amended Complaint at 7. Count VII is a claim for violations of the EPA. <u>See</u> Amended Complaint at 8. Count VIII is a claim for breach of contract, and Count IX is a claim for breach of the covenant of good faith and fair dealing. <u>See</u> Amended Complaint at 9, 11.

Vanguard moves the Court for summary judgment. Vanguard alleges that Clayton's claims for discrimination under Title VII and the NMHRA fail. <u>See</u> Motion at 24. Vanguard contends Clayton has no direct evidence of age or gender bias. <u>See id.</u> at 25. Vanguard argues that Clayton's federal and state discrimination claims fail under the <u>McDonnell Douglas v. Green</u>[50] burden-shifting framework, because she cannot establish a prima-facie case of age or sex discrimination, and, even assuming she can establish a prima-facie case, she cannot demonstrate Vanguard's reasons for termination are a pretext for discrimination. <u>See</u> Motion at 27-29. Vanguard alleges that Clayton's retaliation claims fail, because she never engaged in protected activity, and even assuming protected opposition, the termination was sixteen months after any alleged protected activity -- defying any reasonable inference of retaliation. <u>See id.</u> at 33-34. Vanguard alleges that Clayton's EPA claims

---

[50] 411 U.S. 792 (1973).

fail, because there is no valid basis for her claim, as her job is not legally comparable to other establishments, because any difference in the bonus compensation was based on merit, and any disparity in base pay was a result of factors other than sex.  See Motion at 35-38.  Vanguard alleges that Clayton's breach-of-contract claim fails, because she was an at-will employee, and because it did not breach any harassment and offensive conduct policy.  See Motion at 39, 41.  Finally, Vanguard alleges that Clayton's good-faith-and-fair-dealing claim fails, because she was an at-will employee, and even assuming a duty of good faith and fair dealing applies, it did not commit a breach.  See Motion at 44-45.

Clayton responded to Vanguard's Motion on October 25, 2010.  In her Response, Clayton argues that she has presented sufficient evidence to satisfy a prima-facie case of gender and sex discrimination.  See Response at 5.  She argues that she presents sufficient evidence of pretext, because Vanguard gives contradictory, inconsistent, and implausible explanations of the justification and rationale for the termination.  See Response at 7-8.  She contends that her breach-of-contract claim should survive, because she presents sufficient facts for a reasonable jury to determine that the written progressive discipline policy, and customary practice of following progressive discipline, create a reasonable expectation that Vanguard would follow the progressive steps before terminating her employment.  See Response at 30.  She contends her EPA claim is based on disparities between base salary rates, and that she has presented evidence which demonstrates a pattern of paying female general managers in comparable markets less than male general managers in the same-sized markets.  See Response at 33-34.  She contends that her EPA claim does not rely on bonus plans.  See Response at 34.  Clayton agreed to voluntarily dismiss her retaliation claims in Counts V and VI of her Amended Complaint.  See Response at 39.  Although she asserts that the Court should not grant summary judgment on her claim for breach of the covenant of good faith and fair dealing,

Clayton does not address this claim in her Response.

Vanguard replied on November 1, 2010.  Vanguard contends that Clayton cannot prove pretext, because her conclusory evidence of pretext does not show that the relevant decision makers acted with discriminatory intent or motive.  See Reply at 3.  Vanguard also contends:

> Despite long complaints in her deposition about the bonus plan, [Clayton] never testified her *base pay* was an issue.  Further, she admits she never complained to Davenport of gender-based pay discrimination.  Yet now that discovery is closed she shifts to a base pay theory of discrimination regarding GM's in other markets.  This *ad hoc* reversal is of no avail.

Reply at 13.

At the hearing, Brian M. Mumaugh, Vanguard's counsel, first stated that Clayton's signature on the letter was the triggering event for her termination.  See Transcript of Hearing at 61:17-22 (taken November 8, 2010)(Mumaugh, Court)("Tr.").  The Court asked Mr. Mumaugh whether there were multiple reasons for Clayton's termination.  See id. at 57:3-6, 61:19-21 (Court).  Mr. Mumaugh stated that there was only one reason, and the reason was that Clayton signed the letter.  See Tr. at 61:17-62:6 (Mumaugh, Court).  Mr. Mumaugh also stated that the comparators[51] Clayton sets forth for her EPA claim have differences -- such as being in cities with more airports or fueling operations.  See Tr. at 16:6-17:21 (Mumaugh).  He argued that there are sufficient distinguishing characteristics to explain the differences in base pay.  See id. at 16:21-24 (Mumaugh).  The Court asked Mr. Mumaugh whether there were issues of material fact regarding Clayton's prima-facie case of discrimination, and Mr. Mumaugh said that there were issues of material fact regarding whether Clayton was qualified for her position.  See id. at 52:17-53:8 (Court, Mumaugh).  J. Edward

---

[51] Courts use the word comparator to describe the employees with whom the plaintiff seeks to compare his or her pay to under the EPA.  See Mehus v. Emporia State Univ., 222 F.R.D. 455, 471 (D. Kan. 2004).

Hollington, Clayton's counsel, conceded that Vanguard had stated a nondiscriminatory reason for terminating her.  See id. at 31:1-5 (Court, Hollington).  Mr. Hollington also agreed that there was not any direct evidence of gender or age discrimination, and that the Court should use the McDonnell Douglas analysis.  See Tr. at 41:24-42:2 (Court, Hollington).  Mr. Mumaugh stated that, in his discussions with Mr. Hollington, it was apparent that Clayton was going to dismiss all her state contract claims, with the exception of claims relating to progressive discipline.  See Tr. at 6:3-7 (Mumaugh).  When the Court asked Mr. Hollington whether he agreed with Mr. Mumaugh's characterization of what Clayton had agreed to dismiss, Mr. Hollington stated that Clayton has submitted a stipulation of dismissal on the two retaliation claims, and is stipulating that the breach-of-contract claim is for failure to follow progressive discipline.  See Tr. at 45:14-19 (Hollington).  Mr. Hollington did not object to any portion of Mr. Mumaugh's statement, or correct his statement, but he has not moved to dismiss Clayton's state contract claims.  In any case, Mr. Hollington did not explain why Clayton's Response failed to address Vanguard's arguments regarding Clayton's good-faith-and-fair-dealing claim.

### LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record],

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.")(internal quotation marks omitted).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotes omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo

v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539.  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the court cannot decide any

issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## RELEVANT LAW REGARDING EMPLOYMENT DISCRIMINATION UNDER THE ADEA AND TITLE VII

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin."  Brown v. Gen. Servs. Admin., 425 U.S. 820, 825 (1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3).  "Title VII of the Civil Rights Act of 1964 prohibits an employer from failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL 6364329, at *6 (D.N.M. Dec. 31, 2007)(Browning, J.)(quoting 42 U.S.C. § 2000e-2(a)(1))(internal quotes and alterations omitted).

Under the ADEA, it is "unlawful for an employer" to "discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Thus, a plaintiff suing under the ADEA must prove that his or her age motivated  the challenged employment action.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000).

For both Title VII and ADEA claims, at the summary-judgment stage,  the nonmoving party must come forth with some proof of discrimination, either by demonstrating direct evidence of the employer's discriminatory intent or, "[u]nder McDonnell Douglas, . . . by providing circumstantial rather than direct evidence of [intentional] discrimination." Jones v. Oklahoma City Public Schools, 617 F.3d 1273 (10th Cir. 2010).  See Hare v. Denver Merch. Mart, Inc., 255 F. App'x 298, 301 (10th Cir. 2007) (citing McDonnell Douglas v. Green, 411 U.S. at 802.

### 1.  Direct Evidence.

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue

without inference or presumption." Hall v. U.S. Dep't of Labor, 476 F.3d 847, 855 (10th Cir. 2007).

Moreover, "[d]irect evidence demonstrates on its face that the employment decision was reached

for discriminatory reasons." Danville v. Reg'l Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002).

"When a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination,

[the Tenth Circuit] has held that the plaintiff must demonstrate a nexus exists between the alleged

discriminatory statements and the . . . decision to terminate [the employee]." Negrete v. Maloof

Distrib. L.L.C., No. CIV 06-0338 JB/LFG, Memorandum Opinion and Order at 39, filed November

28, 2007 (D.N.M.)(Browning, J.)(internal quotations omitted).  "Direct evidence is that which

demonstrates a specific link between the alleged discriminatory animus and the challenged

[employment] decision, sufficient to support a finding by a reasonable fact finder that an illegitimate

criterion actually motivated [the employer's] decision to take the adverse employment action."

Deneen v. Nw. Airlines, 132 F.3d 431, 436 (8th Cir. 1998).

### 2. Indirect Evidence Under the McDonnell Douglas Framework.

A plaintiff may use indirect evidence to establish a case under Title VII or the ADEA.  See

McDonnell Douglas Corp. v. Green, 411 U.S. at 802-803.  "[C]laims of age, race, national origin,

gender discrimination, and retaliation are all subject to the burden shifting framework that the

Supreme Court established in McDonnell Douglas Corp. v. Green." Gamez v. Country Cottage Care

and Rehab., 377 F. Supp. 2d 1103, 1119 (D.N.M. 2005)(Browning, J.)(citing McDonnell Douglas

Corp. v. Green, 411 U.S. at 802-804).  Similarly, the United States Court of Appeals for the Tenth

Circuit "has long held that plaintiffs may use the McDonnell Douglas three-step analysis to prove

age discrimination under the ADEA."  Jones v. Oklahoma City Pub. Schs., 617 F.3d at 1279

(citations omitted).

Under the McDonnell Douglas framework, a plaintiff must set forth a prima-facie case of

-46-

discrimination.  See Kelly v. City of Albuquerque, 375 F. Supp. 2d 1183, 1210 (D.N.M. 204)(Browning, J.).  If the plaintiff establishes a prima-facie case for any of his discrimination claims, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision." Mitchell v. City of Wichita, Kan., 140 F. App'x 767, 777 (10th Cir. 2005).  "Upon the employer's articulation of a legitimate, nondiscriminatory reason . . . the presumption of discrimination established by the prima-facie case simply drops out of the picture." Kelly v. City of Albuquerque, 375 F. Supp. 2d at 1210 (internal quotations omitted).  The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual.  See 375 F. Supp. 2d at 1210 (citing Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1230).

### a.    Prima-Facie Case of Discrimination.

To set forth a prima-facie case of discrimination, a plaintiff must show: (i) he or she is a member of the class protected by the statute; (ii) he or she suffered an adverse employment action; (iii) he or she was qualified for the position at issue; and (iv) he or she was treated less favorably than others not in the protected class.  See Sanchez v. Denver Pub. Schools, 164 F.3d 527, 531 (10th Cir. 1998).  "Although the four McDonnell Douglas factors were not cast as a rigid rule to apply to all factual situations, courts have adapted the formulation to fit cases involving claims of discriminatory discharge." Brown v. Parker-Hannifin Corp., 746 F.2d 1407, 1409 (10th Cir. 1984). The Tenth Circuit "has stated that a plaintiff may establish a prima facie case of wrongful termination by showing that:" (i) "she belongs to a protected class;" (ii) "she was qualified for her job;" (iii) "despite her qualifications, she was discharged;" and (iv) "the job was not eliminated after her discharge." Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir. 1999)(citation omitted).

The Tenth Circuit liberally

> defines the phrase adverse employment action. Such actions are not simply limited
> to monetary losses in the form of wages or benefits. Instead, we take a case-by-case
> approach, examining the unique factors relevant to the situation at hand. Although
> we do not deem a mere inconvenience or an alteration of job responsibilities to be
> an adverse employment action, the prong is satisfied by a significant change in
> employment status, such as hiring, firing, failing to promote, reassignment with
> significantly different responsibilities, or a decision causing a significant change in
> benefits.

Jones v. Oklahoma City Pub. Schs., 617 F.3d at 1279 (internal quotation marks and citations

omitted).

> The relevant inquiry at the prima facie stage [regarding whether the employee
> was qualified for the position] is not whether an employee or potential employee is
> able to meet all the objective criteria adopted by the employer, but whether the
> employee has introduced some evidence that she possesses the objective
> qualifications necessary to perform the job sought.

E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1193 (10th Cir. 2000). "If an employee

is able to introduce such evidence, [he or] she has satisfied [the] prima facie burden of

demonstrating that [he or] she does not suffer from an 'absolute or relative lack of qualifications.'"

E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d at 1193-94 (citation omitted). "Thus, a

plaintiff has satisfied her prima facie burden of showing she is qualified by presenting some credible

evidence that she possesses the objective qualifications necessary to perform the job at issue."

E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.2d at 1194 (citation omitted). In E.E.O.C. v.

Horizon/CMS Healthcare Corp., the Tenth Circuit found that the EEOC "need only present some

credible evidence that the Charging Parties possessed the basic skills necessary to perform the

[position at issue]." E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.2d at 1194.

The Tenth Circuit has noted that "[a] plaintiff alleging discrimination in violation of Title

VII can satisfy the fourth element of her prima facie case in a number of ways." Ortiz v. Norton,

254 F.3d 889, 897 (10th Cir. 2001). One of those ways in a discriminatory discharge case is simply

-48-

by showing that the job was not eliminated.  See id. at 897 (citations omitted).  The Tenth Circuit has also "stated that the fourth element of the prima facie test is met if the discharged plaintiff can show that someone was hired to replace her."  Perry v. Woodward, 199 F.3d at 1138 (citation omitted).

### b.   Prima-Facie Case of Age Discrimination.

In a termination case, a plaintiff can establish a prima-facie case of age discrimination by showing that he or she was: (i) "within the protected class of individuals 40 or older;" (ii) "performing satisfactory work;" (iii) "terminated from employment;" and (iv) "replaced by a younger person, although not necessarily one less than 40 years of age."  Adamson v. Multi Community Diversified Services, Inc., 514 F.3d 1136, 1146 (10th Cir. 2008).

### 3.   Legitimate Nondiscriminatory Reason for Employment Decision.

After the plaintiff establishes a prima-facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action.  See McDonnell Douglas Corp v. Green, 411 U.S. at 802.  "[T]he defendant's burden at this stage is one of production, not one of persuasion." Mirzai v. State of N.M. Gen. Servs. Dep't, 506 F. Supp. 2d 767, 775 (D.N.M. 2007)(Browning, J.).  "If the defendant is successful in articulating some legitimate, non-discriminatory reason, the presumption of discrimination established by the prima facie showing simply drops out of the picture." Id. at 775 (internal quotation marks and citation omitted). "The [defendant] need not persuade the court that it was actually motivated by the proffered reasons, but satisfies its burden merely by raising a genuine issue of fact as to whether it discriminated against the plaintiff."  Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1425 (10th Cir.1993)(internal quotations omitted).

-49-

4.      **Pretext as to the Proffered Legitimate Nondiscriminatory Reason.**

"Once the defendant meets its burden of production by offering a legitimate rationale in support of its employment decision, the burden shifts back again to the plaintiff to show that the defendant's proffered reasons were a pretext for discrimination." McDonnell Douglas, 411 U.S. at 804-05.   "[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).

The Tenth Circuit has stated a plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)(internal quotation marks and citation omitted).  See Hare v. Denver Merch. Mart, Inc., 255 F. App'x. at 304.  Although "a plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual," Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)(alterations omitted), pretext is typically shown in one of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

Green v. New Mexico, 420 F.2d 1189, 1193 (10th Cir. 2005).  See Wagoner v. Pfizer, Inc., No. 09-3066, 2010 WL 3199778, *5 (10th Cir. Aug. 12, 2010)("A plaintiff typically makes a showing of pretext with evidence that: (1) defendant's stated reason for the adverse employment action is false,

(2) defendant acted contrary to a written policy, or (3) defendant acted contrary to an unwritten policy or practice."). "The inquiry goes to the subjective belief of those making the termination decision; '[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.'" Hare v. Denver Merch. Mart, Inc., 255 F. App'x. at 304 (quoting Rivera v. City and County of Denver, 365 F.3d 912, 924-25 (10th Cir. 2004)).

"Evidence tending to show pretext permits an inference that the employer acted for discriminatory reasons." Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir. 2005)(citation omitted). At the summary judgment stage, "the inference of discrimination permitted by evidence of pretext must be resolved in favor of the plaintiff." Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir. 2005)(citation omitted). "Thus, once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." Bryant v. Farmers Ins. Exch., 432 F.3d at 1125 (citation omitted).

The Tenth Circuit has stated that the "mere variety in reasons [for an employee's termination will] not alone undermine their credibility[;] [e]ach individual may consider a different reason to be the essential factor in a decision to terminate." Hare v. Denver Merch. Mart, Inc., 255 F. App'x at 305 (citation omitted). When, however, the various reasons are not only different but mutually inconsistent, the contradictions are sufficient to establish pretext for the purpose of summary judgment. See Hare v. Denver Merch. Mart, Inc., 255 F. App'x at 305 (citation omitted); Ruleford v. Tulsa World Pub. Co., 266 F. App'x 778, 782 (10th Cir. 2008)("Although inconsistent rationales may constitute pretext, the mere variety of reasons for a termination decision do not alone create

pretext.")(citations omitted).

      A plaintiff can use the cat's paw or rubber-stamp doctrine to establish that his or her employer's proffered reason for the employee's termination is pretextual. "The 'cat's paw' doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire." EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 484 (10th Cir.2006). "As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none . . . for the cat." EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 484. In employment discrimination cases, the term "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 484. The rubber-stamp doctrine "refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate." EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 484. Under these doctrines, the "issue is whether the biased subordinate's discriminatory reports, recommendation, or other action caused the adverse employment action." EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 487. An employer can avoid liability, however, "by conducting an independent investigation of the allegations against an employee." EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 488. "In that event, the employer has taken care not to rely on the say-so of the biased subordinate, and the causal link is defeated [between the allegedly discriminatory workplace statements and the termination decision]." EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 488. See Schulte v. Potter, 218 F. App'x 703, 719 (10th Cir.2007)(indicating that the cat's paw theory would be applicable in an age-discrimination claim).

For a plaintiff to prevail on a cat's paw theory claim, he or she "must show that a biased subordinate's discriminatory reports, recommendations, or other actions caused the adverse employment action."  Hamby v. Associated Cent. for Therapy, 230 F. App'x 772, 780 (10th Cir. 2007).

In EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, the Tenth Circuit held that Cesar Grado, a District Sales Manager, had broad responsibility to bring facts to the attention of the Human Resources Department, which was ultimately responsible for deciding whether to take any disciplinary action.  See 450 F.3d at 478.  The plaintiff produced evidence that Grado had made "many race-based remarks" and may have used a racial epithet to describe the plaintiff.  See EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 489.  The Tenth Circuit determined that summary judgment was inappropriate, because a factfinder could conclude that the plaintiff's termination was caused by Grado feeding biased-tainted information to the decisionmaker.  See EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 492.

The Tenth Circuit held that summary judgment was inappropriate, although the decisionmaker directed another employee to pull the plaintiff's personnel file.  See EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 492.  The Tenth Circuit found the decisionmaker's actions insufficient to constitute an independent investigation.  See EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 492 (stating that the decisionmaker's "investigation [was] inadequate, as a matter of law, to defeat the inference that . . . Grado's racial bias tainted the decision."  (internal quotations omitted)).  The Tenth Circuit explained that the problem was the decisionmaker "never sought any other version of events, and therefore had no other reason other than . . . Grado's report to believe that the file was relevant."  EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 493.  The Tenth Circuit held that summary

judgment was inappropriate, even though the decisionmaker did not know the race of the plaintiff

and maintained that race had no part in her decision to terminate the plaintiff.  See EEOC v. BCI

Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 481; Flitton v. Primary Residential Mortgage,

Inc., 238 F. App'x 410, 418 n. 5 (10th Cir. 2007)(holding that summary judgment was inappropriate,

because the Tenth Circuit's "caselaw permits [it] to impute the biases of subordinates to an ultimate

decisionmaker if 'the biased subordinate's reports, recommendation, or other actions caused the

adverse employment action,'" and the record revealed that the decisionmaker may have been

persuaded to fire the plaintiff based on the actions of a biased subordinate)(quoting EEOC v. BCI

Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 487).

### NMHRA

The NMHRA makes it an unlawful discriminatory practice for

> an employer, unless based on a bona fide occupational qualification or other
> statutory prohibition, to refuse to hire, to discharge, to promote or demote or to
> discriminate in matters of compensation, terms, conditions or privileges of
> employment against any person otherwise qualified because of race, age, religion,
> color, national origin, ancestry, sex, physical or mental handicap or serious medical
> condition, or, if the employer has fifty or more employees, spousal affiliation;
> provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to
> discrimination based on age; or, if the employer has fifteen or more employees, to
> discriminate against an employee based upon the employee's sexual orientation or
> gender identity[.]

NMSA 1978, § 28-1-7A.  The NMHRA allows individuals to bring a lawsuit in the appropriate

district court after exhausting their administrative remedies.  See Luboyeski v. Hill, 117 N.M. 380,

382, 872 P.2d 353, 355 (1994).  The NMHRA provides:

> A person aggrieved by an order of the commission may obtain a trial de novo in the
> district court of the county where the discriminatory practice occurred or where the
> respondent does business by filing a notice of appeal within ninety days from the
> date of service of the [New Mexico Human Rights] commission's order.

NMSA 1978, § 28-1-13A.  Cf. Bates v. New Mexico Corrections Dept., No. CIV 08-1013, 2010 WL

4339367, at *7 (D.N.M. Sept. 30, 2010)("NMHRA claims must be administratively exhausted before being brought in federal court.").

The Supreme Court of New Mexico applies the framework that the Supreme Court of the United States established in McDonnell Douglas Corp. v. Green "[w]hen considering a violation of the NMHRA." Juneau v. Intel Corp., 139 N.M. 12, 15, 127 P.3d 548, 551 (2005). The Supreme Court of New Mexico has stated that, "when considering claims under the NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the NMHRA. Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own." Ocana v. Am. Furniture Co., 135 N.M. 539, 549, 91 P.3d 58, 68 (2004) (citations and internal quotations omitted).

While New Mexico uses federal law to interpret the NMHRA, there may be two ways in which the NMHRA is broader than federal law. First, as this Court has previously acknowledged, the Supreme Court of New Mexico allows for personal liability under the NMHRA. See Duprey v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2482170, at *7 (D.N.M. July 28, 2009)(Browning, J.). The NMHRA defines "employer" as "any person employing four or more persons and any person acting for an employer." NMSA 1978, § 28-1-2B. While acknowledging that there is generally no personal liability under Title VII, the Supreme Court of New Mexico has "reject[ed] the proposition that there can exist no individual liability under the NMHRA." Sonntag v. Shaw, 130 N.M. 238, 243, 22 P.3d 1188, 1193 (2001). In Sonntag v. Shaw, a defendant relied on Title VII case law to argue that the owner of a corporation could not be sued as an individual under the NMHRA. See Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193. Although it held that the defendant could not be held personally liable, given that the plaintiff had failed to exhaust administrative remedies, the Supreme Court of New Mexico declined to close the door on individual

liability under the NMHRA.  See Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.  The Supreme

Court of New Mexico noted:

> [T]his Court has acknowledged the possibility of individual liability for
> discrimination claims.  Cf. Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355
> (1994) (affirming the dismissal of individual defendants because the plaintiff failed
> to exhaust administrative remedies against them); Mitchell-Carr v. McLendon,
> 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing Luboyeski).  As Plaintiff
> suggests, the potential for individual liability for discrimination claims is rooted in
> the language of the NMHRA itself, which forbids "any person" from supporting a
> discriminatory practice.  Section 28-1-7(i); see NMSA 1978, § 28-1-2(A) (1993)
> (including within its definition of "person" for purposes of the NMHRA, "one or
> more individuals").

Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.  Second, the language of "serious medical

condition" in the NMHRA, NMSA 1978, § 28-1-7, may be broader in scope than the term disability

in the Americans with Disabilities Act, 42 U.S.C. §§ 12201 to 12213.  See Clayton v. Pioneer Bank,

No. CIV 07-0680, 2008 WL 5787472, at *17-18 (D.N.M. Dec. 31, 2008)(Browning, J.)(recognizing

that, although "the terms 'medical condition' under the NMHRA, and 'disability,' under the ADA,

may be interchangeable in some cases[,]" they may not in others).

## RELEVANT LAW REGARDING THE EPA

The EPA states:

> No employer having employees subject to any provisions of this section shall
> discriminate, within any establishment in which such employees are employed,
> between employees on the basis of sex by paying wages to employees in such
> establishment at a rate less than the rate at which he pays wages to employees of the
> opposite sex in such establishment for equal work on jobs the performance of which
> requires equal skill, effort, and responsibility, and which are performed under similar
> working conditions, except where such payment is made pursuant to (i) a seniority
> system; (ii) a merit system; (iii) a system which measures earnings by quantity or
> quality of production; or (iv) a differential based on any other factor other than sex:
> Provided, That an employer who is paying a wage rate differential in violation of this
> subsection shall not, in order to comply with the provisions of this subsection, reduce
> the wage rate of any employee.

29 U.S.C. § 206(d)(1)(emphasis added).  The Code of Federal Regulations defines "establishment"

as "a distinct physical place of business rather than . . . an entire business or 'enterprise' which may include several separate places of business[;] [a]ccordingly, each physically separate place of business is ordinarily considered a separate establishment."  29 C.F.R. § 1620.9.  The Code of Federal Regulations states that

> unusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment.  For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions.  Barring unusual circumstances, however, the term "establishment" will be applied as described in paragraph (a) of this section.

29 C.F.R. § 1620.9.  To prevail in an EPA action, the jobs must be "substantially equal in terms of skill, effort, responsibility, and working conditions."  Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1364 (10th Cir. 1997)(internal quotation marks and citation omitted).

EPA claims proceed in two steps.  "First, the plaintiff must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work."  Mickelson v. New York Life Ins. Co., 460 F.3d 1304, 1311 (10th Cir. 2006).  The Tenth Circuit has stated:

> Substantial equality is to be evaluated in terms of skill, effort and responsibility, and requires a practical judgment on the basis of all the facts and circumstances of a particular case.  Skill includes such considerations as experience, training, education, and ability.  Effort refers to the physical or mental exertion necessary to the performance of a job.  Responsibility concerns the degree of accountability required in performing a job.  Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job.

E.E.O.C. v. Cent. Kan. Med. Ctr, 705 F.2d 1270, 1272 (10th Cir. 1983), rejected on other grounds by McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988).  The Tenth Circuit does not construe the EPA's equal work requirement broadly, and has stated that "failure to furnish equal pay for 'comparable work' or 'like jobs' is not actionable."  Sprague v. Thorn Americas, Inc., 129 F.3d at

-57-

1364.

If the plaintiff establishes a prima-facie case, the burden of persuasion then shifts to the defendant to prove that the wage disparity was justified for one of four permissible reasons.  See Mickelson v. New York Life Ins. Co., 460 F.3d at 1311.  The four reasons are: (i) a seniority system; (ii) a merit system; (iii) a pay system based on quantity or quality of output; (iv) a disparity based on any factor other than sex.  See 29 U.S.C. § 206(d); Mickelson v. New York Life Ins. Co., 460 F.3d at 1311.  This stage means that, to prevail on summary judgment, the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary.  See Mickelson v. New York Life Ins. Co., 460 F.3d at 1311.

## RELEVANT NEW MEXICO LAW REGARDING IMPLIED EMPLOYMENT CONTRACTS

In New Mexico, "an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)(citation omitted). At-will employment relationships "can be terminated by either party at any time for any reason or no reason, without liability."  Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857 P.2d at 779. "New Mexico courts have recognized two additional exceptions to the general rule of at-will employment: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge."  Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857 P.2d at 779.

A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties,

or in a combination of representations and conduct. See Newberry v. Allied Stores, Inc., 108 N.M. 424, 426, 773 P.2d 1231, 1233 (1989)(citation omitted).  "Under New Mexico law, a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined." See Newberry v. Allied Stores, Inc., 108 N.M. at 427, 773 P.2d at 1234.  The question whether an employment relationship has been modified is a question of fact.  See Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. 664, 666, 748 P.2d 507, 509 (1988).  "An implied contract is created only where an employer creates a reasonable expectation.  The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783.  If the alleged employer's promise is not sufficiently explicit, the courts will not find an implied contract.  Hartbarger v. Frank Paxton Co., 115 N.M. at 669, 857 P.2d at 780.

> Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it.  We do not mean to imply that all personnel manual will become part of employment contracts. Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason.  Such actions instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual.  However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it.  Having announced a policy, the employer may not treat it as illusory.

Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. at 666-67, 748 P.2d at 509-10 (citation omitted).

"Whether an employer's words and conduct support a reasonable expectation on the part of employees that they will be dismissed only in accordance with specified procedures or for specified reasons generally is a question of fact for the jury." Meland v. E. N.M. Med. Ctr., 131 N.M. 65, 69,

33 P.3d 285, 289 (2001).  "[B]ecause an employee's expectation based on an employer's words or conduct must meet a certain threshold of objectivity, an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable."  West v. Wash. Tru Solutions, LLC, 147 N.M. 424, 426, 224 P.3d 651, 653 (Ct. App. 2009).  In deciding whether to grant summary judgment, the question is whether a reasonable jury could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons.  See Meland v. E. N.M. Med. Ctr., 131 N.M. at 69, 33 P.3d at 289.

"[E]ven where a personnel manual purports to disclaim any intentions of forming contractual obligations enforceable against an employer, a fact finder may still look to the totality of the parties' statements and actions, including the contents of a personnel manual, to determine whether contractual obligations were created."  Beggs v. City of Portales, 146 N.M. 372, 377, 210 P.2d 798, 803 (2009).

## RELEVANT NEW MEXICO LAW REGARDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement."  Watson Truck & Supply Co., Inc. v. Males, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990)(citations omitted).  "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement."  Watson Truck & Supply Co. v. Males, 111 N.M. at 60, 801 P.2d at 642 (internal quotation marks omitted).  The Supreme Court of New Mexico has expressed reluctance, however, to use the covenant of good faith and fair dealing "under circumstances where . . . it may be argued that from the covenant there is to be implied in fact a term or condition necessary to effect the purpose of a

contract." <u>Watson Truck & Supply Co. v. Males</u>, 111 N.M. at 60, 801 P.2d at 642.

New Mexico has recognized a cause of action for breach of the covenant of good faith and fair dealing sounding in contract. <u>See</u> <u>Bourgeous v. Horizon Healthcare Corp.</u>, 117 N.M. 434, 439, 872 P.2d 852, 857 (1994). The Supreme Court of New Mexico also explained that tort recovery for breach of the covenant of good faith and fair dealing would be permissible only where a special relationship existed, such as between insurer and insured. <u>See</u> <u>Bourgeous v. Horizon Healthcare Corp.</u>, 117 N.M. at 439, 872 P.2d at 857. The "relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position." <u>Bourgeous v. Horizon Healthcare Corp.</u>, 117 N.M. at 439, 872 P.2d at 857 (internal quotation marks and citations omitted). Similarly, the Court of Appeals of New Mexico held that "[t]he claim for breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists." <u>Heimann v. Kinder-Morgan CO2 Co.</u>, 140 N.M. 552, 558, 144 P.3d 111, 117 (Ct. App. 2006).

The Supreme Court of New Mexico has noted that it does "not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship." <u>Melnick v. State Farm Mut. Auto Ins. Co.</u>, 106 N.M. 726, 730, 749 P.2d 1105, 1109 (1988). This limitation is because "there *is* no contract of employment upon which the law can impose the stated duty to exercise good faith and fair dealing." <u>Sanchez v. The New Mexican</u>, 106 N.M. 76, 78, 738 P.2d 1321, 1324 (1987)(emphasis in original).

## <u>ANALYSIS</u>

For Clayton to survive summary judgment on her discrimination claims, she must come forth with either direct evidence of Vanguard's discriminatory intent or circumstantial evidence of intentional discrimination. Because Clayton has conceded that she does not have direct evidence

of Vanguard's discriminatory intent, the Court will analyze Clayton's claims using the McDonnell Douglas burden-shifting analysis.  The Court finds that Clayton has set forth sufficient evidence to establish a prima-facie case of age discrimination under the ADEA and gender discrimination under Title VII.  Vanguard has set forth a legitimate nondiscriminatory reason for Clayton's termination: she signed a letter, which several of her employees drafted, requesting higher wages.  The Court finds that there is a genuine of issue of material fact regarding whether Vanguard's legitimate nondiscriminatory reason is pretextual, because there is evidence in the record that Clayton's signature on the letter was not the only reason that Vanguard terminated Clayton.  There is also evidence that Vanguard's legitimate nondiscriminatory reason for Clayton's termination is pretext for gender discrimination, because there are genuine issues of material fact whether Ham was biased on account of Clayton's gender and whether Ham's actions caused, in part, Clayton's termination. The Court will therefore deny Vanguard's request that it grant summary judgment on Clayton's federal discrimination claims.  Because the Supreme Court of New Mexico has stated that it looks to federal civil rights adjudication for guidance in interpreting the NMHRA, and because the parties incorporate their arguments and analysis regarding Clayton's federal discrimination claims into their arguments regarding Clayton's NMHRA claims, the Court will not grant summary judgment on Clayton's claims for gender discrimination and age discrimination under the NMHRA.  The Court finds that Clayton has established a prima-facie case that Vanguard paid Kennedy more for substantially equal work, but Vanguard has proved that the pay disparity is based on a factor other than sex.  The Court finds that Clayton has not established a prima-case that Vanguard paid her less than male general managers in other markets for substantially equal work.  The Court will therefore grant summary judgment on Clayton's EPA claim.  The Court will not grant summary judgment on Clayton's breach-of-implied-contract claim regarding progressive discipline, because there is a

genuine issue of material fact whether the Associate Handbook and Vanguard's employment practices created an objectively reasonable expectation that Vanguard would use progressive discipline, except in cases of serious offenses such as theft, and there is a genuine issue of material fact whether Clayton's offense was a serious offense.  Although it may not be necessary for the Court to decide whether it should grant summary judgment on Clayton's breach-of-implied-contract claim regarding Vanguard's anti-discrimination and investigation policy, the Court finds that there is no genuine issue of fact regarding whether Vanguard's policies created an implied contract.  The Court will not grant summary judgment on Clayton's implied-covenant-of-good-faith-and-fair-dealing claim, because there is a genuine issue of material fact whether Vanguard deprived Clayton of the benefits of its agreement regarding progressive discipline.  Although it may not be necessary for the Court to decide whether it should grant summary judgment on Clayton's implied-covenant-of-good-faith-and-fair-dealing claim regarding Vanguard's anti-discrimination and investigation policies, the Court finds that there is no genuine issue of material fact regarding this claim.  The implied covenant of good faith and fair dealing that arises out of the implied contract of employment regarding Vanguard's discipline policies would not cover Clayton's claim that Vanguard did not follow its anti-discrimination or investigation policies.  Under New Mexico law, an implied contract of employment covers only those matters on which there were representations sufficiently specific for a reasonable employee to rely.  Any implied contract of employment that Vanguard would follow progressive discipline covers only matters regarding progressive discipline and not discrimination or investigation of discrimination.  Although the Court may not need to decide these issues, it finds that Vanguard's anti-discrimination and investigation policies would not create an implied contract, because they are not sufficiently specific; therefore, there is no contract with which to impose on Vanguard a duty to act in good faith.

## I.     CLAYTON HAS ESTABLISHED A PRIMA-FACIE CASE OF GENDER DISCRIMINATION.

Vanguard alleges that Clayton cannot establish a prima-facie case of gender discrimination, because she cannot show that she was qualified for her position.  See Motion at 28.  Vanguard alleges that, at the time of her termination, she was not meeting Vanguard's legitimate expectations, because of her failure to remedy acute communication problems, and because of her signature on a union-like petition, which was contrary to express Vanguard policy.  See Motion at 28.  Clayton asserts that she has presented enough evidence to establish a prima-facie case of gender discrimination, because she has presented evidence that she met the qualifications of a general manager and was replaced by someone with less experience.  See Response at 5.

The Tenth Circuit "has stated that a plaintiff may establish a prima facie case of wrongful termination by showing that:" (i) "she belongs to a protected class;" (ii) "she was qualified for her job;" (iii) "despite her qualifications, she was discharged;" and (iv) "the job was not eliminated after her discharge."  Perry v. Woodward, 199 F.3d at 1138 (citation omitted).

Clayton belongs to a protected class as a female.  See 42 U.S.C. § 2000e-2 ("It shall be an unlawful employment practice for an employer . . . to . . . discriminate against any individual . . ., because of such individual's . . . sex . . . .").  The Tenth Circuit has indicated that courts should not conclude that a plaintiff was not qualified for a position based on the defendant's proffered reasons for terminating the plaintiff.  In MacDonald v. Eastern Wyoming Mental Health Center, 941 F.2d 1115, 1119 (10th Cir. 1991), overruled on other grounds by Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995), the Tenth Circuit stated

> Moreover, concluding that the [plaintiffs] did not establish a prima facie case based on the reasons for their discharge raises serious problems under the McDonnell Douglas analysis, which mandates a full and fair opportunity for a plaintiff to demonstrate pretext. Short-circuiting the analysis at the prima facie stage frustrates

-64-

> a plaintiff's ability to establish that the defendant's proffered reasons were pretextual and/or that age was the determining factor; if a plaintiff's failure to overcome the reasons offered by the defendant for discharge defeats the plaintiff's prima facie case, the court is then not required to consider plaintiff's evidence on these critical issues.

941 F.2d at 1119.  In accordance with this precedent, the Court will not conclude that Clayton was not qualified for her position based on her signature on the letter, as this result would short-circuit the McDonnell Douglas analysis.

The Tenth Circuit has stated that "[t]he relevant inquiry at the prima facie stage [regarding whether the employee was qualified for the position] is not whether an employee or potential employee is able to meet all the objective criteria adopted by the employer, but whether the employee has introduced some evidence that she possesses the objective qualifications necessary to perform the job sought."  E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d at 1193.  "If an employee is able to introduce such evidence, [he or] she has satisfied [the] prima facie burden of demonstrating that [he or] she does not suffer from an "absolute or relative lack of qualifications."  E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d at 1193-94 (citation omitted).  "Thus, a plaintiff has satisfied her prima facie burden of showing she is qualified by presenting some credible evidence that she possesses the objective qualifications necessary to perform the job at issue."  E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.2d at 1194 (citation omitted).

Although Clayton's 2007 Performance Evaluation -- dated December 31, 2007, a few months before Clayton's termination -- stated that Clayton still needed to work on her relationship with RMS, it listed her overall rating as meets requirements.  The 2006 Performance Evaluation also listed Clayton's overall rating as meets requirements.  Because Clayton met the requirements for her position in the years leading up to her termination, there is some credible evidence that Clayton possessed the objective professional qualifications for the job.  See MacDonald v. E. Wyo. Mental

Health Ctr., 941 F.2d at 1121 ("Both [plaintiffs] . . . possess the objective professional qualifications they held when they were hired. . . .  Both plaintiffs had held their positions for four years and both presented evidence that they had never been disciplined or received unfavorable performance reviews until recently.  Both described the satisfactory nature of their work performance.").

Despite these objective qualifications, Clayton was discharged from her position.  Following her discharge, her job was not eliminated -- instead a younger male was hired to replace her. Because Clayton has established each of the four elements of a prima-facie case, the Court finds that Clayton has established a prima-facie case of gender discrimination.

## II.   CLAYTON HAS ESTABLISHED A PRIMA-FACIE CASE OF AGE DISCRIMINATION.

Vanguard alleges that Clayton cannot establish a prima-facie case of age discrimination, because she cannot show that she was qualified for the position at issue.  See Motion at 28. Vanguard alleges that, at the time of her termination, she was not meeting Vanguard's legitimate expectations, because of her failure to remedy acute communication problems, and because of her signature on a union-like petition contrary to express Vanguard policy.  See Motion at 28.  Clayton asserts that she has presented enough evidence to establish a prima-facie case of age discrimination, because she has presented evidence that she was over forty years old at the time of her termination, met the qualifications of a general manager, and was replaced by a younger male with less experience.  See Response at 5.

In a termination case, a plaintiff may establish a prima-facie case of age discrimination by showing that he or she was: (i) "within the protected class of individuals 40 or older;" (ii) "performing satisfactory work;" (iii) "terminated from employment;" and (iv) "replaced by a younger person, although not necessarily one less than 40 years of age."  Adamson v. Multi

Community Diversified Services, Inc., 514 F.3d 1136, 1146 (10th Cir. 2008).

Clayton was terminated when she was over forty years of age, and she was replaced by someone younger than her. Clayton has provided evidence that the 2006 and 2007 Performance Evaluations put her overall rating at meets requirements. Because an overall rating of meets requirements in the years leading up to her termination indicates that her work was satisfactory, the Court finds that Clayton has established this element of the prima-facie case. See Nealy v. Water Dist. No. 1 of Johnson County, Kan., 554 F. Supp. 2d 1226, 1231 (D. Kan. 2008)("From 1988 to 2001, her work was rated 'satisfactory' or 'competent.' On the last . . . appraisal . . . she received an overall performance rating of 'competent' . . . . Because this evidence must be viewed in the light most favorable to plaintiff, the . . . plaintiff has provided sufficient evidence to avoid summary judgment on this issue."). Because Clayton has established each of the four elements of a prima-facie case, the Court finds that Clayton has established a prima-facie case of age discrimination.

## III. VANGUARD HAS SET FORTH A LEGITIMATE NONDISCRIMINATORY REASON FOR TERMINATING CLAYTON.

After the plaintiff establishes a prima-facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. See McDonnell Douglas Corp v. Green, 411 U.S. at 802. At the hearing, Mr. Mumaugh stated that Vanguard's sole reason for terminating Clayton was because she signed the letter that her employees drafted requesting higher wages. See Tr. at 61:22-24 (Mumaugh)("Well the reason is the letter. That's why they . . . terminated her at that point in time."). Clayton has conceded that this alleged reason is a legitimate nondiscriminatory reason for the adverse employment action, and the Court agrees.

IV.     **THERE IS SUFFICIENT EVIDENCE IN THE RECORD TO CREATE A GENUINE ISSUE OF MATERIAL FACT WHETHER VANGUARD'S PROFFERED NONDISCRIMINATORY REASON FOR TERMINATING CLAYTON'S EMPLOYMENT WAS PRETEXTUAL.**

Clayton argues that Vanguard gives "contradictory, inconsistent and implausible explanations of who made the decision to fire" her, and of the "justification and rationale for the termination." Response at 8.  Vanguard alleges that the reasons for her termination never changed, and are not incompatible or conflicting.  See Reply at 9-10.[52]

"Once the defendant meets its burden of production by offering a legitimate rationale in support of its employment decision, the burden shifts back again to the plaintiff to show that the defendant's proffered reasons were a pretext for discrimination." McDonnell Douglas, 411 U.S. at 804-05.  The Tenth Circuit has stated a plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d at 1323 (internal quotation marks and citation omitted).  When the various reasons for termination are not only different but mutually inconsistent, the contradictions

---

[52] Clayton relies on information that, in 2003, there were five female general managers in the Southwest region, but in 2008, there was only one, to assert that there is statistical information which shows pretext. See Response at 23.  Vanguard argues that Clayton's statistics have a sample size too small to mean anything, and that the statistics do not eliminate non-discriminatory reasons for a disparity. See Reply at 6.  The Tenth Circuit has stated that statistics taken in isolation are generally not probative of discrimination and that statistical evidence on its own will rarely suffice to show pretext. See Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1115 (10th Cir. 2007)(citations omitted).  To create an inference of pretext, the statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals. See Timmerman v. U.S. Bank, N.A., 483 F.3d at 1115 (citation omitted).  Clayton has not, with these statistics, eliminated any nondiscriminatory explanations for the alleged disparity; therefore these statistics do not, without more, create a genuine issue of material fact as to pretext.

-68-

are sufficient to establish pretext for the purpose of summary judgment. See Hare v. Denver Merch. Mart, Inc., 255 F. App'x at 305.

Vanguard contends that there was only one reason that led it to terminate Clayton's employment, and that reason was her signature on the letter her employees drafted, which requested higher wages. There is evidence that Clayton was terminated because of her signature on the letter allegedly in violation of Vanguard's policy of discouraging employees from seeking a union, such as Murphy's statement that he felt Clayton's signature was a terminable offense and recommended her termination. There is evidence that Vanguard had a policy of discouraging unions, and that Clayton was responsible for enforcing the anti-union policy as a general manager. There is evidence that Clayton attended anti-union training. There is also evidence in the record, however, that contradicts Vanguard's assertion that Clayton's signature on a letter in violation of its anti-union policy was the only reason for Clayton's termination. Several days before Filomena terminated Clayton, Baker, Filomena, Murphy and Choquette discussed Clayton's prior performance problems and communication problems with RMS and HR in addition to her signature on the letter. When questioned about the reasons for Clayton's termination, Filomena stated that

> there had been a pattern from all the folks that I had talked to with Chris. Her performance in -- in the station, especially in the last two years, had started to deteriorate in certain areas. Some areas she was doing well in. All the challenges that she had had with RMS and HR. There was the visit that I had with Chris and her team in Albuquerque. So all of those things I believe contributed to the -- the piece where we terminated her, but the final point was the letter itself.

Filomena Depo. at 71:5-16.

In Hare v. Denver Merchandise Mart, Inc., the plaintiff sued the defendant under the ADEA after the defendant terminated him from his position as general manager. See 255 F. App'x at 298. The defendants articulated several legitimate reasons for the plaintiffs termination, including that

"[the plaintiff's] responsibilities could be managed from Dallas at lower cost, he did not maximize the [defendant's] earning potential, he kept short working hours and was not actively involved in day-to-day operations . . . , he displayed an insubordinate attitude towards . . . Dallas management, and he employed an intimidating and ineffective management style." 255 F. App'x at 304. The Tenth Circuit found that the plaintiff successfully showed pretext "by pointing to an apparent contradiction in the testimony of those involved in the decision to terminate him." 255 F. App'x at 304. One decision-maker testified that the plaintiff was terminated because his position was eliminated, not because of his performance, while other decision-makers testified that the plaintiff was terminated because of his poor performance. See 255 F. App'x at 304-05. The Tenth Circuit stated that the stated reasons for the plaintiff's termination "were not only different but mutually inconsistent[,] [and found that] [u]nder the McDonnell Douglas framework, contradictions of this sort are sufficient to establish pretext for purpose of summary judgment." 255 F. App'x at 305.

Similarly, Vanguard's assertion that the sole reason for Clayton's termination was her signature on the letter in violation of Vanguard's policy cannot "be squared" with the evidence in the record that Clayton was terminated because of her poor performance and of her communication problems in addition to her signature on the letter. Hare v. Denver Merch. Mart, Inc., 255 F. App'x at 305. These contradictions are sufficient to establish pretext for the purpose of summary judgment. See Allen v. Garden City Co-op, Inc., 651 F. Supp. 2d 1249, 1260 (D. Kan. 2009)(finding that the defendant's reasons for the plaintiff's termination had been inconsistent over time and stating that evidence demonstrating that an employer gives inconsistent reasons justifying its reasons for termination can indicate pretext).

In Matthews v. Euronet Worldwide, Inc., 271 F. App'x 770 (10th Cir. 2008), the Tenth Circuit addressed whether the defendants' allegedly various and changing explanations for an

-70-

employee's termination were pretextual.  See 271 F. App'x at 773.  The Tenth Circuit recognized

that it has indicated that post-hoc justification given around the time of trial, "which differs from

the reasons given at the time of termination" and for which there is evidence contradicting the post-

hoc justification, "could lead a reasonable jury to infer that the reason . . . is pretextual."  271 F.

App'x at 773 (citations omitted).  The Tenth Circuit recognized, however, that there would be no

support for a finding of pretext if "the employer does not give inconsistent reasons, but instead

merely elaborates on the initial justification for termination."  271 F. App'x at 774.  The Tenth

Circuit stated:

> Mr. Matthews argues that the reasons the defendants provided in an interrogatory
> response are inconsistent with those Ms. Biehl initially gave at his termination
> meeting and that this inconsistency demonstrates pretext. He claims that, during his
> termination meeting, Ms. Biehl told him he was being let go because he had
> problems multi-tasking and cutting off terminals, but in response to an interrogatory,
> the defendants stated:
>
>> Plaintiff had difficulty multi-tasking and preferred to work on one
>> project at a time; Plaintiff failed to complete credit checks in a proper
>> and timely manner, and had difficulty keeping up with NSF ACH's,
>> follow-ups and answering and returning phone calls, and worked at
>> a slow pace; Plaintiff worked on tasks he wanted to do (such as file
>> labels) rather than tasks assigned to him; Plaintiff made excessive
>> personal telephone calls; Plaintiff took excessive breaks and his
>> attendance was unreliable; Plaintiff spent an excessive amount of
>> time talking to others instead of working; Plaintiff failed to file
>> documents appropriately; Plaintiff did not accept and act upon
>> counseling.
>
> Because these asserted deficiencies do not, as Mr. Matthews argues, differ from the
> more general, earlier justifications of inability to "multi-task" and failure to "cut off
> terminals," they do not demonstrate that the defendants' proffered reasons are so
> "weak, implausible, inconsistent, incoherent, or contradictory" such that a rational
> jury could find them unworthy of belief. All the perceived deficiencies -- for
> example, working on administrative tasks, excessive socializing and breaks, and poor
> attendance -- support Ms. Biehl's claim that Mr. Matthews had trouble multi-tasking
> and was not cutting off customers' terminals in a timely manner. They do not provide
> different reasons for his termination, but merely elaborate on the initial explanation.
> That is, they provide examples of Mr. Matthews's inability to multi-task and

demonstrate precisely why he was not adequately performing his job duties.

271 F. App'x at 774 (footnotes omitted).  See E.E.O.C. v. Prof'l Bureau of Collections of Md., Inc., 686 F. Supp. 2d 1151, 1158 (D. Colo. 2010)(stating that a defendant's changing reasons for an employee's termination do not demonstrate pretext when the reasons were "not contradictory . . . [; when the defendant] did not abandon or repudiate its initial reasons, but rather expanded upon those reasons as time went on . . . [; and when the] explanations are not so conflicting as to rise to the level of pretext").  Unlike Matthews v. Euronet Worldwide, Inc., in this matter, Vanguard did not expand upon its reasons as time went on with different articulations of the same problems; instead, Vanguard abandoned its earlier proffered reason that it terminated Clayton because of her communication problems "[t]aken together" with her signature in violation of Vanguard's policy. At the hearing, Vanguard asserted that the only reason for Clayton's termination was her signature on the letter in violation of Vanguard's policy.  Mr. Mumaugh stated -- several times in response to the Court's spoken questions -- that her communication problems were "not the reason" for her termination.  Tr. at 57:3-6 (Court)("And then was the real reason she was fired is because she put her name on that petition, or was the real reason that she was fired all these other reasons [specifically -- her communication problems]").  See id. at 61:2-10 (Court, Mumaugh)("The Court: But it's Vanguard's position that the reason they . . . terminated her was because she put her name on the petition?  Mr. Mumaugh: Well, not just because she put her name on the [letter] . . . [b]ut because she didn't recognize [her signature on the letter] for what it was."); id. at 61:11-14 (Court, Mumaugh)("The Court: But it was this event.  Mr. Mumaugh: It was this event . . . No doubt about it."); id. at 61:17-18 (Mumaugh)("[Clayton's signature on the letter] is the reason."); id. at 61:19-62:9 (Court, Mumaugh)("[Y]ou've got to state a . . . nondiscriminatory reason . . . .  Mr. Mumaugh: Well, the reason is the letter. . . . [Clayton's communication problems were] not the reason.  The

Court: But the reason is [Clayton's signature]?  Mr. Mumaugh: Yes, Your Honor, that is . . . accurate.").  The change in Vanguard's stated reason for termination is not an expansion or different articulation of its first asserted reason for Clayton's termination.  Vanguard's stated reason is a retraction of its first asserted reason.  Instead of stating that Clayton was terminated because of her communication problems in addition to her violation of Vanguard's policy, Vanguard now asserts that Clayton was terminated solely because of her violation of Vanguard's policy.  As in Hare v. Denver Merchandise Mart, Inc., where there was evidence both that the plaintiff was terminated for reasons not related to his performance and that the plaintiff was terminated because of his poor performance, see 255 F. App'x at 304-05, there is evidence both that Clayton was terminated for a reason unrelated to her communication problems -- her signature on a letter in violation of Vanguard's policy -- as well as evidence that Clayton's communication problems led to her termination.  Because the Court believes that a reasonable factfinder could find Vanguard's proffered reason for its action rationally unworthy of credence, because of the inconsistencies and contradictions in Vanguard's proffered legitimate reasons for Clayton's termination, see Mickelson v. New York Life Ins. Co., 460 F.3d at 1315, the Court finds that there is a genuine issue of material fact whether Vanguard's proffered legitimate nondiscriminatory reason for terminating Clayton is pretextual.

Furthermore, the Court finds that there is a genuine issue of material fact whether Vanguard's proffered reason is pretext for gender discrimination, because there is evidence that Ham was biased on account of Clayton's gender and that his actions caused, in part, her termination.  The Tenth Circuit has stated:

> To survive summary judgment on a subordinate bias theory, the plaintiff must first establish a genuine issue of material fact concerning the bias of the subordinate.  It must then establish genuine issues of material fact as to whether the proffered reason

> for the employment action is pretextual, which in a subordinate bias claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision.

EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d at 488.

The Court will first consider whether Clayton has established a genuine issue of material fact regarding Ham's bias based on her age or gender. In EEOC v. BCI Coca-Cola Bottling Co., the Tenth Circuit found that a subordinate's comments suggested a pattern of racial bias that could have affected his conduct with respect to the plaintiff's termination. See 450 F.3d at 489. The subordinate made race-based remarks and racial jokes, and may have called the plaintiff a "nigger" after the plaintiff initiated the lawsuit. 450 F.3d at 482, 489. In addition, there was evidence of several instances where the subordinate treated African-Americans differently. See 450 F.3d at 489-90. In this matter, the evidence in the record establishes that, in electronic-mail transmissions to various Vanguard employees -- who were not in Clayton's chain of command -- Ham called Clayton a "nut, [who] stays crazy 365 days now," "Insane Jane," "Crazy Betty," and described Clayton as having "stopped taking her meds again" and having unclear judgment. Electronic-Mail Transmission from Jeremy Ham to Randy Phillips (dated December 22, 206), filed October 25, 2010 (Doc. 142-13); Electronic-Mail Transmission from Jeremy Ham to Jim Ducker (dated January 19, 2007), filed October 25, 2010 (Doc. 142-13); Electronic-Mail Transmission from Jeremy Ham to Noah Millsap (dated June 26, 2007), filed October 25, 2010 (Doc. 142-13); Electronic-Mail Transmission from Jeremy Ham to Shane Habib (dated January 4, 2008), filed October 25, 2010 (Doc. 142-13). Nothing in these comments suggests age bias. There is no reference to age in any of these comments. None of the comments allude to Clayton's age. Because there is no evidence on which a factfinder could find that Ham was biased on account of Clayton's age, the Court finds that there is no genuine issue of fact whether Ham was biased on account of her age. There is

-74-

therefore no genuine issue of material fact under the subordinate liability theory whether Vanguard's proffered reason is pretext for age discrimination.

There is, however, a genuine issue of material fact whether Ham was biased on account of Clayton's gender.  Although men and women who recently entered the work force may not view Ham's comments as evidence of gender bias, people who worked during the time when women began to fully integrate into the work force might view his comments as evidence of gender bias -- a put down of women.  Although the times have changed over the past few decades, and younger people may view the words as merely rhyming, the Court does not believe that the time has come when comments such as "Insane Jane" and "Crazy Betty" cannot be viewed, as a matter of law, as evidence of gender bias.  Furthermore, when one replaces the terms "Jane" and "Betty" with "woman," the phrases become "Insane Woman" and "Crazy Woman."  A reasonable factfinder could find that these comments imply that Clayton was crazy or insane, because, as a woman, she was too emotional.  While some may view "Crazy Woman" as no more sexist than "Crazy Man," a generation earlier might see the insertion of a reference to sex as putting women generally down. In any case, it seems best to let the factfinder -- composed of a broad set of sexes and ages -- make the determination.  Because a factfinder -- especially one who began working during the late 1960s and early 70s, when women began entering the work force in large numbers -- could find that these comments are evidence that Ham was biased on account of Clayton's gender, the Court finds that there is a genuine issue of material fact whether Ham was biased on account of Clayton's gender.

The Court also finds that there is a genuine issue of material fact whether there is a causal relationship between Ham's actions and Vanguard's decision to terminate Clayton.  Ham sent electronic-mail transmissions to people throughout the company, including Ducker and Habib, which contained negative remarks about Clayton.  Ham had conversations with Davenport regarding

Clayton's communication problems, and he participated in several mediations with Davenport and Clayton in an attempt to improve his relationship with Clayton.  When Davenport left the company, he briefed Filomena on Clayton's strengths and her weaknesses.  When Filomena assumed his position, he spoke with Ducker and Habib about Clayton.  Ducker and Habib both gave Filomena unfavorable information about Clayton.   When Filomena understood Murphy to recommend Clayton's termination, he took the steps to implement her termination.  Although Vanguard contends that it fired Clayton because of her signature on the letter drafted by her employees, there is evidence in the record that suggests there were additional reasons for her termination -- such as her alleged performance and communication problems.  Filomena stated that Clayton's signature was the last straw on top of her performance and communication problems -- specifically her problems with RMS, the group that Ham supervised.  There is sufficient evidence to create an issue of fact whether Ham's actions caused, in part, Clayton's termination.  Ham related negative information about Clayton to Davenport, Ducker, and Habib.  Before Clayton's termination, Filomena, the person who terminated Clayton, received information from Davenport, Ducker, and Habib about Clayton's problems within the company.  A reasonable factfinder could find, from this evidence, that Ham created a negative perception of Clayton in the company, and that the decision to terminate Clayton was based in part on the perception that she had problems communicating and working with others in the company.  There is therefore a genuine issue of material fact whether Ham's actions caused, in part, Clayton's termination.  See  EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d at 488 (stating that, to survive summary judgment, a plaintiff must establish genuine issues of material fact whether there was "a causal relationship between the subordinate's actions and the employment decision").

An employer can avoid liability under the cat's paw doctrine by "conducting an independent investigation of the allegations against an employee."  EEOC v. BCI Coca-Cola Bottling Co., 450

F.3d at 488.  The employee's ability to tell his or her version of the events is sufficient to defeat the inference that the employer's proffered reason is pretext for discrimination.  See EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d at 488 ("[A]n employer can avoid liability by conducting an independent investigation of the allegations against an employee. . . .  Indeed, under our precedent, simply asking an employee for his version of the events may defeat the inference that an employment action was . . . discriminatory.").  The Court finds that Vanguard did not conduct a sufficient independent investigation into the allegations against Clayton, because the record does not contain evidence that Vanguard independently investigated all of the allegations against her. Clayton was able to tell Davenport her version of the events during the mediations, and she was able to tell her version of the events -- that Ham was creating a hostile work environment -- during the October 2006 conference call following the September 12, 2006 electronic-mail transmission from Ham.  There is no evidence in the record, however, which demonstrates that Clayton was able to address all of the allegations against her.  For example, there is no evidence that demonstrates she was able to address Habib's and Ducker's unfavorable comments regarding her.  Because it is possible that Ham's actions could have colored Habib's and Ducker's impression of Clayton, and because there is no evidence that Filomena received information from an independent source of information whether the unfavorable information Habib and Ducker gave him was true, the Court finds that Vanguard did not conduct an independent investigation adequate to defeat, as a matter of law, the inference that Ham's actions tainted the decision to terminate Clayton.  The Court therefore finds that there is a genuine issue of fact whether Vanguard's proffered reason for Clayton's termination is pretext for gender discrimination, because there is a genuine issue of fact whether Ham was biased on account of Clayton's gender, and because there is a genuine issue of fact whether Ham's actions caused, in part, Clayton's termination.

The evidence in the record creates a genuine issue of material fact whether Vanguard's proffered reason for Clayton's termination was pretextual.  While the record may be thin on evidence of sex discrimination, Clayton need not show -- at this stage -- that there was a discriminatory reason for her termination; she only need show that there is a genuine issue of material fact whether the proffered reason was pretextual.  See Jones v. Oklahoma City Pub. Schs., 617 F.3d at 1280 ("[T]he Supreme Court [has] rejected the . . . standard that required plaintiffs using . . . [burden-shifting] . . . to . . . show pretext and produce 'additional evidence of discrimination' . . . to avoid summary judgment. . . .  No additional evidence is necessary to show discrimination because '[p]roof that the defendant's explanation is unworthy of credence is . . . circumstantial evidence . . . of intentional discrimination.'" (internal citations omitted)).  This lower burden of proof is meant to give plaintiffs some help in getting over motions for summary judgment to get to the jury.  "Evidence tending to show pretext permits an inference that the employer acted for discriminatory reasons."  Bryant v. Farmers Ins. Exch., 432 F.3d at 1125 (citation omitted).  See Woods v. Boeing Co., 355 F. App'x 206, 209 n.1 (10th Cir. 2009)("A jury is permitted to draw an inference of illegal bias from a finding that the employer's justification is mere pretext.").  At the summary judgment stage, "the inference of discrimination permitted by evidence of pretext must be resolved in favor of the plaintiff."  Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir. 2005)(citation omitted).  "Thus, once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment."  Bryant v. Farmers Ins. Exch., 432 F.3d at 1125 (citation omitted).  Because there are genuine issues of material fact whether Vanguard's proffered reason for Clayton's termination was pretextual, the evidence permits an inference that Vanguard acted for discriminatory reasons.  This

inference must be resolved in Clayton's favor.  The Court will therefore deny Vanguard's request for summary judgment on Clayton's discrimination claims under the ADEA and Title VII.

**V.      THE COURT WILL NOT GRANT SUMMARY JUDGMENT ON CLAYTON'S AGE AND GENDER DISCRIMINATION CLAIMS UNDER THE NMHRA BECAUSE THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING PRETEXT.**

In their briefing, both parties stated that New Mexico courts' analysis of discrimination claims under the NMHRA closely parallels the federal courts' analysis of discrimination claims, and both parties incorporated their analysis of Clayton's federal discrimination claims into their arguments regarding Clayton's state discrimination claims.  See Motion at 24 ("New Mexico relies upon federal civil rights adjudication for guidance in analyzing NMHRA claims.  Thus, for the same reasons that Plaintiff's Title VII and ADEA claims survive summary judgment, so also do her claims under the NMHRA." (internal citation omitted)); Response at 40 ("Ms. Clayton incorporates her analysis and facts referenced in the foregoing sections relating to her prima facie case, pretext and other evidence of age and gender discrimination in support of her claims under NMHRA.").  The Supreme Court of New Mexico has stated that it looks to "federal civil rights adjudication for guidance in interpreting the NMHRA." Ocana v. Am. Furniture Co., 135 N.M. at 549, 91 P.3d at 68 (citation omitted).  Because the parties have incorporated their arguments regarding Clayton's federal discrimination claims into their arguments regarding Clayton's state discrimination claims, and because the Supreme Court of New Mexico looks to federal adjudication when it interprets the NMHRA, the Court will not grant summary judgment on Clayton's claims under the NMHRA as it has denied summary judgment on Clayton's federal discrimination claims.

**VI.     THE COURT WILL GRANT SUMMARY JUDGMENT ON CLAYTON'S EPA CLAIM.**

Vanguard contends that it is unclear how Clayton was underpaid based on her gender, as she

admitted the bonus plan did not implicate any gender disparity.  See Motion at 35.  Vanguard contends that the Albuquerque market is not the same establishment as other markets and that Clayton's former job is not legally comparable to other general managers.  See id. at 36-37. Vanguard further contends that any difference in bonus compensation is based on merit, and any disparity in base pay is a product of factors other than sex.  See Motion at 37-38.

Clayton responds, arguing that her claim is based on pay disparities between general manager's base pay salaries and not on the bonus plan.  See Response at 33-34.  She contends that general managers perform essentially the same job duties and have the same responsibilities at many locations.  See Response at 33.  Clayton argues she has satisfied the prima-facie burden for an EPA claim, because she has presented evidence that demonstrates she was paid less than male general managers in the same sized markets.  See Response at 34.  Clayton also argues that she has satisfied the prima-facie burden for an EPA claim, because there is evidence that the male hired to replace her was paid a higher salary for the identical work she performed.  See Response at 34.

Vanguard replied, arguing that, despite long complaints in her deposition about the bonus plan, Clayton never complained about base pay, and that once discovery was closed she shifted to a base pay theory of discrimination.  See Reply at 13.  Furthermore, Vanguard argues that Clayton failed to address Vanguard's argument that the Albuquerque market is not the same establishment as the other markets to which she seeks to compare.  See Reply at 14.  Vanguard argues that Clayton cannot establish that she was paid less than male general managers performing substantially equal work.  See Reply at 15.  Vanguard also contends, that even assuming a prima-facie case, Clayton cannot overcome Vanguard's showing that any pay disparities were due to factors other than sex. See Reply at 17.  Vanguard contends that it paid her replacement, Kennedy, a higher base salary because it believed he was the best person for the job and only after he negotiated a higher base pay

-80-

after being offered a salary commensurate to Clayton's base salary.  See Reply at 17.  Vanguard further contends that other facts demonstrate that any pay disparity regarding the other general managers whom Clayton presents as comparators is due to factors other than sex, for example, managing new airport construction and integration of Vanguard's different brands.  See Reply at 17-18.

In Clayton's Amended Complaint, she alleged that Vanguard "paid higher compensation . . . to male general managers for equal work, requiring substantially similar skill, effort, responsibilities, and under similar working conditions," Amended Complaint ¶ 56, at 8, and that Clayton was paid less wages than male employees for equal work, see Amended Complaint ¶ 58, at 8.  Because Clayton's Amended Complaint made allegations regarding base pay, the Court will not limit Clayton to an argument regarding bonus plans under her EPA claim.  The Court will address Clayton's EPA claim on the limited evidence presented to it.

A.   **CLAYTON HAS NOT ESTABLISHED A PRIMA-FACIE CASE THAT VANGUARD PAID HER LESS THAN MALE GENERAL MANAGERS WHO PERFORMED SUBSTANTIALLY EQUAL WORK.**

The EPA forbids employers from discriminating "within any establishment in which such employees are employed, between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility."  29 U.S.C. § 206(d)(1).  The Code of Federal Regulations defines "establishment" as "a distinct physical place of business rather than . . . an entire business or 'enterprise' which may include several separate places of business[;] [a]ccordingly, each physically separate place of business is ordinarily considered a separate establishment."  29 C.F.R. § 1620.9(a) (emphasis added).  The Code of Federal Regulations states that

unusual circumstances may call for two or more distinct physical portions of a

-81-

<u>business enterprise being treated as a single establishment</u>.  For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions.  <u>Barring unusual circumstances, however, the term "establishment" will be applied as described in paragraph (a) of this section</u>.

29 C.F.R. § 1620.9(b) (emphasis added).  EPA claims proceed in two steps.  First, the plaintiff must establish a prima-facie case of discrimination.  To establish a prima-facie case, Clayton must demonstrate that, within the same establishment, employees of the opposite sex were paid differently for performing substantially equal work.  <u>See</u> 29 U.S.C. § 206(d)(1)(stating that  employers cannot discriminate, "within any establishment in which such employees are employed, between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility"); <u>Mickelson v. New York Life Ins. Co.</u>, 460 F.3d at 1311 ("First, the plaintiff must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work.").

Because the Code of Federal Regulations defines establishment as "a distinct physical place of business rather than . . . an entire business or 'enterprise' which may include several separate places of business[,]" and states that "[a]ccordingly, <u>each physically separate place of business is ordinarily considered a separate establishment</u>," 29 C.F.R. § 1620.9 (emphasis added), if Clayton seeks to compare her base salary to that of general managers in other cities, she must present evidence to overcome the rule that, absent "unusual circumstances," two or more distinct physical portions of a business enterprise are not treated as a single establishment, 29 C.F.R. § 1620.9.  Clayton has not addressed Vanguard's argument that the Albuquerque facility is not the same establishment as the other facilities she identifies as comparable, and has not presented any evidence to overcome the "general principle that physically distinct entities are treated as separate

establishments." Sharp v. Ephraim McDowell Regional Med. Ctr., Inc., No. 5:07-362-JMH, 2010

WL 716187, at *5 (E.D. Ky. Feb. 24, 2010). See Meeks v. Computer Assocs. Intern., 15 F.3d 1013,

1017 (11th Cir. 1994)("[W]e presume that multiple offices are not a 'single establishment' unless

unusual circumstances are demonstrated." (citing 29 C.F.R. § 1620.9(a))).  Because Clayton has not

addressed this argument, the Court must determine whether the evidence in the record establishes

that "unusual circumstances" are present, such that it can treat two or more distinct physical portions

of a business enterprise as a single establishment.  29 C.F.R. § 1620.9.  These unusual circumstances

may exist where "a central administrative unit hire[s] all employees, set[s] wages, and assign[s] the

location of employment; [where] employees . . . frequently interchange work locations; and [where]

daily duties may be virtually identical and performed under similar working conditions."  29 C.F.R.

§ 1620.9.  Vanguard's regional office, a central office, sets the base salaries.  See Reply at 14 (citing

Baker's Reply Aff. ¶ 4, at 2).  The bonus compensation was determined by a company-wide merit

bonus system, and Davenport, the Regional Vice President, promoted Clayton to her position as city

manager in Brownsville, Texas.  There is also some evidence that the regional office hired Kennedy,

Clayton's replacement.  See Filomena Aff. ¶ 3, at 2-3 ("We then offered [Kennedy] $68,000 for the

position, which he also declined.  We then offered a base salary of $68,000 . . . .").  Viewed in the

light most favorable to Clayton, the evidence in the record is sufficient to permit a factfinder to

conclude that the different physical places of business constitute a single establishment, because the

evidence demonstrates that the regional office -- a central administrative unit -- set the general

managers' salaries, that there was a company-wide bonus plan, and that the regional office hired and

promoted general managers.  See Stough v. Inns, No. 3:05CV421-SRW, 2006 WL 2009087, at *10

(M.D. Ala. July 17, 2006)(finding that there was sufficient evidence to permit a trier of fact to

conclude that the different facilities were the same establishment when "there [wa]s evidence that

hiring and promotion recommendations for general managers were made by the district manager and approved by the corporate office.   Additionally, the base salary for all . . . new general managers . . . was a uniform rate. . . .   Salaries for defendant's general manager were recommended by the . . . regional managers . . . .").

Although there is evidence in the record that the different physical places of business constitute a single establishment, Clayton has not introduced evidence that comparator general managers were paid differently for performing substantially equal work.   See Mickelson v. New York Life Ins. Co., 460 F.3d at 1311 ("First, the plaintiff must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work.").   The Tenth Circuit has stated:

> Substantial equality is to be evaluated in terms of skill, effort and responsibility, and requires a practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability.   Effort refers to the physical or mental exertion necessary to the performance of a job.   Responsibility concerns the degree of accountability required in performing a job. Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job.

E.E.O.C. v. Cent. Kan. Med. Ctr, 705 F.2d at 1272.   The Tenth Circuit does not construe the equal work requirement in the EPA broadly, and has stated that "failure to furnish equal pay for 'comparable work' or 'like jobs' is not actionable."   Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1364 (10th Cir. 1997).   "Job descriptions or titles do not determine whether the jobs are substantially equal."   E.E.O.C. v. Cent. Kan. Med. Ctr, 705 F.2d at 1273.   "Jobs may be equal even though one sex is given extra duties if the other sex also performs extra duties of equal skill, effort and responsibility, or if the extra tasks take little time and are of only peripheral importance."   E.E.O.C. v. Cent. Kan. Med. Ctr, 705 F.2d at 1273 (citation omitted).

Although the Court has not found a Tenth Circuit case discussing whether two positions with

-84-

the same titles and involving similar general duties should be considered equal under the EPA, other courts have addressed this issue.  In Cullen v. Indiana University Board of Trustees, 338 F.3d 693 (7th Cir. 2003), the United States Court of Appeals for the Seventh Circuit addressed whether the plaintiff's EPA claim should survive summary judgment, because the plaintiff had shown that her employer paid a male employee higher wages for performing equal work requiring substantially similar skill, effort, and responsibilities.  See 338 F.3d at 698.  The Seventh Circuit stated:

> First, we consider whether the positions required the same level of skill. "Skill includes consideration of such factors as experience, training, education, and ability."  29 C.F.R. § 1620.15(a).  Although Dr. Cullen and Dr. Quillen have different educational credentials, the comparison at this juncture is between positions, not individuals.  See id. ("Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill."); 4 Joseph G. Cook & John L. Sobieski, Jr., Civil Rights Actions ¶ 20.15[B], at 20-123-24 (2003) (noting that the issue is comparison of jobs, individual qualifications are irrelevant at this point in the analysis).  Although different educational levels required by different positions can be significant, there is no suggestion that Physical Therapy Program Directors are required to hold more degrees than Respiratory Therapy Program Directors.  However, the positions did require different levels of ability, for the Physical Therapy Program Director was required to create a new graduate program, which the Respiratory Therapy Program Director position did not require.  See Horner v. Mary Inst., 613 F.2d 706, 714 (8th Cir. 1980) (finding different skill requirements between positions of elementary school teachers when one teacher was required to develop and implement a physical education curriculum and the other was to teach courses selected by someone else). Accordingly, the positions do not require equal levels of skill.

> The second inquiry is whether the two positions require equal amounts of effort.  Dr. Quillen was appointed when the Physical Therapy Program was on probation, and he was given the task of saving the program and creating a graduate course of study.  Dr. Cullen nevertheless submits that, although Physical Therapy has a strong tuition base, she had to exert more effort to secure outside funding to supplement her department's resources, an effort, she claims, that Dr. Quillen does not match.  Although this consideration may decrease somewhat the significance in the disparity between the effort required by the two positions, we think the district court correctly concluded that the effort required to create Master's and Doctoral courses of study in a program on probation to be greater than that required to secure grants for the Respiratory Therapy Department. See 29 C.F.R. § 1620.16(a) ("Job factors which cause mental fatigue and stress . . . are to be considered in determining the effort required by the job.").  The jobs do not require equal effort; Dr. Cullen

cannot establish her prima facie case of equal positions.

Third, we must determine whether the two positions impose the same level of responsibility.  The Respiratory Therapy Program at the University required Dr. Quillen to create and launch a graduate program. Dr. Cullen is not responsible for such a program. Dr. Cullen argues that the creation of the graduate program was not an additional duty, for she was also required to meet accreditation requirements. However, this argument places too much emphasis on the job description or title of "establishing program accreditation," instead of considering "the duties actually performed by each employee." Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1461 (7th Cir. 1994).

Dr. Quillen supervises more students and faculty members.  As of September 1999, Dr. Quillen was responsible for 116 students to Dr. Cullen's 57, and Dr. Quillen supervised six faculty members and two secretaries to Dr. Cullen's three faculty members and one secretary.  Dr. Cullen contends that the record contains no evidence that Dr. Quillen exercises any supervision over students or that the additional faculty members create a greater burden in terms of responsibility. Supervisory responsibilities "must be real, significant, regular, and recurring." Mack A. Player, Employment Discrimination Law § 4.11(b)(3), at 147-48 (1988). Nevertheless, it is reasonable to conclude that Dr. Quillen's management of a department twice the size of Dr. Cullen's is indicative of greater responsibility.  See Howard v. Lear Corp. EEDS & Interiors, 234 F.3d 1002, 1005 (7th Cir. 2000) ("The additional skill, effort, and headache involved in managing three to six times the number of workers in a more complex employment environment rendered the [ ] positions . . . substantially different . . . ."); Orahood v. Board of Tr. of Univ. of Arkansas, 645 F.2d 651, 655 (8th Cir. 1981) (affirming a finding of unequal positions because male employee supervised a much larger department with more employees).

. . . .

Consequently, the positions do not have equal levels of responsibility; therefore, Dr. Cullen cannot establish a prima facie case.

338 F.3d at 699-700 (footnotes and citations to the record omitted).

Clayton states that she was

familiar with the job duties of General Managers in the Southwest Region and they include managing staff and developing managerial teams, delivering superior customer service, establishing brand delivery, revenue performance by working with Fleet and Revenue Management, assure adherence to expense control and maintenance, provide asset control through Fleet management, manage delivery of administrative functions, maintain and cultivate airport, corporate, licensee and

employee relations.

See Clayton Aff. ¶ 5, at 2-3.  The Tenth Circuit has stated, however, that "[j]ob descriptions or titles do not determine whether the jobs are substantially equal."  E.E.O.C. v. Cent. Kan. Med. Ctr, 705 F.2d at 1273.  The only evidence to which Clayton directs the Court's attention regarding whether she and the other managers performed substantially equal work is her affidavit, which contains a general job description of a general manager's position.  The United States Court of Appeals for the Fourth Circuit has recognized that a person can have the same job title and same general duties as a comparator employee, yet not meet the textual touchstone of the EPA -- equal skill, effort, and responsibility.  See Wheatley v. Wicomico County, Maryland, 390 F.3d 328, 332 (4th Cir. 2004)("[P]laintiffs present a classic example of how one can have the same title and the same general duties as another employee, and still not meet [the] textual touchstones of the EPA.").  The Court therefore finds that, even though Clayton has presented evidence that the general duties of Vanguard's general managers are the same, this evidence does not establish a prima-facie case that the other general managers performed substantially equal work under the EPA.  Clayton has the burden of establishing a prima-facie case under the EPA by introducing evidence that the other general managers were paid differently for performing substantially equal work, see Mickelson v. New York Life Ins. Co., 460 F.3d at 1311 ("First, the plaintiff must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work."), specifically in light of Vanguard's detailed evidence to the contrary, and the Court finds, upon careful consideration of the evidence in the record, that Clayton has set forth only a general description of general manager's duties, yet has not introduced evidence that the textual requirements of the EPA are met -- specifically, that other general managers performed substantially equal work.

The record shows that the general managers in the comparator markets had different levels of responsibility, because there is evidence that they had additional duties that were of more than peripheral importance.  See E.E.O.C. v. Cent. Kan. Med. Ctr, 705 F.2d at 1273 (citation omitted)("Jobs may be equal even though one sex is given extra duties if . . . the extra tasks take little time and are of only peripheral importance.").  "Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation."  29 C.F.R. § 1620.17.  The Code of Federal Regulations states:

(b) Comparing responsibility requirements of jobs.

> (1) There are many situations where one employee of a group performing jobs which are equal in other respects is required from time to time to assume supervisory duties for reasons such as the absence of the regular supervisor. Suppose, for instance, that it is the employer's practice to pay a higher wage rate to such a "relief" supervisor with the understanding that during the intervals in which the employee performs supervisory duties the employee is in training for a supervisory position.  In such a situation, payment of the higher rate to the employee might well be based solely on the additional responsibility required to perform the job and the equal pay provisions would not require the same rates to be paid to an employee of the opposite sex in the group who does not have an equal responsibility.  There would clearly be no question concerning such a wage rate differential if the employer pays the higher rate to both men and women who are called upon from time to time to assume such supervisory responsibilities.

> (2) Other differences in responsibilities of employees in generally similar jobs may require similar conclusions.  Sales clerks, for example, who are engaged primarily in selling identical or similar merchandise may be given different responsibilities.  Suppose that one employee of such a group (who may be either a man or a woman) is authorized and required to determine whether to accept payment for purchases by personal checks of customers. The person having this authority to accept personal checks may have a considerable, additional degree of responsibility which may materially affect the business operations of the employer.  In this situation, payment of a higher wage rate to this employee would be permissible.

> (3) On the other hand, there are situations where one employee of the group may be given some minor responsibility which the others do not have (e.g., turning out the lights in his or her department at the end of the business day)

but which is not of sufficient consequence or importance to justify a finding of unequal responsibility.

29 C.F.R. § 1620.17.  It is undisputed that there are significant differences between the Albuquerque location and other Vanguard markets, because Albuquerque is a small to medium location with only one airport.  Clayton compares her base salary with male general managers' base salaries in Memphis, Tulsa, Houston, and San Antonio.  See Salary Chart, filed October 25, 2010 (Doc. 142-21).  Although Vanguard's regional office sets base salaries, it does so in accordance with a unique determination based on the market's inherent characteristics and particular circumstances, without reference to the base salaries of other general managers.  See Baker Reply Aff. ¶ 4, at 2.[53]  In 2008, these various comparator markets had multiple airport and/or rental facilities -- specifically, Houston had four, Tulsa had two, Memphis had two, and San Antonio had two.  See id. ¶ 6, at 2.  This fact was true since 2004 for Tulsa and Houston, and true since 2006 for Memphis.  See id. ¶ 6, at 2.  The comparator general managers' management of additional facilities in cities with two or more airports, when Albuquerque has only one airport, shows that the general managers in the comparator markets had greater responsibility than Clayton; Clayton does not introduce any contrary evidence or dispute Vanguard's evidence.  Cf. Cullen v. Ind. Univ. Bd. of Trustees, 338 F.3d at 700 ("[I]t is reasonable to conclude that [the comparator's] management of a department twice the size of [the plaintiff's] is indicative of greater responsibility."  (citing Howard v. Lear Corp. EEDS & Interiors, 234 F.3d 1002, 1005 (7th Cir. 2000)("The additional skill, effort, and headache involved in managing [more] of workers in a more complex employment environment rendered the HR

---

[53] Although Baker attached his affidavit to Vanguard's Reply, and Clayton did not ask leave from the Court to file a sur-response to respond to the assertions in Baker's affidavit.  The Court held a hearing on Vanguard's Motion, and, at the hearing, Clayton did not dispute the facts in Baker's Affidavit or ask for the opportunity to file a sur-response.  The Court will therefore consider the facts asserted in Baker's Affidavit to be undisputed.

positions . . . substantially different . . . .")).  In Houston, the general manager must manage a fueling hangar, and in Memphis and Houston, the general manager must manage a car transfer operation that Vanguard owns and maintains.  See Baker Reply Aff. ¶ 7, at 3.  Furthermore, in Tulsa, where corporate operations are located, the general manager has additional management responsibilities associated with numerous corporate employees' company cars, and the need to develop market-level staff to fill continual corporate openings.  See id. ¶ 7, at 3.  In San Antonio, the general manager was responsible for management of Vanguard's facilities during new airport construction and the integration of Vanguard's different brands.  See id. ¶ 8, at 3.  The additional duties of managing a fueling hangar, managing a car transfer operation, integrating brands, and managing corporate employees' company cars is more analogous to an employee's authority to accept personal checks than to an employee's additional duty to turning out the lights at the end of the day.  See 29 C.F.R. § 1620.17(b)(2), (3).  The Court therefore finds that these duties show that the general managers in the comparator markets had an additional degree of responsibility; therefore these general managers did not perform substantially equal work.  See  29 C.F.R. § 1620.17 (stating that "payment of a higher rate" to an employee who has "additional degree of responsibility which may materially affect the business operations of the employer" is permissible).  Clayton did not introduce any evidence to dispute Vanguard's description of the other general manager's responsibilities.

Furthermore, the evidence demonstrates that the general managers' positions in Memphis and Houston required a different amount of effort from the general manager's position in Albuquerque.  The Code of Federal Regulations states: "Where substantial differences exist in the amount or degree of effort required to be expended in the performance of jobs, the equal pay standard cannot apply even though the jobs may be equal in all other respects."  29 C.F.R. § 1620.16.  There is evidence that Memphis was a "perennially difficult location where three prior

[general managers] had failed." Baker Reply Aff. ¶ 8, at 3. This evidence demonstrates that the general manager's position in Memphis required additional effort, because it was a perennially difficult location to manage, and the general manager was given the task of turning around the location, which three previous general managers had failed to do. See Cullen v. Ind. Univ. Bd. of Trustees, 338 F.3d at 699 (finding that the jobs did not require equal effort when the alleged comparator was given the task "of saving the program" the employer hired him). In Memphis and Houston, the general managers' duties were complicated by union work forces, which produced difficulties in working relationships. See Baker Reply Aff. ¶¶ 7-8, at 3. "Job factors which cause mental fatigue and stress . . . are to be considered in determining the effort required by the job." 29 C.F.R. § 1620.16. Conducting interactions with difficult union work forces is part of the general manager's position in Memphis and in Houston. The evidence that the general mangers in Memphis and Houston dealt with difficult union work forces shows that their positions required additional effort when a union work force, much less a difficult union work force, did not exist in Albuquerque. Again, Clayton does not introduce evidence to dispute these details.

There is also evidence that the general manager's position in Tulsa required different skills from the general manager's position in Albuquerque. Vanguard believed that the general manager in Tulsa needed a particular ability to work with local political leaders. See Baker Reply Aff. ¶ 8, at 3. Vanguard's belief that the general manager in Tulsa needed a particular ability to work with local political leaders is evidence that the general manager needed a skill which was not necessary for the general manager in Albuquerque. See 29 C.F.R. § 1620.15(a) ("Skill includes consideration of such factors as experience, training, education, and ability."). Again, Clayton did not dispute Vanguard's description of the manager's position in Tulsa.

Although Clayton presented evidence that the general managers perform the same general

duties, this evidence does not establish a prima-facie case under the EPA if the evidence in the record shows that she does not meet the textual touchstones of an EPA claim -- specifically, that the jobs require equal responsibility, skill, and effort.  See Wheatley v. Wicomico County, Md., 390 F.3d at 332.  The evidence shows: (i) that the general managers in comparator markets had additional responsibilities, because the markets contained more rental car facilities and airports, or the additional duties of managing a fueling hangar, a rental car transfer operation, or company employees' cars; (ii) that some of the general managers' positions in comparator markets required a different amount of effort, because the markets were perennially difficult or contained difficult union work forces; and (iii) that the general manager's position in Tulsa required different skills, because the general manager needed the ability to work with local political leaders.  The Court therefore finds that Clayton does not establish a prima-facie case that Vanguard paid her less than male general managers who performed substantially equal work.  See Cullen v. Ind. Univ. Bd. of Trustees, 338 F.3d at 700 (finding that the plaintiff did not establish a prima-facie case under the EPA when the comparator's position required more effort as he was given the task of saving the program, when the employer gave the comparator the additional responsibility of creating a graduate program, and when the comparator supervised more students and faculty members).

**B.    CLAYTON HAS ESTABLISHED A PRIMA-FACIE CASE THAT KENNEDY WAS PAID A HIGHER SALARY FOR SUBSTANTIALLY EQUAL WORK, BUT VANGUARD HAS SHOWN THAT THE DISPARITY WAS BASED ON A FACTOR OTHER THAN SEX.**

Clayton also argues that she can establish a prima-facie EPA case another way: she has presented evidence that Vanguard hired a male to replace her at a base salary of $80,000 a year when her salary was $66,000 a year.  See Response at 33-34.  Clayton establishes a prima-facie case through this evidence.  Although nine months after Clayton's termination, Kennedy's position was

absorbed into a new position which included added responsibility for new locations and franchisees, Kennedy was hired to replace Clayton, and he initially performed the same position that she had performed.  Vanguard therefore paid Kennedy more for performing substantially equal work.  See Mickelson v. New York Life Ins. Co., 460 F.3d at 1311 ("[T]he plaintiff must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work.").

Although Clayton can establish a prima-facie case, Vanguard has shown that the wage disparity is based on a factor other than sex.  See Mickelson v. New York Life Ins. Co., 460 F.3d at 1311 (stating that if the plaintiff establishes a prima-facie case, the burden of persuasion then shifts to the defendant to prove that the wage disparity was justified for one of four permissible reasons); 29 U.S.C. § 206(d).  The four permissible reasons for a wage disparity are: (i) a seniority system; (ii) a merit system; (iii) a pay system based on quantity or quality of output; and (iv) a disparity based on any factor other than sex.  See 29 U.S.C. § 206(d), Mickelson v. New York Life Ins. Co., 460 F.3d at 1311.  This stage means that, to prevail on summary judgment, the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary. See Mickelson v. New York Life Ins. Co., 460 F.3d at 1311.  When Vanguard offered Kennedy the position, it offered him an amount comparable to Clayton's salary of $66,000.00.  See Filomena Aff. ¶ 3, at 1.  Kennedy declined this offer.  Vanguard then raised its offer to $68,000.00 a year.  When Kennedy declined this offer, Vanguard offered Kennedy a base salary of $68,000 and a cost of living adjustment of $1,000 a month.  Kennedy accepted this final offer.  This evidence shows that Kennedy's base salary was higher than Clayton's, because  he rejected Vanguard's initial offers of lesser salaries and not because he was male.  The disparity between the base salary rates was based on a factor other than sex.  Cf. Horner v. Mary Inst., 613 F.2d at 714 ("There is evidence to find that

[the defendant paid the employee a higher salary] not because [employee] was male but . . . because a higher salary was necessary to hire him.  The differential was based on a factor other than sex.").  The Court therefore finds that, although Clayton can establish a prima-facie case that Kennedy was paid more than her for substantially equal work, summary judgment is appropriate, because Vanguard has proved that the disparity is based on a factor other than sex.  See Mickelson v. New York Life Ins. Co., 460 F.3d at 1311 (stating that, to prevail at the summary judgment stage, "the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary")(citation omitted).

**VII.   THE COURT WILL NOT GRANT SUMMARY JUDGMENT ON CLAYTON'S BREACH-OF-IMPLIED-CONTRACT CLAIM REGARDING PROGRESSIVE DISCIPLINE, BUT WILL GRANT SUMMARY JUDGMENT BASED ON VANGUARD'S NON-DISCRIMINATION AND INVESTIGATION POLICIES.**

Vanguard argues that its Associate Handbook does not contain promises sufficient to give rise to objectively reasonable expectation of an implied employment contract.  See Motion at 40. Vanguard argues that Clayton cannot establish that the general practice or conduct at Vanguard altered the disciplinary policy, as she oversaw the termination of four employees in her operation to whom she did not provide progressive discipline before they were terminated.  See Motion at 41.

Clayton contends that the Vanguard's Associate Handbook was sufficiently specific to create a reasonable expectation of an implied employment contract.  See Response at 31.  Clayton also argues that other general managers followed progressive discipline, which a jury could find created a reasonable expectation by Vanguard employees that they would be dismissed only in accordance with progressive discipline procedures.  See Response at 31.  Vanguard replies that the testimony of the other general managers fails to support a reasonable expectation, because they testified that there were times in which they did not follow progressive discipline.  See Reply at 19.

"An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783. "Whether an employer's words and conduct support a reasonable expectation on the part of employees that they will be dismissed only in accordance with specified procedures or for specified reasons generally is a question of fact for the jury." Meland v. E. N.M. Med. Ctr., 131 N.M. at 69, 33 P.3d at 289. In deciding whether to grant summary judgment, the question is whether a reasonable jury could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons. See Meland v. E. N.M. Med. Ctr., 131 N.M. at 69, 33 P.3d at 289.

The Associate Handbook states that it "does not constitute an expressed or implied employment contract." Associate Handbook at 6. It also states that employment with Vanguard is at-will -- meaning that "employment may be terminated with or without cause, as well as, with or without notice at any time at the option of either the associate or Vanguard." Associate Handbook at 12. The Associate Handbook provides that

> The specific nature of the offense will ultimately guide the level and course of corrective action. Suspension or termination is sometimes appropriate for certain types of offenses. There may be situations where these steps may be bypassed due to the serious nature of the offense.
>
> Corrective Action may involve four sequential steps:
> - Step I        Coaching Discussion
> - Step II       Documented Discussion
> - Step III      Written Warning
> - Step IV       Final Disposition

Associate Handbook at 18-19 (emphasis added). The Associate Handbook further states that, "[d]epending on the severity of a situation or policy violation, disciplinary action up to and including

immediate termination may be taken at the Company's sole discretion.  Involuntary terminations may occur as a result of reorganizations, job elimination, reduction of workforce, violation of Company policy or unsatisfactory performance."  Associate Handbook at 19.  Clayton signed an acknowledgment stating that she knew that her employment was at-will, and that she knew the Associate Handbook was not meant to create, in any way, an implied or express contract.  Although the Associate Handbook contains clear disclaimers that it is not meant to create an implied contract, language in an employment handbook that contradicts the disclaimers, or employment practices that contradict the disclaimers in an employment handbook may supercede the disclaimers.  See West v. Wash. Tru Solutions, LLC, 147 N.M. at 429, 224 P.3d at 656 ("[E]ven if an employee manual contains clear disclaimers, these may be superceded by other representations made by the employer outside of the manual -- for instance, in oral statements.").  There is language in the Associate Handbook that contradicts the disclaimers.  The Associate Handbook states: "The specific nature of the offense will ultimately guide the level and course of corrective action.  Suspension or termination is sometimes appropriate for certain types of offenses.  There may be situations where these steps may be bypassed due to the serious nature of the offense."  Associate Handbook at 18. A factfinder could find that this is evidence that Vanguard would follow its progressive discipline policies before terminating an employee, except in situations involving serious offenses -- where the employee could be terminated without progressive discipline.  Other evidence in the record indicates that Vanguard followed progressive discipline, except in the case of a serious offenses. Jared testified that she was required to follow progressive discipline, with the exception of offenses such as theft or employee violence.  See Jared Depo. at 68:3-12.  Villegas testified that he used progressive discipline, except in instances of theft or insubordination.  See Villegas Depo. at 32:15-25.

In Kiedrowski v. Citizens Bank, 119 N.M. 572, 893 P.2d 468 (Ct. App. 1995), the Court of Appeals of New Mexico addressed whether an implied contract existed.  See 119 N.M. at 575, 893 P.2d at 471.  The defendant argued that an implied contract could not exist, because its handbook disclaimed any contractual relationship and stated that employees could be discharged at any time for any reason.  See Kiedrowski v. Citizens Bank, 119 N.M. at 575, 893 P.2d at 471.  The Court of Appeals of New Mexico noted that a disclaimer does not automatically negate a document's contractual status, and must be read in reference to the parties' norms of conduct and the expectations that are founded on the norms of conduct.  See Kiedrowski v. Citizens Bank, 119 N.M. at 575, 893 P.2d at 471.  The Court of Appeals of New Mexico found that the defendant's

> handbook contains detailed disciplinary procedures which Bank managers must follow when disciplining employees.  Depending on the severity of an employee's performance problem, the handbook requires managers to respond with progressive discipline, in a gradually escalating fashion, first with an oral warning, then a written warning, written probation, suspension, and finally, termination.  Plaintiff stated in her affidavit, based on her own management experience, that the Bank instructed their managers to follow the disciplinary procedures outlined in the handbook.  Plaintiff herself, followed those same procedures when disciplining other employees, and the Bank applied those same procedures to Plaintiff in terms of a gradually escalating response to its alleged problems with her.  Therefore, Plaintiff can reasonably maintain that she relied on more than just a custom or vague inferences of not terminating employees at will.  The Bank's systematic application of its termination policies could reasonably create an expectation in Plaintiff that the same would be done in her case.  There is at least a genuine issue of material fact, for resolution by the jury, as to whether the Bank's handbook, combined with the Bank's actual practices and representations, created an expectation of "an implied-in-fact contract term limiting the employer's right to terminate at will."

Kiedrowski v. Citizens Bank 119 N.M. at 576, 893 P.3d at 472 (citation omitted).  Similarly, in this case, despite the disclaimers in the Associate Handbook, which state that the handbook did not create an implied contract and that employment with Vanguard was at will, the specific language in the handbook, stating that Vanguard may bypass its progressive discipline policy in some situations because of the serious nature of the offense, is evidence that Vanguard used progressive

discipline before terminating an employee, except in situations involving serious offenses.  There is also evidence that the practice of Vanguard's general managers was to use progressive discipline, except when employees committed serious offenses.  This evidence creates a genuine issue of material fact whether the language in the Associate Handbook, combined with Vanguard's employment practices, created a reasonable expectation that Vanguard would follow its progressive discipline policies, except in situations involving serious offenses such as theft.  There is also a genuine issue of material fact whether Clayton's signature on the letter was a serious offense warranting immediate termination without progressive discipline.  Although Murphy felt that Clayton's signature on the letter was a terminable offense, there is evidence that Villegas and Jared believed the offenses for which progressive discipline could be bypassed were offenses such as theft or employee violence.  Because a factfinder could conclude that Clayton's signature on the letter was not as serious an offense as theft, there is a genuine issue of material fact whether her offense warranted immediate termination.  Because there is a genuine issue of fact whether Clayton had a reasonable expectation that Vanguard would use progressive discipline, except in situations involving serious offenses, and whether Clayton's offense was sufficiently serious to warrant termination without progressive discipline, the Court will deny Vanguard's request that it grant summary judgment on Clayton's claim for breach of implied contract regarding progressive discipline.

Vanguard also moves for summary judgment on Clayton's claim for breach of implied contract based on Vanguard's policy which stated that it would not tolerate discrimination or harassment, and would investigate any complaints of discrimination or harassment.  See Motion at 41.  Although Clayton appears to have agreed to stipulate that her breach-of-implied contract claim is limited to progressive discipline, Clayton did not mention whether she had agreed to withdraw

her good-faith-and-fair-dealing claim regarding Vanguard's anti-discrimination and investigation policies.  Because the Court must decide whether there is an implied contract to decide whether there is an implied covenant of good faith and fair dealing, the Court will decide whether there is an implied contract based on Vanguard's anti-discrimination and investigation policies.  The Court believes that there is not a genuine issue of material fact regarding Clayton's claim.  Vanguard's non-discrimination policy states:

> Discrimination and harassment will not be tolerated . . . .  Vanguard encourages and expects reporting of all instances of harassment or discrimination. . . .  Retaliation against anyone who, in good faith, reports discrimination is strictly prohibited and will result in discipline up to an including termination. . . . or harassment and to take any necessary corrective action, up to and including termination.

Policy No. 1 -- Non-Discrimination at 1, filed October 25, 2010 (Doc. 142-10).  This policy prohibits harassment and discrimination on the basis of race, national origin, gender, age, and disability.  See Policy No. 1 -- Non-Discrimination at 1-4.  Another policy states: "Each report of a known or suspected violation [of Vanguard's policies] will be promptly and thoroughly investigated.  In all cases, the Corporate Compliance Committee . . . should carefully document all actions taken and decisions reached.  A report should be prepared even if the investigation reveals that no violation occurred."  Policy No. 29 -- Reporting and Investigating Violations and Seeking Clarification of Policies, filed October 25, 2010 (Doc. 142-10).

New Mexico courts have recognized implied contracts outside the context of limiting at-will employment.  See Beggs v. City of Portales, 146 N.M. at 373, 376-77, 210 P.2d at 799, 802-03 (finding a genuine issue of material fact whether an implied contract existed from a personnel policy provision that required the city to offer its retiring employees the option of continuing their health care coverage under the city's group plan, when the manual "exhaustively addressed 'all phases of Personnel Administration,'" covered every aspect of the employment relationship, and contained

language that the city "shall offer" its retiring employees health insurance benefits). The Court nonetheless does not believe that Vanguard's anti-discrimination policy creates an implied contract. The Court has not found a New Mexico case addressing whether an anti-discrimination policy creates an implied contract. New Mexico courts state, however, that an implied contract is created when a personnel manual creates a reasonable expectation that an employer will follow specified procedures, and that the "reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783. See Sanchez v. New Mexican, 106 N.M. at 78, 738 P.2d at 1324 ("[T]he evidence supports the Employer's contention that the handbook lacked specific contractual terms which might evidence the intent to form a contract. The language is of a non-promissory nature and merely a declaration of defendant's general approach to the subject matter discussed.").[54] The Court has found an analogous case from the Court of Appeals of New Mexico that used these general principles to reach its decision. In Ruegsegger v. Western New Mexico University Board of Regents, 141 N.M. 306, 154 P.3d 681 (Ct. App. 2006), the Court of Appeals of New Mexico addressed whether a student handbook, in which one provision was a sexual harassment policy that set forth the University's commitment to a environment free of sexual discrimination, created an implied contract. See 141 N.M. at 312-313, 154 P.3d at 687-88. The Court of Appeals found that the handbook's provisions provided guidelines and not a guarantee to specific rights. See 141 N.M.

---

[54] These principles find support in contract law. In general, consideration necessary to form a contract "requires a bargained-for benefit or detriment[;] [w]here an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration." 3 Williston on Contracts § 7:7 (4th ed.). See Piano v. Premier Distributing Co., 137 N.M. 57, 60, 107 P.3d 11, 14 (Ct. App. 2004)("A promise may be consideration for a promise if it is 'lawful, definite and possible.' However, a promise that 'puts no constraints on what a party may do in the future -- in other words, when a promise, in reality, promises nothing -- it is illusory and is not consideration." (internal citations omitted)).

at 313, 154 P.3d at 688.

>Review of these Handbook provisions indicates that, instead of contractually guaranteeing a right to specific types of investigation, support, and sanctions in the event of a sexual assault, they provide guidelines for the operation of WNMU. Therefore, they do not constitute the terms of an implied contract and do not contractually guarantee the rights asserted by Plaintiff. See Sanchez v. The New Mexican, 106 N.M. 76, 79, 738 P.2d 1321, 1324 (1987) (affirming the dismissal of an implied contract claim on grounds that "the handbook lacked specific contractual terms which might evidence the intent to form a contract . . . [insofar as the] language is of a non-promissory nature and merely a declaration of defendant's general approach"); Stieber v. Journal Publ'g Co., 120 N.M. 270, 274, 901 P.2d 201, 205 (Ct. App. 1995) (holding that general policy statements in a handbook are "insufficient to create an implied contract" because they are merely declarations of a general approach to the subject matter); see also Goodman v. President & Trustees of Bowdoin Coll., 135 F. Supp. 2d 40, 56 (D. Me. 2001) (holding that handbook language that "'[d]iscrimination . . . has no place in an intellectual community . . . [and] [s]uch practices violate both the ideals of the College and its Social Code and are subject to appropriate disciplinary sanctions'" does not indicate a contractual obligation by the college to refrain from discrimination). Even though the Student Handbook sets out a general framework of policies, we are not persuaded that the language contractually obligates WNMU to conduct any specific type of investigation, to provide support services, or to impose specific discipline.

141 N.M. at 313, 154 P.3d at 688. Similarly, Vanguard's policy, which states that discrimination and harassment will not be tolerated, is a general guideline, and the policy does not contain language specific enough to raise a reasonable expectation that Vanguard is guaranteeing a right to be free from discrimination.

>The Tenth Circuit has explained:

>In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. . . . The federal court must follow the most recent decisions of the state's highest court . . . . Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. . . . In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, . . . appellate decisions in other states with similar legal principles, . . . district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law . . . . Ultimately, however, the Court's task is to predict what the state supreme court would do.

Wade v. Emcasco Ins. Co., 483 F.3d 657, 665-66 (10th Cir. 2007)(citations and internal quotation marks omitted).  The Court believes that the Supreme Court of New Mexico would follow the Court of Appeal's decision in Ruegsegger v. W. N.M. Univ. Bd. of Regents, because it is an established principle in New Mexico law that the terms of the personnel manual must be "sufficiently explicit to create a reasonable expectation of an implied contract," Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 131 N.M. 607, 615-616, 41 P.3d 333, 342-43 (2001), and because the Court of Appeals relied on the language in an opinion from the Supreme Court of New Mexico, Sanchez v. New Mexican, in reaching its holding.

The Court has found several cases that have found that the language of an employer's anti-discrimination policy that solely contains a general statement of adherence to anti-discrimination laws does not create an implied contract.  In Peralta v. Cendant Corp., 123 F. Supp. 2d 65 (D. Conn. 2000), the United States District Court for the District of Connecticut stated:

> The language of the anti-harassment policy that plaintiff urges as the basis of his implied contract claim does not indicate that defendant is undertaking any contractual obligations towards the plaintiff; rather, it obliges Cendant to comply with federal and state anti-discrimination laws, and to undertake an investigation upon receiving complaints of discrimination and/or harassment.  Cendant is required to publicize its equal opportunity and anti-harassment policy, as well as the complaint procedure, in order to guard against liability under the discrimination laws.  See Faragher v. City of Boca Raton, 524 U.S. 775, 807 . . . (1998).  As any promises in the policy are general statements of adherence to the anti-discrimination laws, standing alone they do not create a separate and independent contractual obligation.  See Gally v. Columbia Univ., 22 F. Supp. 2d 199, 208 (S.D.N.Y. 1998) (anti-discrimination policy does not give rise to contractual liability); Belgrave v. City of New York, 1999 WL 692034 (E.D.N.Y.) (no breach of contract claim where employee claimed that employer failed to follow its procedures for providing equal opportunity to employees).

> The Court also notes that federal policy would not be served by allowing contractual recovery under such policies and procedures, as employers might thus be chary of publicizing and enforcing their complaint procedures.  See Malik[v. Carrier Corp.], 202 F.3d [97, 106 (2d Cir. 2000)]("The issue here is not the proper balance between employee rights and employer authority under state law.  The issue

> is how to ensure that federal policies are not undermined by imposing on employers legal duties enforceable by damages that reduce their incentives to take reasonable corrective action as required by federal law.")[.]

123 F. Supp. 2d at 83-84 (citation to the record omitted).  Similarly, the United States District Court for the District of South Dakota  granted summary judgment on a breach-of-contract claim seeking to enforce the anti-discrimination provisions in the employer's employee handbook, because the employer already must abide by Title VII and a promise to perform a legal duty is not consideration for a return promise.  See Mutua v. Tex. Roadhouse Mgmt. Corp., Civ. No. 09-4080, 2010 WL 4683859, at *14-15 (D.S.D. Nov. 10, 2010)(citation omitted); Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 254 (D. Conn. 2008)(recognizing that an "anti-discrimination policy" does not indicate that an employer is undertaking any contractual obligations towards the employee; rather, it requires the employer "to comply with federal and state anti-discrimination laws"); Gally v. Columbia Univ., 22 F. Supp. 2d at 208 (stating that a provision in the code of conduct requiring that all students receive fair and equal treatment is "merely a general statement of adherence by [the defendant] to existing anti-discrimination laws[;] [i]t does not create a separate and independent contractual obligation")(citation omitted).  The Court has found no case that has found an implied contract based solely on an anti-discrimination policy and the parties have not cited such a case.  The Court believes that the Supreme Court of New Mexico would not vary from this body of law, because the Supreme Court has recognized that "an agreement to do what one is already legally bound to do is not sufficient consideration for the promise to another," W. Bank of Santa Fe v. Biava, 109 N.M. 550, 551, 787 P.2d 830, 831 (1990).  In any case, these cases that the Court has found support the Court's conclusion that the policy's language that Vanguard will not tolerate harassment or discrimination on the basis of race, national origin, gender, age, and disability would not create an implied contract.

Vanguard's policy is broader than a statement of anti-discrimination; it also says that Vanguard will investigate complaints of discrimination.  Nevertheless, the Court believes that the statements in Vanguard's policies regarding investigation of complaints of discrimination set forth general guidelines for the investigation process, but do not contractually guarantee employees a right to investigation of a discrimination complaint.  In Ruegsegger v. W. N.M. Univ. Bd. of Regents, the Court of Appeals of New Mexico considered whether the language of the University's student handbook contractually obligated the University to conduct a specific type of investigation, to provide support services, or impose specific discipline.  See 141 N.M. at 313, 154 P.3d at 688.  The student handbook contained several portions that the plaintiff argued gave rise to an implied contract.

> The Student Handbook . . . contains a section on the Student Appeals Committee, which pertains to appeals from various committees including the disciplinary committee.  This section confers upon students the right to be present, bring witnesses, be accompanied by an attorney, and have no one but committee members present.  The section provides that "[t]he student" will be given verbal notification of the committee's decision and written notification will follow "in a timely manner."  This section does not clarify whether the phrase "[t]he student" refers to the student being disciplined, the complaining student, or both.
>
> The Handbook's "sexual harassment policy statement" consists of a general statement of WNMU's commitment to maintaining an environment free of sexual discrimination and "objectionable and disrespectful conduct and communication of a sexual nature."  Students who feel they have been harassed are encouraged to contact the Director of Affirmative Action/EEO.  Students are also encouraged to report "[c]onduct of a sexual nature" to "their immediate supervisor, and/or appropriate vice president, and/or Affirmative Action."
>
> The handbook also contains a section titled "RESPONSE TO AN ALLEGED SEXUAL ASSAULT" which states that "[t]he University has established the following Crisis Intervention Team to respond to any emergencies concerning sexual assaults."  It then states that the "Crisis Team is as follows" and lists (along with phone numbers) campus police, Vice President of Student Affairs, Vice President of Counseling, and Vice President of Housing.  This section recommends that at least two team members respond to any emergency and that the team should include male and female members when possible.

-104-

141 N.M. at 312, 154 P.3d at 687.   The Court of Appeals found that these provisions in the handbook indicated that, "instead of contractually guaranteeing a right to specific types of investigation, support, and sanctions in the event of a sexual assault, they provide guidelines for the operation of [the University][;] [t]herefore, they do not constitute the terms of an implied contract and do not contractually guarantee the rights asserted by [p]laintiff."   141 N.M. at 313, 154 P.3d at 688.   Similarly, the Court believes that the language regarding investigations in Vanguard's Associate Handbook contains mere declarations of Vanguard's approach to investigations, and are not sufficiently specific to create an implied contract.   Indeed, Vangaurd's policy is much less specific than the handbook in West v. Wash. Tru Solutions, LLC.   See West v. Wash. Tru Solutions, LLC, 147 N.M. at 429, 224 P.2d at 656 (finding issue of fact whether implied contract existed when a handbook contained language indicating "that managers and employees 'must' or were 'expected to' use the outlines procedures").   Vanguard's anti-discrimination policy states that it is Vanguard's policy to investigate complaints of discrimination or harassment.   This language is a general statement or a guideline regarding how complaints of discrimination will be handled.   This anti-discrimination policy states that it is Vanguard's policy to investigate any complaints of discrimination.[55]   It does not say Vanguard will investigate all complaints, and the phrasing does not contain mandatory language, such as, Vanguard must investigate all complaints of discrimination. This statement also does not contain any specific procedures for the investigation of complaints of discrimination.   Although federal anti-discrimination laws and New Mexico anti-discrimination laws do not require an employer to conduct investigations into allegations of discrimination, the Court

---

[55] In the following paragraph, the Court will discuss Vanguard's statement that it will investigate reports of violations of its policies, which is contained in its policy regarding investigation of complaints.

believes that Vanguard's statement that its policy is to investigate complaints of discrimination merely reinforces its wish to adhere to federal and state anti-discrimination laws. See Peralta v. Cendant Corp., 123 F. Supp. 2d at 83-84 ("[T]he anti-harassment policy . . . obliges [the defendant] to comply with federal and state anti-discrimination laws, and to undertake an investigation upon receiving complaints of discrimination and/or harassment. . . .  As any promises in the policy are general statements of adherence to the anti-discrimination laws . . . they do not create a separate . . . contractual obligation.").

Another policy states that Vanguard will promptly investigate reports of violations of its policies, and that in all cases, the actions taken to investigate should be documented, and a report should be prepared.  This language that Vanguard will promptly investigate, and should document that investigation, is similar to the language in Ruegsegger v. W. N.M. Univ. Bd. of Regents, which stated that students are encouraged to report sexual harassment and that the emergency response team should include male and female managers; the Court of Appeals found that the language in the student handbook was not specific enough to create a reasonable expectation that the University would be obligated to provide her a more comprehensive investigation and more support after her assault. See 141 N.M. at 312, 154 P.3d at 387.  See also Sanchez v. New Mexican, 106 N.M. at 78, 738 P.2d at 1324 ("[T]he evidence supports the Employer's contention that the handbook lacked specific contractual terms which might evidence the intent to form a contract.  The language is of a non-promissory nature and merely a declaration of defendant's general approach to the subject matter discussed."); Romero v. Earl, 111 N.M. 789, 791, 810 P.2d 808, 810 (1991)("Consideration adequate to support a promise is essential to enforcement of the contract . . . ."); Guest v. Allstate Ins. Co., 145 N.M. 797, 805, 205 P.3d 844, 852 (Ct. App. 2009)("Where a contract leaves it entirely optional for one of the parties to perform, the contract is not founded on mutual promises and is,

[without performance], not binding or enforceable." (citation omitted)). The Court believes that this language sets forth general guidelines of how Vanguard will conduct investigations. The policy states that Vanguard will not overlook complaints. The policy does not set forth a contractual obligation that Vanguard would investigate every complaint of discrimination, because it does not state that managers must investigate every complaint, and does not set forth detailed and mandatory procedures for how the complaints should be investigated. The Court therefore does not believe that the language is sufficiently specific, explicit, or mandatory to create a reasonable expectation that Vanguard contractually obligated itself to conduct an investigation into discrimination complaints. See Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783 ("The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon."). The Court does not believe that the language in Vanguard's policies regarding investigations is sufficiently specific to create a reasonable expectation that it would conduct an investigation of a discrimination complaint or that Vanguard's anti-discrimination policy would create an implied contract. Because the Court had to determine whether an implied contract based on Vanguard's anti-discrimination and investigation policies existed to decide Clayton's good-faith-and-fair-dealing claim regarding Vanguard's anti-discrimination and investigation policies, and because Clayton has not yet taken action to withdraw her claim for breach of implied contract regarding Vanguard's anti-discrimination and investigation policies, the Court will grant summary judgment on Clayton's breach of implied contract claim regarding Vanguard's anti-discrimination and investigation policies.

**VIII.  THE COURT WILL NOT GRANT SUMMARY JUDGMENT ON CLAYTON'S
CLAIM FOR GOOD FAITH AND FAIR DEALING REGARDING PROGRESSIVE
DISCIPLINE, BUT WILL GRANT SUMMARY JUDGMENT ON CLAYTON'S
CLAIM FOR GOOD FAITH AND FAIR DEALING BASED ON VANGUARD'S
ANTI-DISCRIMINATION AND INVESTIGATION POLICIES.**

Vanguard contends that Clayton's claims under the implied covenant of good faith and fair
dealing cannot withstand summary judgment, because she was an at-will employee.  See Motion at
44.  Vanguard further contends that, even assuming that the implied covenant of good faith and fair
dealing applies, Vanguard did not breach the covenant.  See Motion at 45.  Clayton did not respond
to Vanguard's argument regarding her claim for good faith and fair dealing in her Response.
Because Clayton failed to respond to Vanguard's arguments, the Court will grant summary judgment
on Clayton's claim if the facts and law support the entry of summary judgment.  Cf. Donnell v. City
of Cedar Rapids, 437 F. Supp. 2d at 928 n.11 ("Plaintiff does not respond to the [defendant's]
argument.  Where the nonmoving party fails to respond to a motion for summary judgment,
'summary judgment, if appropriate shall be entered . . . .'" (citing Fed. R. Civ. P. 56(c))).

"Whether express or not, every contract imposes upon the parties a duty of good faith and
fair dealing in its performance and enforcement."  Watson Truck & Supply Co. v. Males, 111 N.M.
at 60, 801 P.2d at 642 (citations omitted).  This rule means that, before the implied covenant of good
faith and fair dealing can exist, a contract must exist.  The Court has found that there is a genuine
issue of material fact whether an implied contract that Vanguard would follow progressive
discipline, except in situations involving serious offenses, existed.  In her Amended Complaint,
Clayton alleges that Vanguard failed in its duty of good faith and fair dealing, because of its failure
to comply with its "policies and procedures regarding progressive discipline . . . ."  Amended
Complaint ¶ 78, at 11.  "Broadly stated, the covenant [of good faith and fair dealing] requires that
neither party do anything which will deprive the other of the benefits of the agreement."  Watson

Truck & Supply Co. v. Males, 111 N.M. at 60, 801 P.2d at 642 (internal quotation marks omitted).

"Denying a party its rights to [the benefits of the agreement] will breach the duty of good faith implicit in the contract." Sanders v. FedEx Ground Package Sys., Inc., 144 N.M. 449, 452, 188 P.3d 1200, 1203 (2008)(citation omitted).  The covenant protects only against intentional affronts to a party's rights, or affronts that the breaching party is consciously aware of.  See Paiz v. State Farm Fire and Cas. Co., 118 N.M. 203, 213, 880 P.2d 300, 310 (1994).  A party can deny another party its rights to the benefits of the agreement in several ways, including interference with or failure to cooperate in the other party's performance.  See Sanders v. FedEx Ground Package Sys., Inc., 144 N.M. at 452, 188 P.3d at 1203.  Although there is no evidence that Vanguard interfered with Clayton's performance of the agreement or failed to cooperate with her performance, there is evidence that Vanguard denied her the benefits of an agreement regarding progressive discipline. The evidence in the record demonstrates a genuine issue of material fact whether Vanguard deprived Clayton of the benefits of any agreement that it would follow progressive discipline, except for serious offenses.  As the Court discussed previously, there is a genuine issue of material fact whether Clayton's signature on a letter was an offense that warranted termination without progressive discipline.  Although Murphy regarded Clayton's signature as a terminable offense, there is evidence that general managers used progressive discipline, except in situations involving offenses such as theft or employee violence.  A factfinder could find that Clayton's signature on a letter is not comparable to offenses such as theft; therefore, Vanguard should have used progressive discipline before terminating Clayton's employment.  Because there is a genuine issue of material fact whether Vanguard deprived Clayton of the benefits of an implied contract regarding progressive discipline, the Court will deny Vanguard's request that it grant summary judgment on Clayton's implied-covenant-of-good-faith-and-fair-dealing claim based on Vanguard's failure to follow its progressive

discipline policies.

Although the Court may not need to decide this issue if Clayton intends to withdraw the claim, she has not explicitly confirmed that she will do so any has not done so yet. In any case, the Court believes that Clayton's implied-covenant-of-good-faith-and-fair-dealing claim regarding Vanguard's failure to follow its anti-discrimination and investigation policies should not survive summary judgment, and so close to trial, Vanguard deserves a ruling. In her Amended Complaint, Clayton alleges that Vanguard failed in its duty of good faith and fair dealing because of its failure to comply with its "policies and procedures . . . , specifically harassment and hostile work environment policies." Amended Complaint ¶ 78, at 11. The Court of Appeals of New Mexico has stated that "an implied contract . . . only cover[s] those matters for which there were representations sufficiently specific for a reasonable employee to rely upon." West v. Wash. Tru Solutions, LLC, 147 N.M. at 432, 224 P.3d at 659. Although the Court has found that there is a genuine issue of material fact whether there was an implied contract that Vanguard would follow progressive discipline policies, except in cases of serious offenses, that implied contract is limited to progressive discipline matters. As the Court has stated, it does not believe that Vanguard's non-discrimination and investigation policies create an implied contract. There would be no contract on which to impose on Vanguard a duty to act in good faith.

**IT IS ORDERED** that the Court will grant in part and deny in part Defendant Vanguard Car Rental U.S.A. Inc.'s Motion for Summary Judgment, filed October 8, 2010 (Doc. 134). The Court denies Defendant Vanguard Car Rental U.S.A. Inc.'s request that it grant summary judgment on Plaintiff Christine Clayton's gender discrimination claim under Title VII and the NMHRA, her age discrimination claim under the ADEA and the NMHRA, her implied-contract claim regarding progressive discipline, and her implied-covenant-of-good-faith-and-fair-dealing claim regarding

progressive discipline.  The Court grants Vanguard's request that it grant summary judgment on

Clayton's EPA claim, on Clayton's implied contract claim regarding Vangaurd's anti-discrimination

and investigation policies, and Clayton's implied-covenant-of-good-faith-and-fair-dealing claim

regarding Vanguard's anti-discrimination and investigation policies.



_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

J. Edward Hollington
J. Edward Hollington & Associates, P.A.
Albuquerque, New Mexico

　　　　*Attorneys for the Plaintiff*

Bradford C. Berge
Jacqueline E. Davis
Holland & Hart, LLP
Santa Fe, New Mexico

-- and --

Brian Mumaugh
Holland & Hart, LLP
Greenwood Village, Colorado

　　　　*Attorneys for the Defendant*